# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

<table>
<tr><td>

BRYAN DAVID RANGE,

        Plaintiff,

v.

JEFFREY ROSEN, Acting Attorney
General of the United States, REGINA
LOMBARDO, Acting Director, Bureau of
Alcohol, Tobacco, Firearms, and Explosives,

        Defendants.

</td><td>

Civil Action
No. 20-cv-3488

</td></tr>
</table>

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, defendants Jeffrey Rosen, Acting Attorney General of the United States[1], and Regina Lombardo, Acting Director, Bureau of Alcohol, Tobacco, Firearms, and Explosives, (collectively, "defendants"), by and through their undersigned counsel, move for summary judgment because plaintiff Bryan David Range cannot distinguish himself from the category of persons historically barred from possessing firearms. He therefore fails to show that applying 18 U.S.C. § 922(g)(1) to him burdens his Second Amendment right.

Because Range cannot distinguish himself from this class of historically barred persons, his Second Amendment challenge fails. Even assuming that Range could meet his burden, applying section 922(g)(1)'s firearm restriction to him satisfies intermediate scrutiny review.

Applying the restriction to persons like Range reasonably relates to an important government

interest in removing firearms from a category of risky and potentially irresponsible citizens.

The reasons for this motion are set forth more fully in the attached memorandum of law.

Respectfully submitted,

WILLIAM M. MCSWAIN
United States Attorney

s/ Susan R. Becker for GBD
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

s/ Paul J. Koob
PAUL J. KOOB
ERIC D. GILL
Assistant United States Attorneys
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476
215-861-8432/8250 (phone)
215-861-8618 (facsimile)
Paul.Koob@usdoj.gov
Eric.Gill@usdoj.gov

*Attorneys for Defendants*

---

[1] When the Court docketed this matter, William Barr served as the Attorney General. Jeffrey Rosen has since assumed the office. An office's successor is "automatically substituted as a party." Fed. R. Civ. P. 25(d).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| BRYAN DAVID RANGE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action |
| v. | : | No. 20-cv-3488 |
| | : | |
| JEFFREY ROSEN, Acting Attorney | : | |
| General of the United States, REGINA | : | |
| LOMBARDO, Acting Director, Bureau of | : | |
| Alcohol, Tobacco, Firearms, and Explosives, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
## <u>FOR SUMMARY JUDGMENT</u>

**TABLE OF CONTENTS**

FACTUAL BACKGROUND..................................................................................................... 1

STANDARD OF REVIEW .................................................................................................... 2

ARGUMENT ........................................................................................................................ 3

    Range's Constitutional Challenge to Section 922(g)(1) Lacks Merit......................................... 3

        A.   Congress lawfully restricted firearms access to persons who have criminal backgrounds. .................................................................................................................... 4

        B.   In an as-applied challenge, the Court's inquiry ends if the restriction burdens no Second Amendment right. ...................................................................................................... 6

            1.   Persons who commit serious crimes lack Second Amendment rights........................ 7

            2.   Range fails to rebut the presumptive lawfulness of the firearms restriction because his crime was serious........................................................................................... 11

        C.   The firearm restriction substantially relates to an important governmental interest in protecting public safety................................................................................................... 15

CONCLUSION.................................................................................................................... 22

# Table of Authorities

**Supreme Court Cases**

*Abramski v. United States*, 573 U.S. 169 (2014) ................................................................. 15, 18, 21

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 3

*Barrett v. United States*, 423 U.S. 212 (1976) ................................................................. 16

*Clark v. Jeter*, 486 U.S. 456 (1988) ................................................................. 15

*Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103 (1983) ................................................................. 19

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................................................. 3, 4, 7, 8

*Huddleston v. United States*, 415 U.S. 814 (1974) ................................................................. 19

*Marks v. United States*, 430 U.S. 188 (1977) ................................................................. 7

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................................. 4

*Richardson v. Ramirez*, 418 U.S. 24 (1974) ................................................................. 8

*Schall v. Martin*, 467 U.S. 253 (1984) ................................................................. 16

*Spencer v. Kemna*, 523 U.S. 1 (1998) ................................................................. 8

*Tennessee v. Garner*, 471 U.S. 1 (1985) ................................................................. 12

*United Public Workers of Am. v. Mitchell*, 330 U.S. 75 (1947) ................................................................. 20

*United States v. Bean*, 537 U.S. 71 (2002) ................................................................. 20

*United States v. Salerno*, 481 U.S. 739 (1987) ................................................................. 15

**Federal Circuit Court Cases**

*Abdelqadar v. Gonzales*, 413 F.3d 668 (7th Cir. 2005) ................................................................. 11

*Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575 (3d Cir. 2009) ................................................................. 3

*United States v. Barton*, 633 F.3d 168 (3d Cir. 2011) ................................................................. 6, 7, 9

*Beers v. Attorney General*, 927 F.3d 150 (3d Cir. 2019), *judgment vacated on other grounds*, *Beers v. Barr*, ⸺ U.S. ⸺, 140 S. Ct. 2758 L.Ed.2d 933 (Mem.) (2020) ............. 7

*Binderup v. Attorney Gen.*, 836 F.3d 336 (3d Cir. 2016) (en banc) ...................................... passim

*Folajtar v. Attorney Gen. of the United States*, 980 F.3d 897 (3d Cir. 2020).............. 7, 12, 14, 17

*Hamilton*, 848 F.3d 614 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 500 (2017)............................ 11

*Heller v. Dist. of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ....................................... 16

*Holloway v. Attorney Gen. United States*, 948 F.3d 164 (3d Cir. 2020) ............................... passim

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ........................................................ 17, 18

*Lawrence v. City of Phila.*, 527 F.3d 299 (3d Cir. 2008)............................................... 3

