IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRYAN DAVID RANGE, | ) | Case. No. 5:20-CV-03488-GEKP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT M. WILKINSON, Acting | ) | |
| Attorney General of the United States, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

Preliminary Statement...................................................... 1

Summary of Argument..................................................... 1

Argument................................................................ 3

I.     Range's misdemeanor offense was not "serious.". ................................. 3

       A.    Range easily prevails at step one under the Third Circuit's
             identified elements. ............................................ 3

       B.    Legislative classification remains the primary factor in assessing seriousness...... 4

       C.    Dishonesty is not a proxy for seriousness.................................. 6

             1.    The Third Circuit rejects step one litmus tests........................ 6

             2.    History reflects a tradition of treating some instances of
                   theft and fraud much less seriously than others....................... 7

             3.    The government's litmus test would lead to absurd results.............. 10

       D.    The government cannot survive step one on cross-jurisdictional consensus....... 10

II.    The government fails to carry its step two burden. ............................. 13

       A.    Section 922(g)(1)'s facial or broader categorical validity is not at issue. ........ 14

       B.    Step two is not step one. Whether the offense is generally "serious"
             is irrelevant at step two........................................ 15

       C.    The Third Circuit has already rejected the relevance of the
             government's studies. ......................................... 15

       D.    Range never violated Section 922(g). And neither Range nor his wife
             committed any so-called "straw" purchases........................... 18

       E.    The government's failure to discover anything that would advance its step two
             argument does not mean that *Binderup* was wrongly decided. ............... 22

Conclusion............................................................. 22

i

Table of Authorities

Cases

*Abramski* v. *United States*,
　　573 U.S. 169 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Binderup* v. *Att'y Gen.*,
　　836 F.3d 336 (3d Cir. 2016) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . 3-6, 10, 11, 14-18, 22

*Binderup* v. *Holder*, No. 13-cv-06750,
　　2014 U.S. Dist. LEXIS 135110,
　　2014 WL 4764424 (E.D. Pa. Sept. 25, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Commonwealth* v. *Hill*,
　　210 A.3d 1104 (Pa. Super. Ct. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Commonwealth* v. *Zawatsky*,
　　41 Mass. App. Ct. 392, 395; 670 N.E.2d 969 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*DiMasi* v. *Galvin*,
　　2020 Mass. Super. LEXIS 102,
　　2020 WL 3619939 (Mass. Sup. Ct. Suffolk Jul. 2, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Folajtar* v. *Att'y Gen.*,
　　No. 19-1687, 2020 U.S. App. LEXIS 37006
　　(3d Cir. Nov. 24, 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5, 6, 9-11, 15

*Hamilton* v. *Pallozzi*,
　　848 F.3d 614 (4th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Holloway* v. *Att'y Gen.*,
　　948 F.3d 164 (3d Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-6, 11

*Kanter* v. *Barr*,
　　919 F.3d 437 (7th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Medina* v. *California*,
　　569 U.S. 975 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Padilla* v. *Kentucky*,
　　559 U.S. 356 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*PDK Labs, Inc.* v. *Drug Enf't Admin.*,
　　362 F.3d 786 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Rehaif* v. *United States*,
    139 S. Ct. 2191 (2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Scott* v. *Illinois*,
    440 U.S. 367 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Booker*,
    643 F.3d 12 (1st Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States* v. *Jones*,
    418 U.S. 368 (3d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

*United States* v. *Phillips*,
    827 F.3d 1171 (9th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Torres-Rosario*,
    658 F.3d 110 (1st Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14


Statutes

18 Pa. C.S. § 6105(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 921(a)(20). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. § 922. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(g)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 10, 14, 15, 18, 20, 22

18 U.S.C. § 925(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Ga. Code Ann. § 49-4-15(e)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Haw. Rev. Stat. § 346-34(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Haw. Rev. Stat. § 346-34(d)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Haw. Rev. Stat. § 346-34(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Haw. Rev. Stat. § 346-34(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

iii

Mass. Gen. Laws ch. 18, § 5B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Mass. Gen. Laws ch. 18, § 5K. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Mass. Gen. Laws ch. 18, § 5L. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Mass. Gen. Laws ch. 274, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Mass. Gen. Laws ch. 279, § 19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Mass. Gen. Laws ch. 279, § 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Ohio Rev. Code Ann. § 2921.13(A)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Ohio Rev. Code Ann. § 2921.13(F)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Ohio Rev. Code Ann. § 2921.46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Ohio Rev. Code Ann. § 2921.46(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Or. Rev. Stat. Ann. § 161.705. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Or. Rev. Stat. Ann. § 411.630 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Or. Rev. Stat. Ann. § 411.990(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

S.D. Codified Laws § 22-29-11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

S.D. Codified Laws § 22-29-16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

S.D. Codified Laws § 28-13-16.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Statute of Westminster of 1275, 3 Edw. I, ch. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Wis. Stat. § 943.20(3)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Other Authorities

2018 Pa. Act 125, § 5 (Oct. 24, 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5 St. George Tucker, Blackstone's Commentaries [Book Four] (1803). . . . . . . . . . . . . . . . . . . . 7, 8

Garen J. Wintemute, et al., *Prior Misdemeanor Convictions as a
  Risk Factor for Later Violent and Firearm-Related Criminal
  Activity Among Authorized Purchases of Handguns*,
  280 J. AM. Med. Ass'n 2083 (1998)..........................................17, 18

Mona A. Wright, et al., *Effectiveness of Denial of Handgun Purchase
  to Persons Believed to Be at High Risk for Firearm Violence*,
  89 Am. J. of Pub. Health 88 (1999)..........................................15-17

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PRELIMINARY STATEMENT

The government's re-imagination of Bryan Range as some sort of serious, dangerous criminal who ignores gun laws and participated in straw purchases with his wife contradicts the record, the U.S. Code, controlling Supreme Court and Third Circuit precedent, various state laws, and common sense. Under no reasonable construction of the facts or law could the government be entitled to summary judgment. Its motion should be denied.

