## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRYAN DAVID RANGE,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **No. 20-3488** |
| **REGINA LOMBARDO** *et al.,* | : | |
| *Defendants* | : | |

## MEMORANDUM

PRATTER, J.                                                      AUGUST 30, 2021

Bryan Range pled guilty to making a false statement to obtain food stamps assistance more than 25 years ago, which was then a misdemeanor offense. While Mr. Range served no time in prison because of this conviction, the crime to which he pled guilty was punishable by up to five years' imprisonment. As a result, 18 U.S.C. § 922(g) prohibits him from owning a weapon.

Mr. Range seeks the Court's declaratory judgment that § 922(g) as applied to him violates the Second Amendment. Because the Court concludes that Mr. Range's conduct is sufficiently "serious," as that term is defined by Third Circuit precedent, § 922(g) is constitutional as applied. The Court will grant the Government's motion for summary judgment, and deny Mr. Range's motion for summary judgment.

### BACKGROUND

Mr. Range pled guilty, in August 1995, to one count of making a false statement to obtain food stamps assistance, in violation of 62 Pa. C.S. § 481(a). At that time, Mr. Range mowed lawns for a living, earning between $9 and $9.50 an hour, or approximately $300 per week. He and his wife struggled to make ends meet caring for their three children—a three-year-old and twin two-year-olds. Mrs. Range prepared an application for food stamps, which she and Mr. Range both signed. The application omitted Mr. Range's income. Mr. Range alleges that he did not review

1

the application, but accepted responsibility for it and acknowledged that it was wrong to not fully disclose his income. Mr. Range was sentenced to three years' probation, which he satisfactorily completed, $2,458 in restitution, $288.29 in costs, and a $100 fine. He served no time in jail. But as will become relevant later, Mrs. Range—who allegedly prepared the application and also signed it—was not charged with a crime.

Violations of 62 Pa. C.S. § 481(a) were at the time classified as first-degree misdemeanors,[1] punishable by up to five years' imprisonment. Mr. Range alleges that when he pled guilty, neither the prosecution nor the judge informed him of the maximum potential sentence, or of the fact that by pleading guilty, he thereafter would be barred from possessing firearms.

Since 1995, Mr. Range's only other "criminal" history includes minor traffic and parking infractions, as well as a fishing offense in 2011. He testified that he thought he had renewed his fishing license, and that after paying the fine, he renewed the license.

At one time, Mr. Range attempted to purchase a firearm, but was rejected by the background check system. The employee at the gun store Mr. Range visited reviewed a list of prohibiting offenses with Mr. Range, and Mr. Range verified that he had not committed any of them. The employee told Mr. Range that the rejection was likely due to a computer error (a

---

[1] Mr. Range's conduct was classified as a first-degree misdemeanor at the time, but in 2018 the Pennsylvania legislature amended 62 Pa. C.S. § 481 so that fraudulently obtained assistance of $1,000 or more is now classified as a felony of the third degree. However, the parties agree—as does the Court—that the classification of Mr. Range's conduct at the time of his conviction governs. *See Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 351 (3d Cir. 2016) (en banc) ("[T]he category of serious crimes changes over time as legislative judgments regarding virtue evolve."); *United States v. Irving*, 316 F. Supp. 3d 879, 890 (E.D. Pa. 2018), *aff'd sub nom. United States v. Mills*, No. 18-3736, 2021 WL 2351114 (3d Cir. June 9, 2021) (applying *Binderup* and noting that "having the Court rule on the constitutionality of an [indictment] based on a jury's verdict some two months later" would "require some form of judicial time travel").

common refrain of modern life), and that he should retry his purchase at a later time.  But because Mrs. Range had not been convicted of falsifying the application (or any other crime), she was able to pass a background check.  She purchased a hunting rifle and gifted it to Mr. Range.  When that gun later was destroyed in a house fire, she gifted him a different rifle.