*Medina v. Whitaker*, 913 F.3d at 153 (D.C. Cir. 2019) ............................................. 11

*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) ............................................. 19, 20

*Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016) (en banc).......................... 8

*United States v. Booker*, 644 F.3d 12 (1st Cir. 2011) ................................................. 4, 20

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)................................................ 6, 16, 21

*United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015)............................................ 19

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc)........................................ 8, 15, 20

## Federal District Court Cases

*Hamilton v. Pallozzi*, 165 F. Supp. 3d 315 (D. Md. 2016), *aff'd*,
848 F.3d 614 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 500 (2017)................................... 11

*Moore v. Giorla*, No. 14cv3873, 2018 WL 1516656 (E.D. Pa. Mar. 28, 2018)............................ 3

## Statutes

18 Pa. C.S.A. § 1104............................................................................. 1, 13

18 Pa. C.S.A. § 1105............................................................................. 13

18 Pa. C.S.A. § 6111(b) ................................................................................................ 18

18 Pa. C.S.A. § 6111(g) ................................................................................................ 18

18 U.S.C. § 921(a)(20) .................................................................................................... 6

18 U.S.C. § 922(a)(6) .................................................................................................... 18

18 U.S.C. § 922(g)(1) ...................................................................................................... 5

18 U.S.C. § 925(c) ........................................................................................................ 20

28 U.S.C. § 1865(b)(5) .................................................................................................... 8

62 Pa. C.S.A. § 481 (b) ................................................................................................. 13

62 Pa. C.S.A. § 481(a) .................................................................................................. 13

Pub. L. No. 75-785, 52 Stat. 1250 (1938) ....................................................................... 4

Pub. L. No. 87-342, 75 Stat. 757 (1961) ......................................................................... 4

Pub. L. No. 90-618, 82 Stat. 1213-14 ............................................................................. 5

## Rules

Fed. R. Civ. P. 56(a) ...................................................................................................... 2

## Lesiglative Material

114 Cong. Rec. 13,219 (1968) ........................................................................................ 5

H.R. Rep. No. 87-1202 (1961), *reprinted in* 1961 U.S.C.C.A.N. 3067 ......................... 4

Pub. L. No. 90-351, 82 Stat. 225 .................................................................................... 5

S. Rep No. 89-1866 ...................................................................................................... 19

S. Rep. No. 88-1340 ....................................................................................................... 5

S. Rep. No. 88-1340 (1964) ............................................................................................ 4

S. Rep. No. 89-1866 ....................................................................................................... 5

S. Rep. No. 89-1866 (1966) ................................................................................... 5

S. Rep. No. 90-1097, (1968) .................................................................................. 5

S. Rep. No.102-353 ............................................................................................... 20

**Secondary Sources**

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662 (1971) ............................... 8

3 *Wharton's Criminal Law* § 410 (15th ed.) ............................................................... 11

Black's Law Dictionary (10th ed. 2014) .................................................................... 12

Bureau of Justice Statistics, U.S. Dep't of Justice, Fact Sheet,
   *Profile of Nonviolent Offenders Exiting State Prisons*, (Oct. 2004) ........................................ 17

Bureau of Justice Statistics, U.S. Dep't of Justice, Special Report,
   *Recidivism of Prisoners in 30 States Released in 2005: Patterns from 2005 to 2010*
   (Apr. 2014) .......................................................................................... 17

David Yassky, *The Second Amendment: Structure, History, & Constitutional Change,*
   99 MICH. L. REV. 588 (2000) ........................................................................... 7

Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*,
   82 MICH. L. REV. 204 (1983) ........................................................................... 8

Garen J. Wintemute, *et al.*, *Prior Misdemeanor Convictions as a Risk Factor
   for Later Violent and Firearm-Related Criminal Activity Among Authorized
   Purchases of Handguns*. 280 J. AM. Med. Ass'n 2083 (1998) .............................................. 18

Mona A. Wright et al., *Effectiveness of Denial of Handgun Purchase to Persons
   Believed to Be at High Risk for Firearm Violence*, 89 Am. J. Pub. Health 88 (1999) ............ 18

**State Court Cases**

*Comm. v. Hill*, 210 A.3d 1104 (Pa. Super. Ct. 2019) ..................................................... 18

Plaintiff Bryan David Range, a welfare fraud convict, seeks a court order that 18 U.S.C. § 922(g)(1), the felon-in-possession statute, is unconstitutional as applied to him. The Court should grant summary judgment for defendants because the restriction is presumptively lawful, and Range fails to carry his burden of distinguishing himself from those convicted of serious crimes. Fraud crimes are inherently serious—the antithesis of virtuous conduct that defines the Second Amendment right. Furthermore, although the Court does not need to reach the issue, the firearm restriction reasonably relates to the government's important interest in keeping firearms out of the hands of persons likely to misuse them.

## FACTUAL BACKGROUND

On August 8, 1995, in the Court of Common Pleas of Lancaster County, Pennsylvania, Range pled guilty to making a false statement to fraudulently obtain public assistance. Compl. ¶ 7. Specifically, he falsified his income when he and his wife jointly applied to receive approximately $2,458 in welfare assistance in violation of 62 Pa. C.S.A. § 481(a). *Id.* The Court of Common Pleas sentenced him to three years of probation; he was assessed a $100 fine, $288.29 in costs and eventually paid $2,458 in restitution. Compl. ¶ 9.