SUMMARY OF ARGUMENT

This is a two-step case. Step one asks whether Range's offense was "serious." The Third Circuit has thus far set out five factors to consider in the seriousness analysis, of which the first—classification—is "generally conclusive." *Folajtar* v. *Att'y Gen.*, No. 19-1687, 2020 U.S. App. LEXIS 37006, at *9 (3d Cir. Nov. 24, 2020). Range plainly checks off that box, and three of the four others. The government does not question that he prevails on classification, nonviolence, dangerousness, and sentencing. And Range need not prove cross-jurisdictional consensus, which, in any event, appears indeterminate.

Rather than track the precedential guidance as to what makes an offense "serious" and applying the case's facts to the law, the government spends much time discussing background generalities not here at issue—18 U.S.C. § 922(g)(1)'s legislative history and purpose, and the virtuousness-based theory underlying the current approach to as-applied challenges. When it finally reaches discussion of this case, and the central step one question of whether Range's predicate misdemeanor is a "serious" offense, the government's brief muddles the nuts-and-bolts application of facts to law. It misstates the legal standards and avoids the basic facts.

Trying to compensate for its loss on classification, the government suggests that classification is not all that important. Instead, it posits that dishonesty is a proxy for seriousness. But these claims cannot be correct. The Third Circuit rejects the concept of a categorical litmus test at step one, and it holds classification paramount. Consistent with historical tradition, legislatures classify many if not most instances of fraud or theft as misdemeanors. Were the government correct, it could disarm people for the most trivial offenses. Further contradicting circuit law, the government suggests that Range must sweep all five elements, and puts all its eggs in the least important, cross-jurisdictional consensus basket. Its 91 page survey at times cites the wrong laws, confusing application violations with the different, more serious crime of food stamp trafficking, and fails to focus on the specific violation at issue. And even if the government were right on this score, it would not overcome its loss on classification—let alone on all the other factors.

The government loses step one. Accordingly, the Court would ordinarily proceed to step two, where the government bears a heightened scrutiny burden to justify Range's disarmament. Except that the government has adamantly insisted throughout this litigation that step two is irrelevant.

Even should this Court reach step two, the government's heightened scrutiny effort is frivolous, if not disingenuous. Under its logic, *everyone* fails at step two, because... Section 922(g)(1) is facially constitutional. The government also confuses step one arguments at step two, arguing generalities to support a specific application. And as the government should know, Range never violated any aspect of 18 U.S.C. § 922, and neither did his wife. The government's reading of Range's deposition transcript is incomplete and unfair, jumping to conclusions that are undercut by glossed-over portions. And considering that the government's argument heavily relies on statistical surveys whose relevance the en banc Third Circuit specifically rejected, the government should have at least mentioned that fact, and not merely noted another court's different opinion.

2

ARGUMENT

I.    RANGE'S MISDEMEANOR OFFENSE WAS NOT "SERIOUS."

The government disarms Bryan Range *only* because, nearly thirty years ago, he was convicted of a misdemeanor for signing a food stamp application that failed to disclose lawn-mowing income. But for this conviction, he would not have any firearm disability. "[T]he seriousness of the purportedly disqualifying offense is our sole focus throughout *Marzzarella*'s first step." *Binderup* v. *Att'y Gen.*, 836 F.3d 336, 350 (3d Cir. 2016) (en banc) (citing *United States* v. *Marzzarella*, 614 F.3d 85 (3d Cir. 2010)).[1]

A.    Range easily prevails at step one under the Third Circuit's identified elements.

There is no need to fully recount why Range meets his step one burden. It suffices to note that while "[t]here are no fixed rules for determining whether an offense is serious," the Third Circuit has identified "various factors [that] may be informative including, but not limited to, whether the crime poses a danger or risk of harm to self or others, whether the crime involves violence or threatened violence, the classification of the offense, the maximum penalty, the penalty imposed, and how other jurisdictions view the crimes." *Holloway* v. *Att'y Gen.,* 948 F.3d 164, 172 (3d Cir. 2020) (citing *Binderup*, 836 F.3d at 351-52) (footnote omitted).

While no single factor is dispositive, the factors are not equally weighted. The Third Circuit "giv[es] primary weight to" the first factor—"the legislature's determination" of whether the offense is a felony or misdemeanor. *Folajtar*, 2020 U.S. App. LEXIS 37006, at *18. Indeed, the Third Circuit holds this factor to be "generally conclusive." *Id.* at *9. As Range's offense was a

---

[1]Contrary to the government's assertion, Gov't Br. at 14, Range never argued that the fact of his rehabilitation and upstanding citizenship is relevant at step one. It is, however, quite relevant at step two. *See Binderup*, 836 F.3d at 354 n.7.

3

misdemeanor, the analysis begins tilting heavily in his favor. The government nonetheless asks this Court to "exercise deference to the Pennsylvania General Assembly's determination that public assistance fraud is a serious crime and merits serious penalties," as though the misdemeanor classification here should count *against* Range. Gov't Br. at 13. But it does so citing to *Holloway*—failing to mention that unlike Range's misdemeanor, *Holloway*'s misdemeanor carried a mandatory term of imprisonment. "The legislature's mandate that repeat DUI offenders receive at least three months in jail reflects its judgment that such offenses are serious." *Holloway*, at 948 F.3d at 176. Range's misdemeanor is classified identically to *Binderup*'s, about which the Third Circuit offered that "Congress may not overlook so generally the misdemeanor label, which, in the Second Amendment context, is also important." *Binderup*, 836 F.3d at 352.