Years later, Mr. Range again tried to purchase a gun and was again rejected.  Once more, the store employee told him that the rejection was a mistake.  But when Mr. Range researched the matter further, he learned that he was barred from possessing firearms because of his public assistance application conviction.  Mr. Range sold his only firearm so that he would be compliant with the law, and then he brought this lawsuit.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

On a motion for summary judgment, the Court views the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255.  However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant is initially responsible for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## DISCUSSION

The controlling issue in this case is what limits the Second Amendment puts on the ability of governments to limit access to firearms because of a citizen's non-violent misdemeanor conviction. This debate asks how to interpret language in the Supreme Court's watershed Second Amendment case, *District of Columbia v. Heller*, 554 U.S. 570 (2008). After concluding that the Second Amendment protects an individual's right to possess firearms, the Supreme Court stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and that such laws are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26. However, courts have grappled with whether a

4

challenger could rebut *Heller*'s "presumption" that such laws are lawful, at least as applied to them, and whether laws that prohibit the possession of firearms by misdemeanants are also consistent with the Second Amendment.

Our Third Circuit Court of Appeals very recently addressed and tackled one of the "uncharted frontiers" remaining after *Heller*. *See Drummond v. Robinson Twp.*, No. 20-1722, 2021 WL 3627106 (3d Cir. Aug. 17, 2021). While analyzing the issue of the possible interference of zoning rules with citizens' Second Amendment right to bear arms, the appellate panel underscored lessons from *Heller* that demand the delicate balancing of the right to bear arms with the not unlimited nature of that right that leaves room for lawful restrictions, subject to heightened judicial scrutiny on it. *Id.* at *11-12.

Turning to the specific *Heller* frontier presented by Mr. Range, the Third Circuit Court of Appeals first considered this question en banc in *Binderup v. Attorney General of the United States of America*, 836 F.3d 336 (3d Cir. 2016) (en banc). *Binderup* itself shows the challenging topography of the topic. Three opinions were issued in *Binderup*, none of which represented a majority. Judge Ambro, joined by two other judges, wrote for the court. Judge Hardiman was joined by four other judges, concurring in the judgment. Judge Fuentes was joined by six other judges in an opinion concurring in part and dissenting in part. The Third Circuit Court of Appeals has since treated Judge Ambro's opinion as controlling based on an analysis under *Marks v. United States*, 430 U.S. 188, 193 (1977), because it represented the median position between the dissenting and concurring opinions. *See Beers v. Attorney General*, 927 F.3d 150, 155-56 (3d Cir. 2019), *judgment vacated on other grounds*, *Beers v. Barr*, 140 S. Ct. 2758 (mem.) (2020).

*Binderup* adopted, with some modifications, *United States v. Marzzarella*'s two-step approach to determining whether a crime was "serious." *Binderup*, 836 F.3d at 345 (citing *United*

*States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)).  At the first step, a court considers whether the Second Amendment is implicated.  *See Drummond*, 2021 WL 3627106, at \*3 (citing *Marzzarella*, 614 F.3d at 89).  If the claimant has committed a "serious" offense, rendering that person an "unvirtuous citizen" who was historically barred from possessing a firearm, that person is judged to have lost his or her Second Amendment rights.  *Holloway v. Attorney General United States*, 948 F.3d 164, 171 (3d Cir. 2020) (quoting *Binderup*, 836 F.3d at 348-49).  "[I]f the challenger succeeds at step one, the burden shifts to the Government to determine that the regulation satisfied some form of heightened scrutiny."  *Binderup*, 836 F.3d at 347.  *See also Drummond*, 2021 WL 3627106, at \*3.

Accordingly, the Court will first consider whether Mr. Range's conduct is sufficiently "serious" for Mr. Range to lose his Second Amendment rights.  Then, if it finds that the Second Amendment is implicated, it will consider whether the Government has carried its burden of demonstrating that the regulation satisfies heightened scrutiny.

### A. *Marzzarella* Step One: Whether the Second Amendment is Implicated

*Binderup* set forth a nonexclusive four-factor test for determining whether a crime is "serious": "(1) whether the conviction was classified as a misdemeanor or a felony, (2) whether the criminal offense involves violence or attempted violence as an element, (3) the sentence imposed, and (4) whether there is a cross-jurisdictional consensus as to the seriousness of the crime."  *Holloway*, 948 F.3d at 172 n.10 (citing *Binderup*, 836 F.3d at 351-52).  *Holloway* itself added one more factor: (5) the potential for physical harm to others. *See id.* at 173.