The overwhelming majority of states treat welfare fraud for the amount Range stole very seriously. Under Pennsylvania law, Range's crime was graded as a first-degree misdemeanor, which is punishable by up to five years' imprisonment. *See* 18 Pa. C.S.A. § 1104(1); Compl. ¶¶ 7-8. In the attached survey, *forty-two* states treat welfare fraud in the amount Range stole to be a felony, in many cases punishable by a year or more in prison. *See Defendants' 50 State Survey,* attached hereto as Exhibit 1. The amount of welfare fraud that triggers felony status varies, with some states treating a $100 violation as a potential felony, and others $2,500. *Id. (see* Arkansas

statutory threshold at $100 or more and Colorado statutory threshold at $2,500). In any event, Range's theft falls at the higher range of those states which treat this crime as a felony. By contrast, *only seven* states treated a similar crime as a misdemeanor, and one state was equivocal in its treatment.

Range claims to be ignorant that his conviction prevented him from owning a firearm until years later. *See* December 30, 2020 Deposition of Bryan David Range ("Range Dep.") at 17-18, 20-21, excerpts attached hereto as Exhibit 2. However, he was prevented from purchasing a hunting rifle in 1998. Range Dep. 18-19. Specifically, Pennsylvania's Instant Check System ("PICS") prevented Range from buying the rifle at a gun store. *Id.* Shortly thereafter and knowing that the PICS system had denied him the ability to purchase a rifle, his wife circumvented that denial by buying the hunting rifle for him. Range Dep. 14-16; 21-22. Range possessed that hunting rifle and a shotgun until he lost both firearms in a house fire in 2006. Range Dep. at 15. After the fire and knowing that he could not legally purchase a firearm because of the PICS system, Range's wife bought him another hunting rifle. Range Dep. at 16-17. He possessed that rifle for a few years of ownership before selling it to a gun shop. Range Dep. at 15-16.

Finally, in 2011, Range violated the law again. Range committed summary offenses of making a false statement and fishing without a license. Range Dep. Tr. at 37-39. He paid a summary fine of $200. *See* Plaintiffs' Response to Defendants' Interrogatories at 3-4, excerpts attached hereto as Exhibit 3.

## STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion

for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

The standard governing summary judgment is identical when the Court considers cross-motions for summary judgment. *See Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). When confronted with cross-motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Moore v. Giorla*, No. 14cv3873, 2018 WL 1516656, at *2 (E.D. Pa. Mar. 28, 2018) (citations omitted).

## ARGUMENT

The Court should grant summary judgment for defendants because Range fails to show that applying 18 U.S.C. § 922(g)(1) to him burdens his Second Amendment right. Even if Range could make such a showing, summary judgment for defendants remains proper because applying the firearm restriction to those who are not law-abiding reasonably relates to an important government interest in preventing crime and protecting the public, thus satisfying intermediate scrutiny review.

### Range's Constitutional Challenge to Section 922(g)(1) Lacks Merit.

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation," but "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 592, 626 (2008). The Supreme Court in *Heller* identified the right as belonging to "law-abiding, responsible citizens," *id.* at 635, and, consistent with that understanding, it stated that "nothing in [its]

3

opinion should be taken to cast doubt" on "longstanding prohibitions on the possession of firearms by felons," *id.* at 626. The Court described this "permissible" measure as falling within "exceptions" to the right to bear arms. *Id.* at 635. Two years later, a plurality of the Court "repeat[ed]" its "assurances" that *Heller*'s holding "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626).

A.   **Congress lawfully restricted firearms access to persons who have criminal backgrounds.**

"Enacted in its earliest incarnation as the Federal Firearms Act of 1938," the firearm restriction codified at 18 U.S.C. § 922(g)(1) "initially covered those convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary, but extended to both felons and misdemeanants convicted of disqualifying offenses." *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *see* Federal Firearms Act, Pub. L. No. 75-785, §§ 1(6), 2(f), 52 Stat. 1250, 1250-51 (1938). In 1961, Congress amended the Federal Firearms Act of 1938, 15 U.S.C. §§ 901 *et seq.*, to prohibit any person convicted of a "crime punishable by imprisonment for a term exceeding one year" from "receiv[ing] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961), *codified at* 18 U.S.C. § 922(g).

Congress introduced this amendment as "an integral part of an anticrime legislative program" in response to the "exploding crime rate." H.R. Rep. No. 87-1202, at 2 (1961), *reprinted in* 1961 U.S.C.C.A.N. 3067, 3068. Its purpose was to "make it more difficult for the criminal elements of our society to obtain firearms." *Id.* After an additional, multi-year inquiry that included "field investigation and public hearings," S. Rep. No. 88-1340, at 1 (1964),

Congress determined that the ease through which firearms could be obtained by "criminals . . . and others whose possession of such weapons is similarly contrary to the public interest is a significant factor in the prevalence of lawlessness and violent crime in the United States," Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(2), 82 Stat. 225.

During this inquiry, Congress identified "a serious problem of firearms misuse in the United States," S. Rep. No. 89-1866, at 53 (1966), and a "relationship between the apparent easy availability of firearms and criminal behavior," *id.* at 3. Law enforcement officials testified to the "tragic results" of firearms misuse by persons with prior criminal convictions. S. Rep. No. 88-1340, at 12, 17-18. Statistical evidence likewise showed "the terrible abuse and slaughter caused by virtually unrestricted access to firearms by all individuals, regardless of their backgrounds." 114 Cong. Rec. 13,219 (1968) (statement of Sen. Tydings). Aiming to "reduce the likelihood that [firearms] fall into the hands of the lawless or those who might misuse them," S. Rep. No. 89-1866, at 1, Congress included in the Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213-14, additional statutory provisions limiting firearms access by persons with "criminal background[s]," S. Rep. No. 90-1097, at 28 (1968).

These restrictions are now codified at 18 U.S.C. § 922(g)(1). That statute provides that "[it] shall be unlawful for any person . . . who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year . . . to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1). The prohibition includes an exception. It does not apply to "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights

restored . . . unless such pardon, expungement, or restoration of civil rights expressly provides

that the person may not ship, transport, possess, or receive firearms." *Id.* § 921(a)(20).