Range's step one case only strengthens as the analysis proceeds. Range's misdemeanor involved no danger or risk of harm to anyone, no violence or threats of violence, and merited Range no jail sentence. As described more fully in Range's motion and in yet more detail below, the cross-jurisdictional inquiry is indeterminate. Range clearly passes step one.

The government's effort denies the importance of legislative classification. It asserts an impermissible single-factor test, skips past the other three factors on which its loss is self-evident, and makes an unpersuasive showing on the final, least important factor. None of this adds up.

B.      Legislative classification remains the primary factor in assessing seriousness.

The government repeats its unsuccessful *Binderup* arguments, to the effect that the felony/misdemeanor distinction is arbitrary and not all that important. Gov't Br. at 12. In fairness, Second Amendment advocates representing felons have tended to agree on this point. But these arguments are usually unsuccessful. As Range noted, classification counts a great deal because it expresses the legislature's view.

The legislature's view is either important or it isn't. It isn't important only in cases involving actual felons, where it supports the government's desired outcome. And even before *Folajtar*, classification proved critical in *Binderup*, which involved two misdemeanants. The government overcame misdemeanor classification in *Holloway*, but that offense was very dangerous—a second high-level DUI, registering a BAC of .192% that carried a mandatory jail sentence. *Holloway*, 948 F.3d at 168. Arguments for degrading the importance of legislative classification are better addressed to a higher court.

Those arguments are unlikely to succeed. In *Folajtar*, the Third Circuit declined to get into the business of deciding how dangerous is too dangerous for step one purposes, offering that District Courts should not "face the unenviable task of weighing the relative dangerousness of hundreds of offenses already deemed sufficiently serious to be classified as felonies." *Folajtar*, 2020 U.S. App. LEXIS 37006, at *18. It would be even more difficult for courts to suddenly undertake the task of sorting out anew whether theft becomes serious at $100, $1000, or $10,000. Legislatures have already made these decisions. "By giving primary weight to the legislature's determination, our approach is no doubt more administrable." *Id.*

Indeed, there may be no surer refutation of the government's litmus test than its Exhibit 1, its survey of how Range's offense is viewed throughout the 50 states. Putting aside this study's various flaws (discussed below), the basic point of *the government's* proposed undisputed fact no. 6 is well-taken: "The amount of welfare fraud that triggers felony status varies, with some states treating a $100 violation as a potential felony, and others $2,500." Gov't Sep. Statement, Proposed Fact 6 (citations omitted). It is within judicial notice that petty larceny is generally a misdemeanor, and the distinction is typically based on some amount left to legislative judgment. The government avers that "[b]oth *Folajtar* and Range 'willfully deprived the government of its property,'" Gov't Br. at

5

12 (citation omitted), but then, so does a person who parks his car while willfully ignoring the government's parking meter.

If the government's litmus test were correct, then legislative classification, which the Third Circuit considers "generally conclusive," *Folajtar*, 2020 U.S. App. LEXIS 37006, at *9, would count for nothing at all. To claim, as the government does, that "Range's crime is only distinguishable from *Folajtar*'s in its classification," Gov't Br. at 12, is akin to claiming that the *Titanic*'s voyage was only distinguishable from similar boat trips by an iceberg.

C.     Dishonesty is not a proxy for seriousness.

The government's claim that "[f]raud crimes are inherently serious," Gov't Br. at 1, in the sense that they "are [inherently] serious enough to destroy Second Amendment rights," *Binderup*, 836 F.3d at 351, is wrong as a matter of law. Its claim that "[t]he Third Circuit agrees that fraud crimes are serious," *id.* at 12 (citing *Folajtar*), is seriously overstated.

1.     *The Third Circuit rejects step one litmus tests.*

To begin—and, it suffices, to end—it bears repeating that the Third Circuit has time and again admonished that "[t]here are no fixed rules for determining whether an offense is serious." *Holloway*, 948 F.3d at 172; *Binderup*, 836 F.3d at 351. There is no step one litmus test.

"[I]f it is not necessary to decide more, it is necessary not to decide more." *PDK Labs, Inc.* v. *Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment). However, in the interest of thoroughness, Range is constrained to address the other defects in the government's litmus test.

2.    *History reflects a tradition of treating some instances of*
      *theft and fraud much less seriously than others.*

It is simply untrue that the law has historically treated all instance of theft or fraud as uniformly serious. The law has always distinguished the severity of such offenses depending on a variety of factors, such as the amount at stake, the methods used by the offender, and the character of the property at issue. Of particular relevance, even some of the more serious first-time offenders have historically sustained no collateral consequences for their convictions. For people like Bryan Range, non-capital sentences settled all outstanding accounts with the law. History supports Pennsylvania's legislative judgment in this case.

As Blackstone noted, "*grand* larceny" consisted of the "stealing of goods above the value of twelvepence," while stealing "goods to that value, or under, [was] *petit* larceny." 5 St. George Tucker, Blackstone's Commentaries [Book Four] 229 (1803).[2] The offenses' characteristics were otherwise equal, but they were "considerably distinguished in their punishment," *id.*, which often varied according to what was stolen. For example, stealing "any lead or iron fixed to a house, or in any court or garden thereunto belonging, is made felony, liable to transportation for seven years," but stealing "underwood or hedges, and the like, to rob orchards or gardens of fruit growing therein, to steal or otherwise destroy any turnips or the roots of madder when growing, are . . . punishable criminally, by whipping, small fines, imprisonment, and satisfaction to the party wronged, according to the nature of the offense." *Id.* at 232-33 (citations omitted). Stealing "valuable domestic animals, as horses and other beasts of draught," and tame animals "which serve for food," was larceny. *Id.* at

---

[2]The distinction was codified in the (first) Statute of Westminster of 1275, 3 Edw. I, ch. 15 though it has earlier roots. "Our ancient Saxon laws nominally punished theft with death, if above the value of twelvepence: but the criminal was permitted to redeem his life by a pecuniary ransom . . . ." 5 Tucker's Blackstone, at 237.