The Government concedes that Mr. Range satisfies four out of the five factors.  His conviction was classified as a misdemeanor, the criminal offense does not involve violence or attempted violence as an element, he was not sentenced to any jail time, and the crime involved

no potential for physical harm to others.   But the parties dispute whether there is a "cross-jurisdictional consensus" as to the seriousness of his crime.

The parties agree that between 39 and 41 jurisdictions in the United States would have classified Mr. Range's conduct as a felony.[2]  Mr. Range concedes that 39 jurisdictions would likely constitute a consensus, and the Court agrees—for at least two reasons.  First, the word "consensus" implies something short of total unanimity, but rather the acknowledged existence of a "general agreement."   *See* Consensus, Black's Law Dictionary (11th ed. 2019) ("A general agreement; collective opinion."); Consensus, Shorter Oxford English Dictionary (6th ed. 2007) ("Agreement or unity of opinion, testimony, etc.; the majority view, a collective opinion . . . .").   Second, as the challenger, the burden rests with Mr. Range to make a "'strong' showing that . . . he has not committed a 'serious' crime."   *Holloway*, 948 F.3d at 172 (quoting *Binderup*, 836 F.3d at 347).   Therefore, even if this particular case falls close to the line, it is Mr. Range's burden to prove that there is *not* a consensus.

But Mr. Range argues that the proper point of reference is not all 50 states, but rather only those states that criminalize the making of a false statement regarding food stamps specifically.   He argues that the Court should disregard the 15 states that punish conduct like Mr. Range's as a felony under a general theft or falsification statute.

The Court disagrees.   Every time that the Third Circuit Court of Appeals has applied the *Binderup* balancing test, it has considered the laws of all 50 states.   Mr. Range cites no authority for his argument that the Court should only consider laws that define the elements of a crime in the same way as the state in which the challenger was convicted.   Instead, he argues that the law

---

[2]     *See* Doc. Nos. 17 at 18; 18 at 6.   Because the parties agree that the difference between 39 and 41 jurisdictions should make no difference to the Court's analysis, the Court will not discuss the details of the parties' dispute over the classification of the remaining two jurisdictions.

should recognize that "there is a difference between a poor parent who applies for too many food stamps, and a sophisticated fraudster who schemes to systematically bilk Medicare of millions." Perhaps, like compassionate human nature, or a personal gauge of morality, the law should make such a distinction.  Indeed, it can certainly be said that the law should be written in a way to recognize many finer or closer distinctions than it does.  No doubt there are even finer gradations of guilt between the two extremes Mr. Range proposes.[3]  But under our system of government it is within the prerogative of every state to choose between having a more complex criminal code that defines its statutes narrowly, and more general criminal statutes that are accompanied by a greater range of possible punishments.   Nothing in *Binderup*, or any opinion applying its multifactor test, provides that a state's choice to classify conduct like Mr. Range's as a felony is irrelevant merely because the drafters of the laws in any given state choose to define crimes with more general language.

Because the Court has concluded that there is a cross-jurisdictional consensus that making a false statement regarding food stamps is serious, the question is whether this one factor is sufficiently important for the Government to prevail here.   Mr. Range argues that it is not, for several reasons.  First, he argues that the law's classification as a misdemeanor or a felony is the most important factor.  In support of this argument, he notes that the Third Circuit Court of Appeals has described the law's classification as "generally conclusive."  *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 900 (3d Cir. 2020), *cert. denied sub nom. Folajtar v. Garland*, No. 20-812, 2021 WL 1520793 (U.S. Apr. 19, 2021).  The Third Circuit Court of Appeals has also held that the underlying conduct's "potential for danger and risk of harm to self and others" was

---

[3]      Indeed, the compelling tug on the human heart such as Mr. Range appears to present has stood the test of time and modalities in literature. *See* Victor Hugo, Les Misérables (Norman Denny trans., Penguin Books 1982) (1862).

sufficiently important that the Government prevailed even though the other four factors weighed in favor of the challenger. *See Holloway*, 948 F.3d at 164. Mr. Range reasons that because *Binderup* endorsed a balancing test, he need not prevail on every factor, especially where, as here, both of the factors that the Third Circuit Court of Appeals has treated as most important support his claim.