B.    **In an as-applied challenge, the Court's inquiry ends if the restriction burdens no Second Amendment right.**

An as-applied challenge "does not contend that a law is unconstitutional as written but

that its application to a particular person under particular circumstances deprived that person of

a constitutional right." *See Binderup v. Attorney Gen.*, 836 F.3d 336, 345 (3d Cir. 2016) (en

banc). Under the *Binderup* framework, there are two-steps in evaluating an as-applied

challenge to a firearm regulation.

At step one, a challenger must prove "that a presumptively lawful regulation burdens his

Second Amendment rights." *Id.* at 346-47. In other words, the burden is on the challenger of the

regulation to show that "the challenged law imposes a burden on conduct falling within the scope

of the Second Amendment's guarantee." *Id.* at 346  (quoting *United States v. Marzzarella*, 614

F.3d 85, 89 (3d Cir. 2010)). If the regulation does not impose such a burden, it "must stand" and

the Court's inquiry is at an end. *See id.*  In carrying out this analysis, the Court "will presume the

judgment of the legislature is correct and treat any crime subject to § 922(g)(1) as disqualifying

unless there is a *strong reason* to do otherwise." *Id.* at 351 (emphasis added) .

To satisfy step one, the challenger must "clear two hurdles: he must (1) identify the

traditional justifications for excluding from Second Amendment protections the class of which

he appears to be a member, and then (2) present facts about himself and his background that

distinguish his circumstances from those of persons in the historically barred class." *Id.* at 347

(citing *United States v. Barton*, 633 F.3d 168, 173-74 (3d Cir. 2011)). In 2016, a divided Court of

Appeals for the Third Circuit granted the only successful as-applied constitutional challenges to

section 922(g)(1). *See Binderup*, 836 F.3d at 346[2]; *Holloway v. Attorney Gen. United States*, 948 F.3d 164, 176 (3d Cir. 2020).

      1.      <u>Persons who commit serious crimes lack Second Amendment rights.</u>

The court in *Binderup* clarified the first hurdle of step one by defining the traditional justification for excluding convicted felons from Second Amendment protections. 836 F.3d at 348. The court identified the justification, which "dates back to our founding era," as being that some criminal offenders were "'unvirtuous' because they committed serious crimes." *Id.* at 349. As one commentator observed, "[t]he average citizen whom the Founders wished to see armed was a man of republican virtue." David Yassky, *The Second Amendment: Structure, History, & Constitutional Change*, 99 MICH. L. REV. 588, 626 (2000). Thus, "[i]n the parlance of the republican politics of the time, these limitations were sometimes expressed as efforts to disarm the 'unvirtuous.'" *Binderup*, 836 F.3d at 348 (citation omitted). Persons who are unvirtuous by committing a serious crime "forfeit the right to possess firearms much the way they 'forfeit other civil liberties, including fundamental constitutional rights.'" *Id.* at 349 (quoting *Barton*, 633 F.3d at 175); *see also Folajtar v. Attorney Gen. of the United States*, 980 F.3d 897, 902 (3d Cir. 2020).

The conclusion that criminal convictions are disqualifying rests on sound "historical justifications," *Heller*, 554 U.S. at 635, because "[f]elons simply did not fall within the benefits of the common law right to possess arms," *Binderup*, 836 F.3d at 349  (Ambro, J.) (quoting Don

---

[2] Although no single opinion in *Binderup* garnered a majority, this Court has treated as controlling Judge Ambro's opinion announcing the judgment of the Court. *See Beers v. Attorney General*, 927 F.3d 150, 155-56 (3d Cir. 2019), *judgment vacated on other grounds*, *Beers v. Barr*, ⸺ U.S. ⸺, 140 S. Ct. 2758, 206 L.Ed.2d 933 (Mem.) (2020); *see also Binderup*, 836 F.3d at 356-57  (Ambro, J.) (announcing "the law of our Circuit" based on an analysis under *Marks v. United States*, 430 U.S. 188, 193 (1977)).

B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1983)). That common-law tradition is reflected in the background of the Second Amendment itself. "*Heller* identified as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citation omitted) (quoting *Heller*, 554 U.S. at 604). That report expressly recognized the permissibility of disarming convicted criminals, stating that "citizens have a personal right to bear arms '*unless for crimes committed*, or real danger of public injury.'" *Skoien*, 641 F.3d at 640 (emphasis added) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)).

In this respect, the right to keep and bear arms is analogous to other civic rights that have historically been subject to forfeiture by individuals convicted of crimes, including the right to vote, *see Richardson v. Ramirez*, 418 U.S. 24, 56 (1974), the right to serve on a jury, 28 U.S.C. § 1865(b)(5), and the right to hold public office, *Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998). Just as Congress and the States have required persons convicted of felonies to forfeit civic rights, section 922(g)(1) permissibly imposes a firearms disability "as a legitimate consequence of a felony conviction." *Tyler v. Hillsdale Cty. Sherriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in judgment).

Under *Binderup*, a serious criminal offense is not rendered non-serious for lack of a formal element of violence.  836 F.3d at 348; *see also Holloway*, 948 F.3d at 174 ("[T]he fact that an offense does not include the use or threatened use of violence does not mean it is not serious."). "People who have committed or are likely to commit 'violent offenses'—crimes 'in which violence (actual or attempted) is an element of the offense,'—undoubtedly qualify as

8

'unvirtuous citizens' who lack Second Amendment rights." *Binderup, 836 F.3d.* at 348 (citation omitted). The Supreme Court recognized, however, "longstanding prohibitions on the possession of firearms by felons," not just violent felons. *Id.* (citation omitted). The category of unvirtuous citizens is "thus broader than violent criminals; it covers any person who has committed a serious criminal offense, violent or nonviolent." *Id.* (citation omitted).