235. But the law held generally non-eaten animals "to have no intrinsic value;" thus, stealing "dogs of all sorts, and other creatures kept for whim and pleasure," was not larceny. *Id.* at *235. The punishment for forgery also varied. At common law, forgery was punished by "fine, imprisonment and pillory," though "by a variety of statutes," capital punishment widely applied "in many particular cases." *Id.* at 247.

Even when a crime was punishable as a felony, that hardly meant that it must have led to the gallows. "[T]he mercy of juries will often make them strain a point, and bring in larciny to be under the value of twelvepence, when it is really of much greater value." *Id.* at 238. "It is likewise true, that by the merciful extensions of the benefit of clergy by our modern statute law, a person who commits a simple larciny to the value of thirteen pence or thirteen hundred pounds, though guilty of a capital offence, shall be excused the pains of death" for a first offense, absent aggravating circumstances. *Id.*

Indeed, thieves entitled to the "benefit of clergy," including most first offenders, suffered no collateral consequences at all. In the medieval period, criminally-accused clergy were often afforded the benefit of being tried in lenient ecclesiastical courts, thereby avoiding the King's punishment. *Id.* at *365-68. Over time, the "benefit of clergy" of avoiding capital punishment was extended more broadly throughout society, often on the condition of sustaining alternative punishment. By Blackstone's day, commoners committing their first offense were "discharged of the capital punishment of felonies within the benefit of clergy, upon being burnt in the hand, whipped, or fined, or suffering a discretionary imprisonment . . . or, in case of larciny, upon being transported for seven years, if the court shall think proper." *Id.* at *373.

And having received alternative punishment, a first-time felon was "restored to all capacities and credits, and the possession of his lands, as if he had never been convicted." *Id.* at *374.

8

The innumerable distinctions Blackstone recounted as to the different types and gravity of theft and fraud were not made by judges. These were legislative judgments. The Third Circuit's legislative deference on this score, so clearly expressed most recently in *Folajtar*, reflects the fact that classification of crimes has always been the sovereign's business, not that of the courts. The government not only misunderstands the history, it also misunderstands how courts have used that history in the context of as-applied challenges to firearm prohibitions.

As discussed, theft and fraud were historically liable to be treated with relative severity, even if, like today, they were not *universally* so treated. Thus, in modern Second Amendment cases involving actual felons, courts have invoked that history to justify a legislature's classification. But that is a far cry from suggesting that an offense *must* be deemed "serious" if one of its elements involves dishonesty, even if the legislature has classified it as a misdemeanor, or less. No court has ever reached such an extreme result.

The government misreads *Hamilton* v. *Pallozzi*, 848 F.3d 614 (4th Cir. 2017). That case does not stand for the proposition that a court may disregard a state's classification of a fraud crime. Quite the opposite: it demonstrated a court's *deference* to legislative classification to reach a result the court deemed absurd. Hamilton, convicted of felony fraud in Virginia, had all of his rights restored by the courts and governor of that state, including the right to keep and bear arms. That effected an automatic restoration of his rights under 18 U.S.C. § 921(a)(20), whereupon Hamilton embarked on a career as an armed guard and, eventually, a Federal Protective Officer with the Department of Homeland Security. Though he carries a gun at work defending government installations in Washington, Maryland does not recognize Hamilton's Virginia and federal restorations, and thus bars him from having guns at his Maryland home.

The Fourth Circuit agreed that sustaining Maryland's firearm prohibition worked an "apparently absurd result." *Hamilton*, 848 F.3d at 628. But it denied relief because "[f]or the purposes of Maryland law, Hamilton is deemed a felon." *Id.* History supported Maryland's "absurd" choice, to which the court reluctantly deferred, but it did not require that choice. The Fourth Circuit could have also found historical support for Maryland's treatment of Hamilton as a redeemed felon, had the state done that. And just as the Fourth Circuit deferred to legislative judgment in *Hamilton*, here, the Third Circuit instructs that Pennsylvania's legislative judgment—which is also supported by historical practice—be given "primary weight." *Foljatar*, 2020 U.S. App. LEXIS 37006, at *18.

        3.     *The government's litmus test would lead to absurd results.*

The government's proposed litmus test would sanction legislative excess, as there is no limit to the government's logic that *any* offense involving dishonesty is "unvirtuous" to the point of destroying Second Amendment rights. As the Ninth Circuit observed, there remains "the question of whether there are limits on Congress's and the States' ability to define any old crime as a felony and thereby use it as the basis for a § 922(g)(1) conviction, consistent with the Second Amendment." *United States* v. *Phillips*, 827 F.3d 1171, 1176 n.5 (9th Cir. 2016). "Can a conviction for stealing a lollipop . . . serve as a basis under § 922(g)(1) to ban a person for the rest of his life from ever possessing a firearm, consistent with the Second Amendment? That remains to be seen." *Id*.

        D.     The government cannot survive step one on cross-jurisdictional consensus.

Unable to evade or do much with the four factors that address Range's offense, the government leans heavily on the one factor that seeks to put the case in a national context. The effort is unavailing. Again, the government begins with error, claiming that because Range is allegedly unable to show that his crime is un-serious elsewhere, "he cannot carry his burden at the first stage of the *Binderup* analysis." Gov't Br. at 14. Except, again, *Binderup* does not require that Range hit

all the elements. "[T]here are no fixed criteria" at step one. *Binderup*, 836 F.3d at 351. That is why classification has primary, but just short of dispositive weight. The Third Circuit "do[es] not foreclose the possibility" that a felon's as-applied challenge could succeed. *Folajtar*, at *10.