Mr. Range's position is not without merit. The plurality opinion in *Binderup* described the factor test as a balancing test, not a set of elements that all petitioners must meet. *See Binderup*, 836 F.3d at 351. And Judge Fuentes's opinion dissenting in part likewise viewed the plurality's holding as endorsing a balancing test of factors. *See id.* at 411 ("Judge Ambro's approach . . . would require district court judges to consider a variety of factors in order to assess a crime's 'seriousness' . . . .") (Fuentes, J., dissenting). One could reason that had *Binderup* intended future challengers to "run the gauntlet," satisfying every factor, it would have said so.

However, that is not how subsequent opinions interpreting *Binderup* have used the multifactor test. Both times that it has applied *Binderup*, the Third Circuit Court of Appeals has held for the Government even though only one factor weighed in its favor. The Government prevailed in *Holloway* even though only the (newly-minted) "likelihood of physical harm" factor weighed in its favor. *Holloway*, 948 F.3d at 173. The Government also prevailed in *Folajtar* even though the only factor in its favor was the law's classification as a felony rather than a misdemeanor. *Folajtar*, 980 F.3d at 900. Indeed, the fact that the dissents in *Folajtar* and *Holloway* both argued that the majorities had improperly treated one factor as dispositive only confirms this interpretation of those opinions. Even more important is language in *Binderup* itself. While no court has held that the cross-jurisdictional factor is similarly important, dicta in *Binderup* suggests that its absence would have been dispositive. *See Binderup*, 836 F.3d at 353 ("Were the

Challengers unable to show that so many states consider their crimes to be non-serious, it would be difficult for them to carry their burden at step one.").

Mr. Range next argues that the Government's proposed approach improperly renders the law's classification as a "one-way rachet, employed only in felony cases to assist the government's defense but relegated to a lower status when considering misdemeanors." Doc. No. 13-1 at 16. But a one-way rachet is exactly what the Third Circuit Court of Appeals has twice imposed, once in *Folajtar* where it treated a crime's classification as dispositive, and once in *Holloway* where it relied solely on the likelihood of physical harm. While Mr. Range argues that *Folajtar* stands for the proposition that a law's classification as a felony or a misdemeanor is "generally conclusive," that is not what *Folajtar* said. Rather, it said that "the legislature's designation of an offense as a felony is generally conclusive in determining whether that offense is serious." *Folajtar*, 980 F.3d at 900. It simply did not speak to the relative importance of a law's classification as a misdemeanor. Thus, this Court cannot adopt Mr. Range's view that a law's classification as a misdemeanor is generally conclusive that a law is not serious, because this would be inconsistent with *Holloway*, which held for the Government even though the offense was a misdemeanor. *See Holloway*, 948 F.3d at 174 ("While 'generally the misdemeanor label . . . in the Second Amendment context is . . . important' and is a 'powerful expression' of the state legislature's view, it is not dispositive." (alterations in original) (quoting *Binderup*, 836 F.3d at 352)).

While Mr. Range argues that this approach is inconsistent with *Binderup*'s description of the standard as a "balancing test," the Court is bound to follow *Folajtar* and *Holloway*. Moreover, this route makes sense when considered against the wider context of as applied challenges to § 922(g)(1). Challengers like Mr. Range do face an uphill battle because statutes are presumptively constitutional. *See, e.g., Holloway*, 948 F.3d at 172 (noting that the burden rests

with the challenger to demonstrate that § 922(g) is unconstitutional as applied); *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 270 (1827) (noting that courts should "presume in favor of [a statute's] validity, until its violation of the Constitution is proved beyond a reasonable doubt"). And it is not merely each state's determination of a statute's seriousness that the Court is considering. Congress has also determined that the conduct in question was sufficiently serious to justify disarmament. This fact operates as a powerful "sixth factor" present in every case, weighing in favor of the Government.

While the Court acknowledges that this can be considered a matter of first impression, it concludes that the cross-jurisdictional consensus factor—like the subject law's classification as a felony, and the likelihood of physical harm—is generally conclusive that a crime is serious.[4] *See Binderup*, 836 F.3d at 353.

## CONCLUSION

For the foregoing reasons, the Court will grant the Government's Motion for Summary Judgment, and deny Mr. Range's Motion for Summary Judgment. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[4] Because the Government prevails at *Marzarella* step one, the Court will not proceed to step two to consider whether the Government has produced sufficient evidence to withstand heightened scrutiny.