Accordingly, to bring a successful as-applied challenge and clear the second hurdle in step one, the challenger generally must show that he or she was not convicted of a serious crime, thereby making himself or herself a "virtuous citizen" instead. *Id.* at 348. In other words, the challenger must "present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." *Id.* at 347. Elaborating on this hurdle, the court in *Binderup* agreed with its earlier decision in *Barton* that "a challenger may show that he never lost his Second Amendment rights because he was not convicted of a serious crime." *Id.* at 349 (citing *Barton,* 633 F.3d at 174). "[B]eing convicted of a non-serious crime does not demonstrate a lack of 'virtue' that disqualifies an offender from exercising [his Second Amendment] rights." *Id.* The court otherwise rejected the *Barton* court's holding that "the passage of time or evidence of rehabilitation will restore" Second Amendment rights. *Id.*

The *Binderup* court recognized that "the category of serious crimes changes over time as legislative judgments regarding virtue evolve," and therefore set forth a non-exhaustive list of factors for courts to consider in evaluating whether challengers have presented sufficient facts at step one to "distinguish[ ] their circumstances from persons historically excluded from the right to arms." *Id.* at 351, 353. The Third Circuit instructed that, in evaluating an as-applied challenge to the constitutionality of section 922(g)(1), courts should consider: (1) whether a state classifies the offense as a misdemeanor or felony; (2) whether an offense involves violent criminal

conduct, i.e., that violence (actual or attempted) is an element of the offense; (3) the severity of

the sentence imposed on the challenger; and (4) whether there is cross-jurisdictional consensus

regarding the seriousness of the disqualifying crime. *Id.* at 351-52. *see also Holloway*, 948 F.3d

at 172 ("There are no fixed rules for determining whether an offense is serious but various

factors may be informative including, but not limited to, whether the crime poses a danger or risk

of harm to self or others, whether the crime involves violence or threatened violence, the

classification of the offense, the maximum penalty, the penalty imposed, and how other

jurisdictions view the crimes.).

The *Binderup* Court suggested that absent even one of those indications that the crimes

were not serious, the plaintiffs in *Binderup* could not "have distinguished their circumstances

from those of persons historically excluded from the right to arms." *Binderup*, 836 F.3d at 353

(Ambro, J.); *see generally, Holloway*, 948 F.3d 164 (finding challenger's crime sufficiently

serious despite three of the four factors falling in challenger's favor). Addressing the cross-

jurisdictional consensus, for example, the *Binderup* Court noted that, "[w]ere [the plaintiffs]

unable to show that so many states consider their crimes to be non-serious, it would be difficult

for them to carry their burden." 836 F.3d at 353 (Ambro, J.)

2.    Range fails to rebut the presumptive lawfulness of the firearms restriction because his crime was serious.

Range cannot prevail at summary judgment "merely on his say-so," and instead must make a "strong" showing "to rebut the presumptive lawfulness" of the statute. *Id*. at 347. The *Binderup* factors confirm that Range committed a serious offense and, thus, forfeited his Second Amendment rights. Applying the *Binderup* factors, Range fails to meet his burden of distinguishing himself from other persons convicted of serious crimes.

Range was convicted of a fraud offense. Criminalization of fraud dates to before the founding. *See* 3 *Wharton's Criminal Law* § 410 (15th ed.) (a 1757 English statute established the crime of false pretense, subject to "imprison[ment] . . . for the term of seven years"); *see also Hamilton v. Pallozzi*, 165 F. Supp. 3d 315, 326 (D. Md. 2016), *aff'd*, 848 F.3d 614 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 500 (2017) (stating fraud "is the kind of misconduct that the law has proscribed since time immemorial."). Thus, fraud offenses have been serious for centuries.

That understanding has continued uninterrupted. As the Fourth Circuit recently observed, "[t]heft, fraud, and forgery are not merely errors in filling out a form or some regulatory misdemeanor offense; these are significant offenses reflecting disrespect for the law." *Hamilton*, 848 F.3d 614, 627 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 500 (2017); *Abdelqadar v. Gonzales*, 413 F.3d 668, 671 (7th Cir. 2005) (Easterbrook, J.) ("Crimes entailing deceit or false statement are within the core of the common-law understanding of 'moral turpitude.' "). That "disregard for the basic laws and norms of our society is precisely what differentiates a criminal from someone who is 'law-abiding.'" *Medina v. Whitaker*, 913 F.3d at 153, 160 (D.C. Cir. 2019).

Range's conduct cannot be divorced from the concept of virtue that underlies the Second Amendment right and the *Binderup* court's analysis. Virtue means "[m]oral goodness of

11

character and behavior." Black's Law Dictionary (10th ed. 2014). The *Binderup* court recognized the "common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens," explaining the close link between the Second Amendment right and virtuous conduct. 836 F.3d at 848 (citation omitted). Range cannot reasonably distinguish himself from the class of unvirtuous citizens when he lied to obtain government assistance. Such conduct is not virtuous, responsible, or law-abiding.

The Third Circuit agrees that fraud crimes are serious. In *Folajtar*, the Court found that a felony conviction for submitting a false tax return was sufficiently serious to justify disarmament. 980 F.3d at 910. In discussing the seriousness of the offense, the Court wrote that Folajtar, "willfully deprived the Government of its property. This act is no less serious than larceny, one of the nine common law felonies, or forgery, one of the first felonies in the United States." *Id.* Both Folajtar and Range "willfully deprived the Government of its property," *see id.*, and, in Range's case, he stole public assistance benefits—government property reserved for the neediest citizens.