Surely if a felon, who fails the most important consideration, might pass step one, a misdemeanant may do so even if most *other* jurisdictions would consider him a felon. That is especially true where the misdemeanant's offense was not violent, not dangerous, and resulted in no jail sentence. To hold otherwise is to elevate cross-jurisdictional consensus above the legislative judgment in the convicting state, which is both irrational and contrary to *Folajtar*. Cross-jurisdictional consensus may be important, but it is only one of "various factors [that] may be informative," *Holloway*, 948 F.3d at 172, not an essential element of the inquiry.

Here, the cross-jurisdictional analysis is less informative than the government claims. Before addressing the shortcomings in the government's survey, Range must correct his presentation in one respect. Range cited the relevant Wisconsin provision, Wis. Stat. § 943.20(3)(a), but inadvertently listed it as a misdemeanor rather than a felony. Range regrets this oversight.

Otherwise, to the extent that the parties' survey are in conflict, it is the government that errs in its characterization of five states' laws as classifying Range's offense a felony. Range's offense would be a misdemeanor in Hawaii,[3] Massachusetts,[4] and Ohio;[5] would likely be a misdemeanor in

---

[3]In Hawaii, Range's conduct would have been covered by Haw. Rev. Stat. § 346-34(c), violations of which are always misdemeanors under subdivision (h). The felony provisions of subdivision (h) upon which the government relies refer to violations of subdivisions (d)(2) and (e), which relate to food stamp trafficking, a different offense.

[4]The government lists Massachusetts as a jurisdiction that would treat Range's offense as a felony, based on Mass. Gen. Laws ch. 274, § 1; and Mass. Gen. Laws ch. 18, §§ 5B, 5K, and 5L. That is incorrect. Sections 5K and 5L cover theft from the state and food stamp trafficking, respectively. Range's offense, supplying inaccurate information to obtain benefits, falls under Section 5B, which provides for "imprisonment for not more than one year." The statute does *not*

Oregon;[6] and would likely not have yielded a conviction in Georgia.[7] The government also makes two mistakes in Range's favor. It classifies South Dakota as a misdemeanor jurisdiction under S.D. Codified Laws § 28-13-16.2, which punishes the making of false statements to county welfare officials. But as food stamps are administered by the state government, the correct provisions are apparently S.D. Codified Laws §§ 22-29-11, 16, which create a felony. The government also continues to classify Pennsylvania as a misdemeanor jurisdiction, notwithstanding the recent amendments of 2018 Pa. Act 125, § 5 (Oct. 24, 2018). But that only highlights the danger of surveying a fluid classification decades after the offense.

Thus, the final tallies show Range's offense classified as a felony in 39 states, but that number drops to 27 when considering only those states that distinctly criminalize the making of false statements regarding food stamps—the specific offense to which Range pled guilty.[8] The larger

<hr/>

specify that imprisonment would be in state prison. Accordingly, it is not classified as a felony under Chapter 274, Section 1. "In the absence of reference to State prison as the place of confinement, the statute does not, in the first instance, describe a felony." *Commonwealth* v. *Zawatsky*, 41 Mass. App. Ct. 392, 395; 670 N.E.2d 969 (1996); *accord DiMasi* v. *Galvin*, 2020 Mass. Super. LEXIS 102, at *12 n.11, 2020 WL 3619939 (Mass. Sup. Ct. Suffolk Jul. 2, 2020) ("Where a statute does not expressly state whether a given crime is punishable by confinement in state prison (as opposed to a house of correction), the court looks to the term of confinement the statute prescribes."). Because people may be imprisoned in a "house of correction" for up to two and a half years, Mass. Gen. Laws ch. 279, §§ 19, 23, a conviction under Mass. Gen. Laws ch. 18, § 5B is classified as a misdemeanor under Mass. Gen. Laws ch. 274, § 1.

[5] The government lists Ohio as a jurisdiction that would treat Range's offense as a felony, based on Ohio Rev. Code Ann. § 2921.46. That is incorrect. Section 2921.46(B) prohibits food stamp trafficking, a different offense. Range's conduct be covered by Section 2921.13(A)(4), making a false statement "to secure the payment of . . . benefits administered by a governmental agency or paid out of a public treasury," which is a misdemeanor per Section 2921.13(F)(1).

[6] Or. Rev. Stat. Ann. §§ 161.705, 411.630, 411.990(2); *see* Range Summ. Judgment Br. at 13 n.9.

[7] Ga. Code Ann. § 49-4-15(e)(3); *see* Range Summ. Judgment Br. at 13 n.10.

[8] The 26 noted in Range's summary judgment brief, at 12 n.7, plus Wisconsin.

number is probably a consensus; the smaller one is not. But even if the Court grants the government the cross-jurisdictional consensus, that would not suffice to defeat Range's step one showing. The step one analysis is not otherwise close—Range plainly meets all the other factors, including classification—and how Range's community viewed his "virtuousness" is far more relevant than how other legislatures would see matters. Moreover, Pennsylvania's decision here is not so out of step that it can be considered an outlier: Range would *not* have been a felon in just over 20% of the states, plus the nation's capital.

The government loses step one.