Range's crime is only distinguishable from *Folajtar*'s in its classification. But the Third Circuit has cautioned that the distinction is not dispositive for at least two reasons. First, the difference between felonies and misdemeanors is "minor and often arbitrary . . . [and] some states do not use the distinction at all." *Holloway*, 948 F.3d at 174 (internal citations and quotations omitted). "Second, 'numerous misdemeanors involve conduct more dangerous than many felonies.'" *Id.* at 175 (citing *Tennessee v. Garner*, 471 U.S. 1, 14 (1985)). *Holloway*'s analysis is consistent with the views espoused in *Binderup*. As the court observed there, "[t]his is not to say that state misdemeanors cannot be serious," and "the maximum possible punishment is certainly probative of a misdemeanor's seriousness." 836 F.3d at 352. Although

12

Range's crime does not entail violence, the Commonwealth imposes a punishment of up to five years in prison for securing public assistance through willfully making a false statement, *see* 62 Pa. C.S.A. §§ 481(a) & (b). The Pennsylvania criminal code is unusual in that many of its misdemeanor crimes are the functional equivalent of felonies, punishable by more than one year of imprisonment. *See* 18 Pa. C.S.A § 1104. The legislature chose to punish Range's offense far beyond a traditional felony, forgoing classification as a misdemeanor of a lesser degree, or even a "summary offense." *See id.* (first degree misdemeanor punishable by five years, second degree by two years, and third degree by one year); *id.* § 1105 (summary offense punishable by 90 days). That substantial imprisonment term "reflects the serious of the offense" despite the misdemeanor label. *See Holloway*, 948 F.3d at 176 & n.14 (citation omitted) (finding that the maximum penalty of up to five years' imprisonment for DUI, irrespective of its misdemeanor label, reflected the seriousness of the offense).

Moreover, the overwhelming majority of states label Range's conduct a felony. A survey of public assistance fraud statutes across the fifty states shows that forty-two states classify Range's conduct—fraudulently obtaining public assistance benefits at nearly $2,500— as a felony. *See* Defendants' Fifty State Survey of Laws Criminalizing Fraud in Obtaining Public Assistance Benefits, attached as Exhibit 1. While Pennsylvania is among just a small handful of states—seven total—that treat Range's conduct as a misdemeanor, the Commonwealth's punishment for Range's conduct is just as severe and, in many cases, more severe than those jurisdictions labeling the crime a felony. *See* Exhibit 5. The Court should exercise deference to the Pennsylvania General Assembly's determination that public assistance fraud is a serious crime and merits serious penalties. *See Holloway*, 948 F.3d at 175 ("[T]he maximum penalty that may be imposed often reveals how the legislature views an

offense."); *Folajtar*, 980 F.3d at 906 ("In upholding Congress's decision to disarm individuals"

falling within the ambit of Section 922(g)(1) , the court "respect[s] the legislatures' choices

about which crimes count as serious and preserve[s] the states' traditional autonomy to define

crimes [and] punishments.") (internal quotations and citations omitted). Finally, in contrast to

those plaintiffs in *Binderup*, the forty-two jurisdictions' characterization of public assistance

fraud as a felony underscores the "cross-jurisdictional consensus" that Range's crime is serious.

*See* 836 F.3d at 351, 353 852 (Ambro, J., joined by two judges) (noting that the "vast majority"

of states did not criminalize the conduct for which Binderup was convicted).

    Therefore, Range is "unable to show that so many states consider [his] crime[] to be

non-serious," and therefore he cannot carry his burden at the first stage of the *Binderup*

analysis. *See id.* There is therefore no need to proceed to means-end scrutiny to uphold

application of section 922(g)(1) to Range. *See Folajtar*, 980 F.3d at 910 (declining to "proceed

to Step Two" of the analysis because application of the prohibition fell outside of the

challenger's fraud offense).

    Finally, circuit precedent squarely forecloses Range's efforts to paint himself as

rehabilitated or an upstanding citizen. The "sole focus" in determining "the constitutional sweep

of statutes like § 922(g)(1) at step one" is the "seriousness of the purportedly disqualifying

offense." *Binderup*, 836 F.3d at 350. The Court does not consider the challenger's rehabilitation

or the passage of time, because "[t]here is no historical support for the view that the passage of

time or evidence of rehabilitation can restore Second Amendment rights that were forfeited." *Id.*

And in any event, Range would fail in any such efforts; he has admitted to repeatedly relying on

his wife's acquisition of firearms, which allowed him on two occasions to evade the section

922(g)(1) prohibition. *See* Range Dep. Trans. pp. 21-22:21-17; *See Abramski v. United States*,

573 U.S. 169, 193 (2014) ("No piece of information is more important under federal firearms law than the identity of a gun's purchaser—the person who acquires a gun as a result of a transaction with a licensed dealer. Had Abramski admitted that he was not that purchaser, but merely a straw—that he was asking the dealer to verify the identity of, and run a background check on, the wrong individual—the sale here could not have gone forward."). Accordingly, Range fails to carry his burden under step one, and the Court should grant summary judgment for defendants.

C.    **The firearm restriction substantially relates to an important governmental interest in protecting public safety.**

The Court should grant summary judgment for defendants without reaching any other issues, because the Court proceeds to evaluate step two of the *Binderup* framework only if the challenger succeeds in showing that the law burdens conduct within the Second Amendment's scope. *See* 836 F.3d at 347. Range cannot make such a showing, as discussed above. If the Court finds it to necessary to consider step two, then "the burden shifts to the Government to demonstrate that the regulation satisfie[s] some form of heightened scrutiny [.]" *Id.* .