II.   THE GOVERNMENT CANNOT CARRY ITS STEP TWO BURDEN.

The government finally concedes that at step two, its only relevant interest is public safety. Gov't Br. at 16. That is very different than the position it took in discovery, when it refused to supply any information it supposedly had about Bryan Range's dangerousness because such information was allegedly "not relevant to any party's claim or defense." Range Exh. D, Dkt. 13-7, at 3. Indeed, per the government, Range's "potential to be less responsible with firearms than non-prohibited, law-abiding citizens generally are does not serve as the standard . . . to evaluate whether plaintiff is eligible to possess a firearm." *Id*. (citations omitted). The government should be made to own this type of discovery response, or at least explain itself better.

In any event, the government lacks a serious step two argument. While "[t]he legitimate and compelling state interest in protecting the community from crime cannot be doubted," Gov't Br. at 16 (internal quotation marks omitted), neither can be the government's complete failure at step two. There is no earthly connection between Range's offense and public danger. The government cannot keep its step one and step two arguments straight. It misrepresents the record. And it relies on statistical studies whose relevance has already been rejected by the en banc Third Circuit.

13

A.    Section 922(g)(1)'s facial or broader categorical validity is not at issue.

The government opens its step two argument by defending Section 922(g)(1)'s facial or broader categorical validity. "Persons convicted of defrauding the government present a type of risk that animated Congress to enact the firearms restriction in 18 U.S.C. § 922(g)(1)." Gov't Br. at 16. Continuing with this theme, the government asserts that various "studies support the reasonable fit between the § 922(g)(1) restriction and the government's compelling interest in protecting communities from crime." *Id.* at 17.

Even if that were true, so what? There is no question here of Section 922(g)(1)'s facial validity, or its validity against the broadest categories of offenders. "Unlike a facial challenge, [this] as-applied challenge does not contend that a law is unconstitutional as written but that its application to a *particular person* under *particular circumstances* deprived *that person* of a constitutional right." *Binderup*, 836 F.3d at 345 (internal quotation marks and citations omitted) (emphasis added). The government approvingly quotes the First Circuit's statement that "the Second Amendment permits *categorical* regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis." Gov't Br. 20 (quoting *United States* v. *Booker*, 643 F.3d 12, 23 (1st Cir. 2011)). Of course it permits "categorical regulation." But the First Circuit also later recognized that the Supreme Court "may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical [firearms] ban," or, phrased differently, "that the Supreme Court might find some felonies so tame and technical as to be insufficient to justify [a firearms] ban." *United States* v. *Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011).

At step two, facial validity is irrelevant. The government must somehow link Range, or at the very least, people who are very much like him, to its public safety concerns.

14

B.    Step two is not step one. Whether the offense is generally "serious" is irrelevant at step two.

Intertwined with the government's defense of Section 922(g)(1) against a non-existent facial challenge is another step one effort to show that Range's offense is "serious." The government cites extensively from *Folajtar*'s reliance on studies of former state prison inmates, purporting to show only a "small difference in likelihood of recidivism between fraud offenders, like Range, and more violent criminals." Gov't Br. at 17. But Range is not "like" these offenders, *because he's never been incarcerated*—a point drilled home in *Binderup. See Binderup*, 836 F.3d at 354; *see also discussion infra*.

More to the point, *Folajtar* is a *step one* case. Its cited discussion explains why Congress was justified in categorically barring the possession of firearms by nonviolent felons. *Folajtar*'s "claim fail[ed] at *Marzzarella* Step One." *Folajtar*, 2020 U.S. App. LEXIS 37006, at *29. It has nothing to do with step two.

C.    The Third Circuit has already rejected the relevance of the government's studies.

The government argues that the studies it claims as support for Section 922(g)(1)'s facial validity*, supra*, also advance its step two arguments. True, "[p]arties may use statistics to show that people who commit certain crimes have a high (or low) likelihood of recidivism that warrants (or does not warrant) disarmament, even decades after a conviction." *Binderup*, 836 F.3d at 355. But such studies must "contain[] reliable statistical evidence." *Id.* The government must produce "evidence explaining why banning people like [the challengers] (i.e., people who decades ago committed similar misdemeanors) from possessing firearms promotes public safety." *Id.* at 353-54.

The Third Circuit has already rejected some of the very studies the government relies upon here as "off-point." *Id.* at 354. The government offers Mona A. Wright, et al., *Effectiveness of*

*Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence*, 89

Am. J. of Pub. Health 88 (1999), for the proposition that denying felons the ability to buy handguns

reduces crime, Gov't Br. at 17-18. "But [such] studies estimate the likelihood that incarcerated

felons will reoffend after their release from prison." *Binderup*, 836 F.3d at 354. Because Range was

neither incarcerated, nor a felon, "[t]he Government cannot draw any reasonable conclusions about

the risk posed by [his] possession of firearms from such obviously distinguishable studies." *Id.* Judge

Ambro likewise dismissed the relevance of a study of inmates exiting prison in 1994. *Id.* The

government adds more studies here of exiting prison inmates, and these are irrelevant for the same

reason. People who are incarcerated tend to be more problematic than those who are given "the

colloquial slap on the wrist." *Id.* at 340.

The Third Circuit could have gone further in criticizing the Wright study. Judge Gardner

did. Pointing to the same conclusion endorsed by the government here, that denying handgun

purchases to certain offenders reduced the risk of later criminal activity by 20%-30%, Gov't Br. at

17-18, Judge Gardner dug further: the authors "went on to state that '[t]his modest benefit may

reflect the fact that the members of both study groups had extensive criminal records and therefore

were at high risk for later criminal activity.'" *Binderup* v. *Holder*, No. 13-cv-06750, 2014 U.S.

Dist. LEXIS 135110, at *84, 2014 WL 4764424 (E.D. Pa. Sept. 25, 2014) (quoting Wright at 89).