To satisfy intermediate scrutiny, "a statutory classification must be substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). A primary governmental objective underlying section 922(g)(1) is to protect the public from "armed mayhem" in the form of firearms violence, and thereby to preserve peace and public safety. *Binderup*, 836 F.3d at 353. (quoting *Skoien*, 614 F.3d at 642). Protecting public safety and combating crime are well-established compelling governmental interests. *See United States v. Salerno*, 481 U.S. 739, 748 (1987) (noting that the Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances,

15

outweigh an individual's liberty interest"). Indeed, "[t]he 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted." *Schall v. Martin*, 467 U.S. 253, 264 (1984) (citations omitted).

To satisfy its burden, the government need only show that barring persons such as Range from possessing firearms is a measure that "fits reasonably" with its interest in protecting the community from crime. *Marzzarella*, 614 F.3d at 98. "The regulation need not be the least restrictive means of serving the interest, but may not burden more [protected conduct] than is reasonably necessary." *Id*. (citations omitted). To show such a reasonable fit, the government "must 'present some meaningful evidence . . . to justify its predictive . . . judgment[]'" that a person like Range is more likely to misuse a firearm. *Binderup*, 836 F.3d at 354 (Ambro, J., joined by two judges) (quoting *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1259 (D.C. Cir. 2011)). The government may rely on "evidence in the record" or simply "common sense." *Id.*

Evidence in the record and common sense demonstrate a substantial fit between disarming citizens such as Range and the government's interest in protecting public safety. *See id*. at 353-56. (Ambro, J., joined by two judges) (discussing intermediate scrutiny); *see also id.* at 397-98, 402 (Fuentes, J., joined by six judges) (same). "Courts have identified Congress's objective in passing § 922(g) as 'keep[ing] guns out of the hands of presumptively risky people' and 'suppressing armed violence.'" *Id.* at 339 (Fuentes, J.) (citation omitted); *see also Barrett v. United States*, 423 U.S. 212, 220 (1976) (citing legislative history reflecting a concern with "keeping firearms out of the hands of categories of potentially irresponsible persons").

Persons convicted of defrauding the government present a type of risk that animated Congress to enact the firearms restriction in 18 U.S.C. § 922(g)(1). As the *Folajtar* court observed, "there is good reason not to trust felons, even nonviolent ones, with firearms." 980

F.3d at 909. Citing statistics from the U.S. Department of Justice, Bureau of Justice Statistics, the

court noted the small difference in likelihood of recidivism between fraud offenders, like Range,

and more violent criminals:

> About thirty percent of burglars and twenty-five percent of drug offenders who were
> sentenced to at least a year of imprisonment were subsequently arrested for a violent
> crime within five years of their release from state prison, compared with about twenty
> percent of fraud or forgery offenders. *Id.* The dissent admits that "disarming burglars and
> drug dealers makes sense," Dissenting Op. ——, but the small difference in the risk of
> future violent crime between those crimes and fraud cannot support the dissent's position
> that the legislature can use these "rules of thumb" to disarm burglars and drug dealers,
> but not felons for fraud crimes.

*Folajtar*, 980 F.3d at 909.

Additional studies support the reasonable fit between the § 922(g)(1) restriction and the

government's compelling interest in protecting communities from crime. "For example, a study

of 210,886 nonviolent offenders released from prison in 1994 demonstrated that approximately

one in five offenders was rearrested for violent offenses within three years of his or her release."

*Kanter v. Barr*, 919 F.3d 437, 449 (7th Cir. 2019) (citing Bureau of Justice Statistics, U.S. Dep't

of Justice, Fact Sheet, *Profile of Nonviolent Offenders Exiting State Prisons*, tbl.11, at 4 (Oct.

2004)).[3] And a separate study of 404,638 state prisoners released in 2005 found that nearly 30%

of individuals incarcerated for a property offense were later rearrested for a violent crime. *See*

Bureau of Justice Statistics, U.S. Dep't of Justice, Special Report, *Recidivism of Prisoners in 30*

*States Released in 2005: Patterns from 2005 to 2010*, at 1, 9 (Apr. 2014).[4] Yet another study has

found that the "denial of handgun purchase[s] [for felons] is associated with a reduction in risk

for later criminal activity of approximately 20% to 30%." Mona A. Wright et al., *Effectiveness of*

---

[3] http://bjs.gov/content/pub/pdf/pnoesp.pdf.
[4] https://bjs.gov/content/pub/pdf/rprts05p0510.pdf.

*Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence*, 89

Am. J. Pub. Health 88, 89 (1999). Finally, a study of 5,923 handgun purchasers revealed that

after a fifteen-year observation period, the 3,128 purchasers that had at least one conviction for a

misdemeanor offense "were more than seven times as likely as those with no prior criminal

history to be charged with a new offense after [the] handgun purchase." Garen J. Wintemute, *et*

*al.*, *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related*

*Criminal Activity Among Authorized Purchases of Handguns*. 280 J. AM. Med. Ass'n 2083,

2083 (1998). More specifically, those same offenders are also far more likely to commit violent

offenses: "even handgun purchasers with only 1 prior misdemeanor conviction and no

convictions for offenses involving firearms or violence were nearly 5 times as likely as those

with no prior criminal history to be charged with new offenses involving firearms or violence."

*Id.* The Seventh Circuit approvingly cited this study in denying a Second Amendment challenge

to the federal mail fraud statute in *Kanter.* 919 F.3d at 449.

By lying to obtain public assistance, Range demonstrated a disrespect for the rule of law.

Furthermore, meaningful evidence in the record—including Range's own deposition testimony

that he received firearms from a straw purchaser[5] during the period of his disarmament, *see*

---

[5] Pennsylvania law prohibits Range's receipt of straw purchased firearms as a felony in the first
degree. *See Comm. v. Hill*, 210 A.3d 1104, 1112-13 (Pa. Super. Ct. 2019) (finding that recipient
of straw purchased firearms violated 18 Pa. C.S.A. § 5111). Pennsylvania law also prohibits the
straw purchase itself. Firearm sellers must ask if the purchaser of a firearm is the "actual buyer of
the firearm" and informs purchasers: "You are not the actual buyer if you are acquiring the
firearm(s) on behalf of another person, unless you are legitimately acquiring the firearm as a gift
for any of the following individuals *who are legally eligible to own a firearm* . . .[including a]
spouse." *See* ATF Form 4473;18 Pa. C.S.A § 6111(b) & (g) (emphasis added).