"Indeed, even those 2470 individuals in the purchaser cohort — who did not have felony

convictions to disqualify them from purchasing — had a cumulative total of 14,192 arrests between

them. Here, plaintiff cannot similarly be described as having an extensive criminal record." *Id.* at

*84–*85 (citing Wright at 87). "Moreover, although the authors noted that '[a]mong those with

only one prior weapon or violence arrest charge, [handgun] purchasers were 2 to 4 times as likely to

16

be charged with new offenses as those who were denied', there was no such effect seen among those (like plaintiff here) with no prior arrest charges involving violence or weapons." *Id.* at *85.

"Finally, and perhaps most significantly, the authors of the study stated that '[i]n terms of some potentially important differences in risk for later criminal activity, *this study was too small to determine whether the differences occurred by chance*.'" *Id.* (quoting Wright at 89). The time has long passed for the government to retire this study.

The government also relies on Garen J. Wintemute, et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchases of Handguns*, 280 J. AM. Med. Ass'n 2083 (1998), for the proposition that misdemeanants, generally, cannot be entrusted with firearms. Gov't Br. at 18. Not just those who have been dishonest—*all* misdemeanants. If true, relevant, and sufficient to carry the government's step two burden, this breathtaking claim would swallow *Binderup*'s holding and act to prohibit all as-applied challenges. But the Third Circuit found this study to be less than useful in *Binderup*, 836 F.3d at 355, and it suffers from various problems in this case's context as well.

For starters, Wintemute studied only people younger than 50. Wintemute at 2083. "We . . . excluded from the study all persons who were 50 years or older at the time of handgun purchase." *Id.* at 2084. Range will turn 51 next month. The sampled individuals might have been misdemeanants, but they were nothing like Range. "Preliminary sampling suggested that approximately half of all handgun purchasers with any prior criminal history had been charged with an offense involving firearms or violence." *Id.* This was a feature, not a bug: "Sample sizes were planned to maximize statistical power for comparisons involving this subgroup." *Id.* Indeed, Wintemute's subjects were extraordinarily lawless. "[T]he 3128 handgun purchasers with at least 1

17

prior conviction for a misdemeanor offense had amassed 7907 such convictions in total, including 337 for nonviolent firearm-related offenses and 672 for violent offenses." *Id.* at 2085. The observation period was 15 years. *Id.* at 2083. Range's conviction took place in 1995. Still he has not re-offended.

This is not a small point. "[T]he passage of time since a conviction can be a relevant consideration in assessing recidivism risks." *Binderup*, 836 F.3d at 354 n.7. In *Binderup*, it was "common sense" that the passage of time—a demonstrated record of no recidivism—proved more persuasive than a merely predictive (and deficient) study. *Id.*

The government should have known that these studies are inadequate. *Binderup* discusses some of them specifically. The challengers in that case, like Range, were misdemeanants who served no jail time. As Judge Ambro summed up, "The problem in our cases is that because the Government's evidence sweeps so broadly, it does not establish that the restriction serves an important interest even as applied to people *like* the Challengers, let alone to the Challengers themselves." *Binderup*, 836 F.3d at 355 n.8. Without mentioning that *this* circuit rejected the Wintemute study's relevance in a case of two non-incarcerated misdemeanants, the government points out that the Seventh Circuit approved of it in *Kanter* v. *Barr*, 919 F.3d 437, 449 (7th Cir. 2019). Gov't Br. at 18. But then, *Kanter* was a *felon* whose fraud cost the government over $27 million dollars. He paid a $50,000 fine—and was imprisoned. *Kanter*, 919 F.3d at 440.

> D.    Range never violated Section 922(g). And neither Range nor his wife committed any so-called "straw" purchases.

Range takes exception to the government's allegations that he violated federal law by knowingly possessing firearms in violation of Section 922(g)(1), and having engaged in "straw" purchases with his wife. That is simply untrue, and the government should, and may, know better.

Defendants in state court are often not advised of federal collateral consequences. Many state judges, and lawyers whose practices are limited to state courts, are unfamiliar with these laws, and some of these lawyers are not competent. In *Padilla* v. *Kentucky*, 559 U.S. 356 (2010), the Supreme Court held that people surprised by such consequences, at least in the immigration context, may have a valid claim that they were denied effective assistance of counsel under the Sixth Amendment. Justice Alito specifically noted that *Padilla* could extend to cases involving "ineligibility to possess firearms." *Id.* at 376 (Alito, J., concurring).[9] Had Range been charged with a felony, or had his judge seriously contemplated imprisoning him for over a year, Range would have been appointed counsel. But Range had no Sixth Amendment right to counsel because the court never intended to imprison him. *Scott* v. *Illinois*, 440 U.S. 367, 373-74 (1979); *United States* v. *Jones*, 418 U.S. 368, 371 (3d Cir. 2005). Range was thus not represented, and did not even have incompetent legal advice. Range SMF 20; Range Dep. T. ("T.") 35:21-36:6. The court never advised him of the federal prohibition. Range SMF 21, 22; T. 36:7-12. "I sat down, and I will assume it was the prosecutor or whoever was there, the state person, I remember her walking up and saying plead guilty, you're going to get probation and a fine, we'll be done. I said okay." T. 35:15-19.

Range's unawareness of his firearm bar is not uncommon. As the Department of Justice must know, the Supreme Court recently declined to "believe that Congress would have expected defendants under §922(g) and §924(a)(2) to know their own statuses" as that would mean that "these provisions might apply to a person who was convicted of a prior crime but sentenced only to probation, who does not know that the crime is '*punishable* by imprisonment for a term exceeding one year.'" *Rehaif* v. *United States*, 139 S. Ct. 2191, 2197-98 (2019) (citing Section 922(g)(1)).