The straw purchase also appears to have violated federal law. *See Abramski v. United States*, 573
U.S. 169 (2014); 18 U.S.C. § 922(a)(6) ("It shall  be unlawful… for any person in connection
with the acquisition or attempted acquisition of  any firearm or ammunition from a … licensed

Range Dep. Trans. pp. 21-22:21-17—supports this conclusion. Common sense dictates that fraud, like that committed by Range, is inherently risky, irresponsible, and unpredictable, explaining in part why 42 states make it a felony. Here, the government adequately demonstrates the reasonable fit between Congress' interest and its means to accomplish that goal. As the D.C. Circuit held, "Congress determined—reasonably in our view—that in order to accomplish the goal of preventing gun violence 'firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them.'" *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013)) (quoting *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119 (1983)).

The government does not need to show that Range engaged in violent conduct to justify the firearm restriction. We are aware of no court so holding. "[T]he government has a strong interest in preventing people who already have disrespected the law . . . from possessing guns," *United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015), rendering the application of section 922(g)(1) reasonably related to Congress' intent to "reduce the likelihood that [firearms] fall into the hands of the lawless," S. Rep No. 89-1866, at 1. Range therefore remains an individual whose possession of firearms would be "contrary to the public interest" as deemed by Congress. *Huddleston v. United States*, 415 U.S. 814, 824 (1974). Congress "has the power in such circumstances to impose a complete ban on the exercise of a constitutional right by a category of persons who, in its reasonable estimation, pose a threat to the public." *Binderup*, 836

---

dealer … knowingly to make any false or fictitious oral or written statement … intended or likely to deceive such … dealer … with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition.").  When Range's spouse declared on the ATF Form 4473 that she was the "actual buyer" of the firearm, she and Range made a false statement intended to conceal from the dealer that the actual buyer of the firearm was Range.

F.3d at 404 (Fuentes, J., joined by six judges) (citing *United Public Workers of Am. v. Mitchell*, 330 U.S. 75, 96-97 (1947)).

Range may also argue that the government must present evidence specific to him to satisfy intermediate scrutiny in this case, but he is mistaken. "Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court." *Schrader*, 704 F.3d at 991 (quoting *Skoien*, 614 F.3d at 641). "*Heller* did not suggest that disqualifications would be effective only if the statute's benefits are first established by admissible evidence." *Skoien*, 614 F.3d at 641. Rather, "the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." *Booker*, 644 F.3d at 23 (citation omitted).

While Congress previously permitted individuals to obtain relief from section 922(g)(1) by demonstrating to the ATF that they would "not be likely to act in a manner dangerous to public safety," 18 U.S.C. § 925(c), Congress abandoned that regime in 1992 after concluding that it presented "a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made," S. Rep. No.102-353, at 19. And in declining to allow individuals to seek section 925(c) relief directly in the courts, the Supreme Court explained that the judiciary is not "institutionally equipped for conducting a neutral, wide-ranging investigation" into an individual's dangerousness, which would necessarily call for an "inherently policy-based decision." *United States v. Bean*, 537 U.S. 71, 77 (2002). Therefore, the Second Amendment does not require courts to engage in an ad hoc and standardless inquiry into individual dangerousness as a prerequisite for section 922(g)(1)'s application.

Even if the government had to advance such evidence, Range's receipt of two firearms from straw purchases—unlawful gun transactions—would justify the government's reasonable approach to prohibit him from owning firearms. *See* Range Dep. Trans. pp. 21-22:21-17; *Abramski*, 573 U.S. at 193. While Range might attempt to minimize his behavior or allege rehabilitation, he cannot reasonably deny that his conduct places him within a narrower category of "presumptively risky people" whom Congress sought to disarm—the only relevant question here. *Binderup*, 836 F.3d at 370 (citation omitted). The Constitution does not require Congress to draw these lines perfectly. *Marzzarella*, 614 F.3d at 98. The government needs to show only that the firearms restriction "fits reasonably" with its interest in protecting public safety. *Id.*

Congress reasonably concluded that placing guns into the hands of potentially irresponsible persons, as shown by their previously unlawful conduct, can harm public safety. Because the government has an important, if not compelling, interest in preserving public safety, *Binderup*, 836 F.3d at 353-56, and because the evidence shows that Range committed a serious fraud offense against the Commonwealth of Pennsylvania, the government can disarm him through section 922(g)(1) without violating the Second Amendment. Accordingly, the Court should reject Range's as-applied constitutional claim at the second step, if it finds it necessary to reach the issue.

## CONCLUSION

For these reasons, the Court should grant summary judgment in favor of defendants.

Respectfully submitted,

WILLIAM M. MCSWAIN
United States Attorney

s/ Susan R. Becker for GBD
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division


s/ Paul J. Koob
PAUL J. KOOB
ERIC D. GILL
Assistant United States Attorneys
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476
215-861-8432/8250 (phone)
215-861-8618 (facsimile)
Paul.Koob@usdoj.gov
Eric.Gill@usdoj.gov

*Attorneys for Defendants*

Dated: January 15, 2021

## CERTIFICATE OF SERVICE

I certify that on this day, the foregoing "Motion for Summary Judgment" and supporting documents were filed electronically and are available for viewing and downloading from the court's ECF system.

Dated: January 15, 2021

s/ Paul J. Koob
PAUL J. KOOB
Assistant United States Attorney