---

[9]The Supreme Court denied a petition for certiorari asking this precise question filed by undersigned counsel. *Medina* v. *California*, 569 U.S. 975 (2013).

Range was not merely uninformed of his firearm prohibition. He was misled as to his status when gun store employees repeatedly told him that his background check denials were erroneous, because he had not committed some specifically prohibiting offense (likely relying on 18 Pa. C.S. § 6105(b)). Range SMF 24, 25.

> [T]he guy at the gun store had read off a list of stuff that said if you ever do this, this and this. I mean, it was just crazy stuff, some of the stuff he read. And of course I said no, and then he said something like into the -- as to the effect or -- that people get turned down, and I believe he -- he said to me wait a couple days and try again.

T. 18:22-19:4. "[H]e read down drug trafficking and child stuff and just, you know, stuff that, of course, I've never done. And I still was at a loss. I just—I thought it had to be a mistake." T. 19:18-21.

The claims that Range and his wife knew that Range could not legally buy a gun, Gov't Br. at 2; that Range's wife "circumvented" the law, *id.*, with a "straw" purchase, *id.* at 18, that Range repeatedly "rel[ied] on his wife's acquisition of firearms, which allowed him on two occasions to evade" Section 922(g)(1), *id.* at 14, are unhinged — false and plainly contrary to the record.

Range knew what he was told: that he hadn't committed an offense on a list of disabling offenses. But when Range did discover the truth, *he disposed of his rifle*. Range SMF 26; T. 16:4-6. Range strongly values his Second Amendment rights, and he loves to hunt. Yet he immediately brought himself into compliance with Section 922(g)(1) once he learned of it, and years later, brought this lawsuit for a declaration of his rights. This is hardly the behavior of someone who thumbs his nose at the law. The very fact of this lawsuit debunks the government's narrative.

As for what Range's wife knew, Range renews his objection to the government's question as to whether his wife knew that he "couldn't legally own a firearm," as calling for speculation as to his wife's state of mind and legal knowledge. T. 22:1-6. The government could have deposed her. In

20

any event, Range's answer makes clear: "My wife did know [about the denial]. We thought for sure that it was a mess-up in the system. I mean, we looked down this list of things and, I mean, I've never drug-trafficked or, you know, any of these things. She's known me since kindergarten, I don't think she was concerned about it." T. 22:12-20.

Because there is no record evidence suggesting—and much record evidence *refuting*—the notion that Range's wife knew her husband was prohibited from having guns and intended to circumvent the law, the accusations leveled at her here by the government are inappropriate. The comparison to the gun trafficking enterprise that dealt with obliterated serial numbers in *Commonwealth* v. *Hill*, 210 A.3d 1104 (Pa. Super. Ct. 2019), is bewildering.

The government also misstates the law with respect to straw purchases. It is not true that "[w]hen Range's spouse declared on the ATF Form 4473 that she was the 'actual buyer' of the firearm, she and Range made a false statement intended to conceal from the dealer that the actual buyer of the firearm was Range." Gov't Br. at 19 n.5. The government relies on *Abramski* v. *United States*, 573 U.S. 169 (2014) for this proposition, but that case provides otherwise. It accurately quotes ATF Form 4473 for the proposition that "You are also the actual transferee/buyer if you are legitimately purchasing the firearm as a gift for a third party." *Id.* at 174.

As the government concedes, it is perfectly legal for a person to gift a rifle to a spouse. Gov't Br. at 18 n.5. Range testified that his wife gifted him firearms. T. 14:2-4, 16:14-16, 17:4-7. There is no evidence suggesting that he gave her money to purchase guns on his behalf. This is hardly the stuff of straw purchases.

E.    The government's failure to discover anything that would advance its step two argument does not mean that *Binderup* was wrongly decided.

Finally, at step two, the government persists in arguing against the concept of as-applied challenges. It points to the old 18 U.S.C. § 925(c) process to claim that "the Second Amendment does not require courts to engage in an ad hoc and standardless inquiry into individual dangerousness as a prerequisite for section 922(g)(1)'s application." Gov't Br. at 20. But *Binderup* already rejected this argument, offering that the step one inquiry is "easily administrable" and objective, 836 F.3d at 353 n.5, while at step two, heightened scrutiny is well-suited to testing predictive judgments, *id*. at 355 n.8.

If the government had actual evidence that Range is dangerous, it would not have concocted the "straw purchase" accusation. In *Binderup*, the government chose to forego discovery. If it conducted any investigation of the challengers, the results were not shared with the courts. Here, the government sought discovery, and Range (unlike the government) fully cooperated. He produced extensive documents, answered interrogatories, and sat down for a deposition. But he is who he is—a stable, hard-working, law-abiding 50-year-old family man who committed a nonviolent, non-dangerous misdemeanor nearly 30 years ago, and who has zero indications of firearms risk. Courts routinely determine whether people are dangerous, in myriad contexts, with much less inquiry.

The government has always been on notice that it carries a step two burden to connect Range to firearms risk. It had a fair chance to do that. Its failure is no fault of *Binderup*.

CONCLUSION

The government's motion for summary judgment lacks merit. It should be denied.

22

Dated: February 5, 2021                    Respectfully submitted,

By:  /s/ Alan Gura_____          By:   /s/ Michael P. Gottlieb_____
    Alan Gura*                                      Michael P. Gottlieb
    Gura PLLC                                        PA Bar No. 36678
    916 Prince Street, Suite 107             319 Swede Street
    Alexandria, VA 22314                      Norristown, PA 19401
    703.835.9085/Fax 703.997.7665     610.279.4200
    alan@gurapllc.com                          Mikem1a1@aol.com

    *Admitted pro hac vice                     Attorneys for Plaintiff

23