```
 1                  IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3
    BRYAN DAVID RANGE,                     :  CIVIL ACTION
 4                                         :
                   Plaintiff,              :
 5            vs.                          :
                                           :
 6  JEFFREY A. ROSEN, Acting Attorney      :  NO. 20-3488
    General of the United States, et al.   :
 7                                         :
                   Defendants.             :
 8
                             PHILADELPHIA, PA
 9                           JULY 1, 2021

10  BEFORE:      THE HONORABLE GENE E.K. PRATTER, J.

11              HEARING ON MOTIONS FOR SUMMARY JUDGMENT
    APPEARANCES:
12                    GURA PLLC
                      BY:  ALAN GURA, ESQUIRE
13                    916 Prince Street, Suite 107
                      Alexandria, VA  22314
14                        - And -
                      MICHAEL P. GOTTLIEB, ESQUIRE
15                    319 Swede Street
                      Norristown, PA  19401
16                    For Plaintiff

17                    WILLIAM M. MCSWAIN
                      UNITED STATES ATTORNEY
18                    BY:  PAUL J. KOOB, ESQUIRE
                      ERIC D. GILL, ESQUIRE
19                    Assistants United States Attorney
                      615 Chestnut Street, Suite 1250
20                    Philadelphia, PA  19106-4476
                      For Defendants
21
                      KATHLEEN FELDMAN, CSR, CRR, RPR, CM
22                    Official Court Reporter
                      Room 1234 - U.S. Courthouse
23                    601 Market Street
                      Philadelphia, PA  19106
24                    (215)779-5578

25          (Transcript produced by machine shorthand via C.A.T.)
```

```
 1                    (Deputy Clerk opened court)

 2            THE COURT:  Hello, everybody.  Please take your

 3  seats.  Make yourselves comfortable, please.

 4            This is the time set aside for oral argument in the

 5  case of Range versus Barr which is docketed at 20-3488 on the

 6  Court's docket.

 7            Let's take attendance first off.

 8            MR. GURA:  Good morning, Your Honor.  Alan Gura for

 9  the plaintiff.

10            MR. GOTTLIEB:  Good morning, Your Honor.  Michael

11  Gottlieb also for the plaintiff.

12            MR. GURA:  And I should say we're joined here by our

13  client, Mr. Range.

14            THE PLAINTIFF:  Hi.

15            THE COURT:  Hi, Mr. Range, how are you doing?

16            THE PLAINTIFF:  All right.

17            THE COURT:  How was the drive or the train or

18  however you guys came in?

19            MR. GOTTLIEB:  My drive was horrible.  Traffic,

20  traffic, traffic just from Norristown.

21            THE COURT:  Welcome to our world.

22            MR. GURA:  The train was fine with me.  Thanks, Your

23  Honor.

24            THE COURT:  Okay.  Well, that's good.

25            MR. KOOB:  Good morning, Your Honor.  Paul Koob for
```

1    the Federal Defendants.

2              MR. GILL:  Good morning, Your Honor.  Eric Gill.

3              THE COURT:  Mr. Gill, I haven't seen you in a while.

4    It's nice to see you again.

5              MR. GILL:  Very nice to see you.

6              THE COURT:  Did you bring up to date your interns

7    from the U.S. Attorney's Office about this case?

8              MR. GILL:  They are here.

9              THE COURT:  Well, I know they're here.

10             MR. GILL:  They're interested in the argument.

11             THE COURT:  Okay.  Well, I think although normally I

12   run into these cases, just to tell everybody, we have a number

13   of interns here from the U.S. Attorney's Office who are

14   interested in the argument just generally to see what goes on

15   in court and so I'm going to ask that as part of the

16   presentations that there is a little bit more than I would

17   normally need of a background description of the case and the

18   posture of it as well as the principal legal issues and then

19   we can get into discussing the argument and my questions if

20   that doesn't upset your apple carts, gentlemen.

21             MR. GURA:  That's okay, Your Honor.

22             THE COURT:  Oh, good, glad to hear it.

23             All right, we have an issue that's very interesting,

24   very timely in some respects, and the motion for summary

25   judgment is -- I guess they're cross motions so it doesn't

1  matter to me who goes first, but whoever goes first has the

2  obligation to set the stage in a more elaborate way than would

3  be typical.

4          Do you want to toss a coin?  What?  It doesn't

5  matter to me.

6          MR. GURA:  I can go first or you can go first.  I

7  don't care.

8          MR. KOOB:  I'll defer to you then.

9          MR. GURA:  All right.  Well, I can start, Your

10  Honor, as long as I get a reply.

11          THE COURT:  Yes.

12          MR. GURA:  Good morning, Your Honor.  Alan Gura for

13  the plaintiff, Bryan Range.

14          Section 922(g) is called the felon in possession law

15  by many courts and lay people, but actually the statute itself

16  does not use the term felony.

17          THE COURT:  Neither do the Court's instructions to

18  the juries when we have that case.

19          MR. GURA:  That's good to know.  The statute says

20  that anyone who's convicted by a crime punishable by over a

21  year in jail or a state misdemeanor punishable by over two

22  years in jail is forbidden from having firearms forever under

23  all circumstances for life.  The statute is quite broad in its

24  application.  And in this case, there is no challenge to

25  whether or not it's facially valid.  There have been a number

1    of cases by people who are charged with a violation of this

2    prohibition and they have all kinds of arguments that the

3    statute is overbroad or it violates the Second Amendment on

4    its face in some capacity, but those types of arguments are

5    not at issue here in the case.  Rather, the issue here is

6    whether or not the statute can be applied, it's an as-applied

7    challenge to Mr. Bryan Range based on his personal

8    circumstances and based on the facts of his offense and his

9    life thereafter.

10           The Third Circuit en banc in a case called Binderup

11    a number of years ago in 2016 accepted the notion that

12    as-applied challenges to Section 922(g)(1) are permissible

13    after all.  In Heller, the Supreme Court said that felon bans

14    are presumptively lawful, and as the Third Circuit reasoned,

15    presumptions in law are typically capable of being overcome

16    based on some circumstances and if we didn't allow for

17    as-applied challenges, we would have a funny situation where

18    you would have a fundamental right to do something and then

19    Congress has complete authority to define who has the right to

20    access this fundamental right and you can't have a

21    constitutional right whose limits are defined by the Congress.

22    The Constitution acts as a limitation on Congress' power and

23    so Congress can --

24           THE COURT:  Heller is 2008?

25           MR. GURA:  That's correct.

1            THE COURT:  And Binderup is eight years later?

2            MR. GURA:  Correct.  Correct.  So there must be some

3    way for a person to come to court and say, As applied to me,

4    this violates my rights.

5            The Court in Binderup was split as to exactly what

6    makes for an as-applied challenge, but over future cases, it's

7    come to be accepted law in this circuit that Judge Ambro's

8    plurality opinion is the controlling law of the Third Circuit.

9            THE COURT:  Have you ever tried to sketch out

10   Binderup --

11           MR. GURA:  Yes.

12           THE COURT:  -- in the opinions?  It's a mess.

13           MR. GURA:  Yes, it's highly fractured and there are

14   some judges who didn't write separately, but their opinions

15   are noted in footnotes of other judges and so it is quite

16   complicated, but the one thing we do know for sure is that

17   Judge Ambro's opinion, for better or worse, is the controlling

18   law and by arguing today under Judge Ambro's controlling

19   opinion, we don't mean to give up our claim preserved in the

20   papers that should some other court wish to change this view,

21   we believe that Judge Hardiman's concurring opinion actually

22   sets forth the better approach to the Second Amendment.

23           THE COURT:  Judge Ambro was joined by two of his

24   colleagues.

25           MR. GURA:  That's right.

1          THE COURT:  Judge Hardiman wrote and was joined by

2    four of his colleagues concurring in the judgment.

3          MR. GURA:  That's correct.

4          THE COURT:  And then Judge Fuentes contributed an

5    opinion that was concurring and dissenting and he has six

6    colleagues.

7          MR. GURA:  That's correct, where Judge Fuentes --

8          THE COURT:  That's more than there were on the Court

9    at the time.

10         MR. GURA:  That's correct.  We had in both cases --

11    there was consolidated cases and actually I argued that case

12    three times because it was argued before two panels and then

13    the Court decided they needed to rehear it en banc.

14         THE COURT:  It must have been quite frustrating.

15         MR. GURA:  No, it was great.  We get to do this

16    three times and by the third time, you know, we sort of

17    figured it out.

18         But, in any event, where Judge Fuentes joined with

19    Judge Ambro was on the idea that the two-step process of

20    Marzzarella was going to be governing.  Where they departed is

21    that Judge Fuentes' dissent offered that anything that fits

22    the definition of Section 922(g)(1) is going to be lawful and

23    end the challenge in step one and Judge Ambro felt that that

24    was not the case.  And so there were eight judges, Judge

25    Ambro's contingents plus Judge Hardiman's contingents who

```
 1    believed that the challenges should prevail, but then those

 2    eight split three and five as to what the theory would be.

 3    Judge Ambro applied the two-step methodology from Marzzarella

 4    and offered a variety of factors at the first step as to what

 5    makes the crime serious meaning that it is okay for Congress

 6    to prohibit a person with that conviction from having guns and

 7    then if the challenger meets step one, the Government then has

 8    a burden of step two to show that prohibiting this individual

 9    from having firearms satisfies --

10            THE COURT:  Okay, but just to keep track of all the

11    steps we have to go through, Binderup has four steps.

12            MR. GURA:  Correct.

13            THE COURT:  And Marzzarella has two steps.

14            MR. GURA:  No, Your Honor.  Binderup and Marzzarella

15    both have a two-step process in terms of whether or not the --

16    I'm doing this in part per your instructions, Your

17    Honor's instructions for the benefit of the folks in the

18    audience, but the first step in Binderup is divided into four

19    factors and then in Holloway, the Third Circuit added a fifth

20    factor.  And so if, figuring out these four, now five factors,

21    the challenger carries his or her burden to show that the

22    regulation impacts something that's within the ambit of the

23    Second Amendment, then the burden shifts to Marzzarella step

24    two where the Government has the burden.

25            THE COURT:  Okay, the Marzzarella step one is the
```

1   five Binderup factors.

2           MR. GURA:  Correct.

3           THE COURT:  The first being --

4           MR. GURA:  Classification.

5           THE COURT:  Okay, is it a misdemeanor or felony.

6           MR. GURA:  Correct.

7           THE COURT:  The second is did it involve violence or

8   attempted violence.

9           MR. GURA:  Right.

10          THE COURT:  Third, what was the sentence imposed.

11          Fourth is then this consensus, cross-jurisdictional

12   consensus concept which we're going to come back to in a

13   minute.

14          MR. GURA:  Sure.

15          THE COURT:  And then the fifth, the Holloway, I

16   think, brought us the fifth and that is the potential for

17   harm.

18          MR. GURA:  That's right.

19          THE COURT:  Right?

20          MR. GURA:  The dangerousness of the actual offense.

21          THE COURT:  Okay.  And then the Marzzarella step two

22   would be --

23          MR. GURA:  The Government would have to carry a

24   burden of showing that -- an intermediate scrutiny burden of

25   showing that applying the law to the challenger advances

1    public safety without -- satisfies an important interest in

2    public safety without going too far in terms of burdening the

3    challenger's rights.

4              With respect to -- I guess I should start --

5              THE COURT:  Now, why don't you --

6              MR. GURA:  Sure.  Sure.

7              THE COURT:  -- for the rule of completeness here --

8              MR. GURA:  Okay.

9              THE COURT:  -- talk about Mr. Range.

10             MR. GURA:  Sure.  So let's talk about Mr. Range.

11   Mr. Range is here because, I guess it's 30 years ago now, it

12   was in 1995 he was convicted of one count of misdemeanor --

13   first degree misdemeanor in Pennsylvania of not revealing

14   fully his income in applying for food stamp assistance for his

15   family.  At the time, the Ranges had three small children.

16   Mr. Range's wife was taking care of the kids, Mr. Range was

17   working, mowing lawns, not making a whole lot of money.  The

18   couple was struggling and they applied for food stamp

19   assistance and in the application to the Welfare Office, the

20   lawn mowing income was not disclosed.  This resulted in

21   additional benefits being given and this went on for a period

22   of time.  By the time that the state discovered this, the

23   excess benefits had come to total just under $2,500 over the

24   course of, I believe it was, about a year and so he was

25   charged with -- both, actually, Mr. Range and his wife were

1   charged with food stamp fraud essentially for not disclosing

2   fully the income.  Mr. Range at the time -- this was a

3   misdemeanor.  This was a Class 1 misdemeanor in Pennsylvania

4   punishable by up to five years in jail.  Therefore, it

5   triggers the application of 922(g)(1).  I should note that the

6   M1 classification in Pennsylvania that's at issue here is

7   exactly the classification that was at issue in Binderup.  Mr.

8   Binderup's violation was also an M1, Misdemeanor 1.

9          THE COURT:  And in Binderup, there really wasn't an

10   overwhelming toting up of the factors in favor of the

11   Government and yet the outcome was to uphold the denial of the

12   right to possess a firearm, was it not?

13          MR. GURA:  No, Binderup prevailed.

14          THE COURT:  But the collection of factors really was

15   so out of balance.  I mean it was not a tough contest there,

16   was it?

17          MR. GURA:  I would say it was not.  It was an '87

18   case, so, you know, who knows.  The judges may have thought it

19   was a closer call and certainly generated a lot of texts, but

20   as Binderup's counsel, I would say to me, it was a -- it was

21   not a close call, yes, but the very first factor was

22   classification.  The Court stressed there and has subsequently

23   told us in other cases that classification is really the most

24   important factor.  There is no litmus test, there is no one

25   factor that solves it all and the Court, the Third Circuit has

1    indicated time and again that it is -- it is a balancing test,

2    it's an art, if you will, but generally dispositive is the

3    word that the Third Circuit most recently used when referring

4    to classification as in Folajtar not long ago.  The Third

5    Circuit told us that they assigned classification primary

6    weight, and the reason the classification is so important is

7    because the courts like to defer to the legislature's

8    expertise and experience in reflecting the public's values as

9    to what is serious and what is not.

10         THE COURT:  And yet it would be your position I'm

11   surmising that Binderup does not require the person

12   challenging the application of 922(g) to satisfy all the

13   factors.

14         MR. GURA:  That's correct.

15         THE COURT:  Okay.

16         MR. GURA:  That's correct.  And the Courts have made

17   that clear because there is no single dispositive factor.  So

18   that means that you can -- you can lose a factor and still

19   carry the day.  There's no need to run an entire gamut,

20   although here I must say we have at least four of them I think

21   fairly clearly.  I think we have a dispute, a legitimate

22   dispute on cross-jurisdictional consensus, which I'll get to,

23   but classification is obvious, it's a misdemeanor.  We know

24   that from looking at the classification at the time and the

25   reason we look to classification is because it's the

1   legislature's view.  We may all have ideas about what's

2   serious and what's not, but this is really a legislative

3   judgment as to how society treats this particular crime and

4   oftentimes, you know, if you have a felon case, the person in

5   my position would say, Well, the classification is, you know,

6   not that important, the felon can still prove that he or she

7   is nonviolent, and the Government would say, Well, felon is a

8   very important --

9          THE COURT:  But do you not think that the label is

10  less important than the consequence?  I mean here this is,

11  whatever you call it, you know, call it a tea party, but if at

12  the end of the day or the end of the party, you're at risk for

13  being sent to prison for five years, isn't that what's

14  important as opposed to the label?

15         MR. GURA:  Okay, I believe that the label would be

16  somewhat more important because even within those five years,

17  there's a great deal of leeway.  Five years, very few

18  misdemeanors in Pennsylvania I think would get all full five

19  years.  There's an assignment by the legislature to the bench

20  of having some flexibility as to how to treat people, but the

21  sentence actually received I think is maybe more telling as

22  far as, you know, what happened in the particular

23  circumstance.  However, that may be my opinion.  The Third

24  Circuit's opinion and they've told us this several times is

25  that the most important factor is the classification itself.

1    It's generally dispositive.  They give it primary weight.

2    Those are their words.

3              THE COURT:  That's because it's easier.  Maybe not

4    the cause is easier, but it is certainly easier.

5              MR. GURA:  It is easier.  It is easier.  I suppose

6    some people might say it's because it's easier, they like to

7    give it primary weight.  I think the Third Circuit would say

8    no, because it actually reflects the judgment.  In any event,

9    what we know is for a fact that they've called it generally

10   dispositive and they give it primary weight.

11             So our position is if it's important for a felon to

12   challenge, like Ms. Folajtar, to say, Oh, that's it, you're a

13   felon, that's super important, well, it has to be important in

14   all cases.  It's not just important where the person is

15   classified as a felon, it should be important where the

16   person's also classified as not a felon.  In any event, that's

17   the first factor.

18             The second factor, there's really no dispute here.

19   This was not a violent crime.  There's no violence at all

20   involved in this type of offense.

21             Third, the sentence actually received.  What was the

22   sentence?  Well, Mr. Range walked out of court.  He was -- he

23   was told, Look, just plead guilty to this and you get a fine

24   and make restitution and, you know, a little bit of probation

25   and that's it and he said deal and that was that.  That

1    reflected the prosecution's view of the case in making him

2    that offer and it reflected the Court's view in taking it.

3    The Court, you know, didn't have to accept that, it could have

4    imposed a different sentence, but it did accept -- it did

5    approve of the prosecution's offer.  So the sentence actually

6    received was not a single day in jail.  Those are the words in

7    Binderup.  So we know that factor weighs in.

8           THE COURT:  Do you accept the notion that it is in

9    this case Mr. Range's burden of proof on each of the factors?

10          MR. GURA:  Well, yes, it is -- it is Mr.

11   Range's burden to prove step one.  So he has to prove that the

12   various five factors, however they might shake out, yield

13   showing that the crime is not considered "serious" given these

14   five factors.  So, yes, that much is our burden and I think

15   we've met it.  We've got four of those factors.  I should get

16   -- the fourth factor we have, of course, is dangerousness.

17          Holloway was a misdemeanor case, but that was a

18   very -- a very dangerous misdemeanor.  It was a repeat offense

19   DUI with an extraordinarily high BAC level.  It was a type of

20   offense that even though it was classified as a misdemeanor,

21   unlike Binderup and unlike here, there was a mandatory jail

22   sentence.  The legislature reflected its view of the severity

23   not just by saying, Look, you have a range of a few years,

24   they actually mandated a jail sentence which, of course, Mr.

25   Holloway received so he actually did go to prison.  This is

1   not a dangerous case at all.  Whatever else you might think of

2   the offense here, it did not involve the risk of harm to

3   anybody.

4          THE COURT:  Well, doesn't that depend upon how one

5   defines harm?  I mean whenever there is a theft of assets for

6   which the entire country -- on which they are dependent, it

7   can be serious.

8          MR. GURA:  I believe here, two points, Your Honor.

9          First of all, I believe Holloway focused on

10  dangerousness, and while theft and fraud can be harmful to the

11  public fits, I don't know that it's something that -- you

12  know, usually we separate between money --

13         THE COURT:  Well, I understand what you're saying --

14         MR. GURA:  And the second --

15         THE COURT:  -- but I don't want to minimize --

16         MR. GURA:  Sure.

17         THE COURT:  -- the notion that whenever someone lies

18  to the Government, we depend -- we, the commonwealth, not

19  Pennsylvania, but the commonwheel depend on truthfulness.

20         MR. GURA:  That's correct.

21         THE COURT:  Otherwise, the whole thing collapses,

22  right?

23         MR. GURA:  That is correct, Your Honor, and this

24  also brings me to my next point which is it's the legislature

25  that decides how much damage is serious because as the

1    Government offered in their own proposed Fact Number 6 which,

2    of course, we admitted to, the Government notes helpfully that

3    in the very states that criminalize welfare fraud, there is

4    typically a distinction, a dollar-level distinction, that the

5    legislature sets as to what is a misdemeanor and what is a

6    felony.  And so the legislature makes that judgment, not the

7    judge, not, you know, other people ten years later.  They tell

8    you it's 100 bucks, it's 500, it's 2,000, whatever.  They

9    decide.  And this actually comports with the well-understood

10   concept that there's a difference between stealing a little

11   bit of money and stealing a lot of it.  It goes back to the

12   13th century.

13           THE COURT:  Yes, well, I understand it and I

14   understand that you teed this up straight out of, you know,

15   Victor Hugo.  I mean this is a Jean Valjean story, you know,

16   par excellence, I get that, but I think the pure legal

17   question really requires me to only put that, Mr.

18   Range's story, in the context of one of the factors.  This is

19   not a novel.  It's not designed to create a legal system based

20   upon a particular story.

21           MR. GURA:  The reason, Your Honor, we put some

22   emphasis on the novelization, if you will, is because that's

23   mostly in response to the Government's presentation of the

24   case, which I'm sure they'll get to make, but the Government

25   had a very strong theme in its papers which is theft is theft

1    and it's always serious and they make this claim that, you

2    know, anything that's fraudulent, anything that's stealing is

3    per se a serious offense and, therefore, fails in step one.

4    That is simply not compatible with deferring to classification

5    where the legislature tells us how much theft is serious and

6    how much theft is not serious.  And so, yes, we can say that

7    the amount of money is a point of distinction.  The character

8    of the crime we're talking about, public welfare offense, as

9    opposed to, I don't know, defrauding Enron investors or world

10   commerce or Bernie Madoff or let's talk about the tax code

11   because Folajtar was a tax case.  Ms. Folajtar was convicted

12   of making a false statement on a tax return, which is a

13   felony, but if you look further down the tax code, we see that

14   there's no distinction either of what she was convicted of or

15   in other tax provisions as to dollar amount.  There is,

16   however, a distinction between felony tax evasion and a

17   misdemeanor wilfully not paying a tax, which is a different

18   section, but whether you lie about $0.50 or $500 or a million

19   dollars, it's still going to be classified according to

20   whether you evaded or whether you simply wilfully didn't pay

21   or whether they decided to charge you for making a false

22   statement.  So the character of the offense also relates to

23   the type of property that was taken or the type of -- or the

24   method that was used.  So, for example, shoplifters stealing a

25   lollipop would be different than an armed robber stealing the

1    same lollipop because the method there is more serious and the

2    legislature is going to express its judgment on that.  So here

3    we have a public welfare offense that is below the limit that

4    the legislature deemed to be felonious and so these

5    distinctions are all over the law of theft and fraud.  They're

6    made by the legislature, they're not made by judges, they're

7    not made by lawyers, and we have to defer to those.  So I

8    would say with respect to the, you know, Jean Valjean on that

9    is that it is simply not true that the fraudulent nature of

10   the crime or the theft nature of the crime is a per se

11   invalidation of a --

12          THE COURT:  Well, I certainly understand the

13   persuasiveness of an argument that says a legal system will

14   only be respected if it is tailored to meet what's really

15   going on in a particular circumstance.  You don't want to --

16   an overreaction is not a system that is going to make it the

17   long haul.  I get that.  I totally get that.

18          Let's talk, though, about what I think is the

19   hardest part of this argument for Mr. Range -- we talk about

20   you, but we're really talking to the lawyers -- and that is to

21   sustain the burden of proving that there is no consent.

22          MR. GURA:  Okay, Your Honor's correct that, and I

23   think we've said in our papers, this is the one factor where

24   the Government has the strongest point.  You know, it is true

25   that, you know, in -- you know, we've had going back and forth

1    the speech about how we count this state's law or that state's

2    law, but we're generally in agreement the numbers are roughly

3    the same.  The Government said that in its last brief and we

4    agree with that that there are -- we would count 38, they

5    would count 39 states where this type of conduct today would

6    be considered a felony.  We would argue, however, that to have

7    an apples-to-apples comparison, it's better to look at laws

8    that target specifically public welfare offenses.  The broad

9    generalized theft statutes do a lot of work.  They cover

10   everything from this type of crime all the way up to, you

11   know, Bernie Medoff level and we would contend that when a

12   legislature sits and thinks about, you know, how do we deal

13   with people who don't report all their income in applying for

14   food stamps, we look at that judgment specifically.  Even

15   within that judgment, we're still looking at, I believe, 29

16   states if you count Massachusetts, we've had a dispute about

17   that, that specify that Range's conduct is felony welfare

18   fraud.  That is a majority.  I don't think that it's a

19   consensus view.  It's not --

20          THE COURT:  That, in fact, is my next question which

21   is how elusive is the concept of what does consensus mean?  I

22   mean this is not a 51/49 issue, is it?  I mean consensus is,

23   you know, practically a tenet of a church.  The Quakers, you

24   know, consent to developing a consensus.  How much grumbling

25   when you leave the room after somebody declares there's been a

1   consensus means there's no consensus which is a question of

2   what does consensus mean.

3           MR. GURA:  We would submit that when you have

4   slightly over 20 percent of the jurisdictions that would label

5   it a misdemeanor, then that's enough grumbling I would say,

6   but, you know, obviously we understand the laws are what they

7   are.  If the Court were to determine that the Government is

8   correct and we have not established the cross-jurisdictional

9   consensus, then I would submit that we still have the other

10  four factors and this is not enough to defeat the primary

11  weight that is, you know, generally --

12          THE COURT:  You're trying to wiggle away from me on

13  the issue of consensus.

14          MR. GURA:  I'm conceding that this is the hardest

15  factor.  I believe that it is what it is.  I don't think

16  there's a consensus because we have enough states that would

17  treat this as a misdemeanor.  We also, let's face it, there

18  are -- there's a real question as to whether or not -- you

19  know, we don't know what's going on in the minds of the

20  legislatures in 50 states, but we can surmise that when the

21  legislature tells the courts, you know, punish theft and fraud

22  here, here's all the theft and fraud, here's one statute, deal

23  with it, that there's a certain level of trust given the

24  judges to sort out the Ranges from the Madoffs.  And, you

25  know, the legislatures that try to be more granular in their

1    classification of these things, there it's a little bit

2    closer.  Overall, the picture is about, you know, a little

3    over 20 percent of the country would have it as a misdemeanor

4    and I'm not sure that that makes for consensus --

5             THE COURT:  Well, the issue I'm focused on here is

6    that the use of the word consensus is really not consistent

7    with the idea that we're going to count noses and majority

8    wins.  So these are in terms of the way we order our

9    conduct -- we, the society.  Consensus implicates something

10   very different than a formal vote.

11            How does that work in this setting do you think?

12            MR. GURA:  I agree with Your Honor that consensus is

13   not a nose counting, it's not a formal vote.  Unfortunately,

14   the only clues that we can have as to consensus is to count

15   these very statutes.  If there's another way, I have not

16   interviewed the various legislatures on their, you know,

17   current opinions on this, but I would say that we can -- we

18   can look to see broadly how this is treated and there is no

19   consensus.  There's no overwhelming view that, oh, yes, there

20   might be but one strange outlier state that doesn't think this

21   is a problem; you know, 49 states, you know, make it a felony.

22   We're not there.  And more than that, we're talking about an

23   area of law which is inherently, I mean, if there was some

24   other type of crime like DUI, which is a specific act that's

25   punished everywhere, and you can -- it's much easier to count

1  that, but when you're talking about the category of theft or
2  fraud, it's inherently subject to all these different --
3  different hues as to whether or not, you know, the methods,
4  the class of property, the dollar amount, and these things are
5  fluid and they're judgment calls, and I think in this
6  particular area of law especially, it's hard to find
7  consensus.  It might be easier to find consensus in perhaps a
8  different class of crime.
9         THE COURT:  Well, and then what do you do with the
10 idea that the consensus might actually shift over time?
11        MR. GURA:  We are stuck in 1995 because, otherwise,
12 as I think it was Judge McHugh in this court in the Irving
13 case said, "There's no judicial time travel," and that is
14 correct because if you think about it, if we're going to
15 disarm people under 922(g) not based upon what they were
16 convicted -- you know, how their crime was treated 30 years
17 ago, but how it's treated today, there would be an
18 unbelievable amount of uncertainty as to whether or how this
19 crime applies.  I think we have to take a snapshot in time,
20 say, okay, this is what society thought of what you did back
21 in whenever it was.
22        THE COURT:  Well, then it would be subject to the
23 executive branch deciding what is a worthy focus to prosecute
24 as well which, by the way, happens all the time.
25        MR. GURA:  That is always the case and I should

1    mention in this case in particular, and this is something I

2    believe we noted in our papers, Mr. Range was not represented.

3    You know, we suspect if he had a lawyer, diversion might have

4    probably been on the table.  This is a type of crime for, you

5    know, that a lot of people, you know, have a diversionary

6    option.  Some states, I believe it was Georgia, actually build

7    it into the statute and that's why we classify it as, you

8    know, not a felony because if you read the case, it's a

9    misdemeanor or it's actually dismissed after a period of time.

10           So, no, we -- we think that we're --

11           THE COURT:  Well, as I understand it, you argue that

12   this consequence was not explained to Mr. Range at the time.

13           MR. GURA:  That is true.  The consequence was not

14   explained, but more the point, we're not -- we're not making a

15   Padilla challenge in this case, but more the point, this is

16   where a lawyer could have made a difference in there being a

17   conviction at all and, in any event, he was convicted, it was

18   classified as a misdemeanor, this is how the society treated

19   it at the time, and we can't go back in time and tell people,

20   well, yes, 30 years ago, what you committed was an infraction,

21   it wasn't even a crime, but today it's a felony so let's turn

22   in those guns.  I mean we don't do that.

23           THE COURT:  No, I understand that because that issue

24   goes both ways.

25           MR. GURA:  Sure.

1          THE COURT:  Why don't you talk about now the step

2     two which I suppose you will argue is the Government's burden

3     to deal with.

4          MR. GURA:  It is and the Government's completely

5     failed to meet it.  And a couple of points.  So, step two,

6     obviously not our burden.  More the point, you know, we did

7     ask the Government some questions in discovery about this and

8     the Government's position throughout discovery was that

9     dangerousness was irrelevant and they put this in their

10    objections to our discovery that, you know, we don't have to

11    tell you because it doesn't relate to any defense whether or

12    not, you know, he's dangerous.

13         THE COURT:  Well, this is in the context of the

14    issue of heightened scrutiny.

15         MR. GURA:  That's correct.  The only public interest

16    here -- we're talking about firearms.  The only public

17    interest here would be public safety.  There isn't some other

18    public interest that's been identified by the Courts or

19    suggested by the Government.  And the evidence for public

20    safety rationale here is surprisingly the same evidence that

21    the Third Circuit rejected flat out in Binderup and that the

22    district court rejected in Binderup.  These are the very same

23    studies that the Third Circuit called off point.  I think that

24    the Government should have retired those studies and perhaps

25    found some other ones and it's easy to see why they're off

1   point.  These are studies of hardened criminals, people who
2   are coming out of state prison and when these studies were
3   offered in Binderup, the Third Circuit said, Wait a minute,
4   neither of these gentlemen here, Mr. Binderup or Mr. Suarez,
5   had ever been in prison and it's not the same cohort.  More to
6   the point, these studies amplify the impact of the cohort that
7   has an unbelievably lawless background, a lot of violent
8   crimes, firearms offenses, dangerous incidents.  There's also
9   an age issue.  One of the studies cuts off looking at people
10  once they reach age 50, and Mr. Range is over 50 right now,
11  and, of course, they also -- they went to a new study, cut off
12  a 15-year follow-through for recidivism.  We've been way past
13  15 years here, and as the Third Circuit recognized in
14  Binderup, the longer you go out in time and the person hasn't
15  recidivated, the less time, you know, the less odds are that
16  there would be recidivism.  But recidivism also of what?
17  Because is the question whether or not Mr. Range will reoffend
18  with another welfare offense or is the question whether or not
19  because 30 years ago he had a welfare offense, that tomorrow
20  he's going to start shooting people?  I mean that's just not
21  logical.  It doesn't make any coherent sense.  So -- and the
22  Government also mixes up their step two argument.
23          THE COURT:  What about the other study?  I mean I
24  probably will revisit here with your friends from the
25  Government on the issue about the candor of disclosing the two

1    tests that have been rejected by Binderup, but there are some

2    studies that they now brought to my attention that have not

3    specifically been rejected.

4            MR. GURA:  Oh, I believe that one of those studies

5    was essentially also -- while there was one -- there were two

6    studies, I believe, that were rejected and one of them that

7    was similar to one that was and it was a study of exiting

8    prison inmates and so it has the same flaw, but with respect

9    to -- one of the studies, of course, was incredible.  I mean

10   Judge Gardner dug into this.  I believe this is the Wright

11   study in here, I mean, quoting from the papers.  This is Judge

12   Gardner.  Finally, perhaps, most significantly, the authors of

13   that study stated that, and he's quoting the Wright study of

14   '89, In terms of some potentially important differences in

15   risk for later criminal activity, this study was too small to

16   determine whether the differences occurred by chance.  That's

17   not enough to carry a heightened scrutiny burden and so I

18   submit, Your Honor, that there is always an interesting

19   question in these cases about step one and whether we have

20   enough of the five factors and some combinations to make a

21   step one case, but then at step two, the Government's case, it

22   simply doesn't fit.  It falls apart.

23           THE COURT:  Would you like a chance to pop up again

24   after I hear from the Government?

25           MR. GURA:  Sure.  I'll appreciate that.  Thanks.

1          THE COURT:  Okay, that's fine.  So which of you

2    gentlemen would like to respond or tell me what the

3    Government's view is on all of this?

4          MR. KOOB:  I will be speaking, Your Honor.

5          THE COURT:  Go ahead.

6          MR. KOOB:  Good morning, Your Honor.  Paul Koob on

7    behalf of the Federal Defendants.

8          Bryan David Range pleaded guilty to welfare fraud,

9    stealing from its reserves for Pennsylvania's neediest

10   citizens.  At the time of his conviction, welfare fraud, as we

11   heard, was a first degree misdemeanor punishable by up to 5

12   years in prison.  Range claims that 18 U.S.C. 922(g)(1) is

13   unconstitutional as applied to him, but the Government's

14   summary judgment brief should be granted because his welfare

15   fraud conviction is a serious crime reflecting a lack of

16   virtue and it removes him from the class of individuals --

17         THE COURT:  If the issue of being entitled to

18   exercise a constitutional right was left only to the virtuous,

19   we might not have a lot of people walking around with their

20   constitutional rights preserved.

21         MR. KOOB:  Understood, Your Honor, generally, but

22   within the Second Amendment context, the virtuousness test is

23   what the Third Circuit has handed down to us in the Binderup

24   opinion as Your Honor is well aware.

25         At the first stage of the Binderup analysis, we look

1   to whether the crime was serious and the way we determine

2   whether a crime is serious is we look to the historical

3   definition of virtuous.  That is where that comes from.

4           THE COURT:  And I find it an unusual word to use in

5   this context.

6           MR. KOOB:  And as Your Honor pointed out and counsel

7   on the other side pointed out, we have the Binderup opinion

8   and we are stuck with it, for lack of a better word, but we

9   will forge ahead.

10          THE COURT:  You haven't checked to see whether

11  there's a microphone straight up to the upstairs here.  No?

12  (Indicating)

13          MR. KOOB:  Perhaps they'll hear me, Your Honor, but

14  we submit that Mr. Range has not satisfied at least two of the

15  factors involved in stage one of that Binderup analysis.  My

16  colleague on the other side discussed the classification as

17  step one, for instance, and focused heavily on the fact that

18  it's a misdemeanor label, but what was ignored was the

19  Holloway opinion in which the focus shifted from the label to

20  the maximum potential penalty which Your Honor raised.  Here

21  Mr. Range was convicted at the time of a first degree

22  misdemeanor punishable by up to five years.  The same as the

23  Holloway DUI which was found to be a serious punishment and,

24  therefore, a serious crime.

25          Also, as Your Honor mentioned, the cross-jurisdictional

1    nexus is a factor that we believe firmly supports the

2    Government's view.

3            Your Honor asked what the consensus means, and if I

4    may address that, we don't get very much guidance from the

5    Holloway majority opinion, but there is some guidance what it

6    could mean from the dissenting opinion of Judge Fisher.

7            Judge Fisher identifies in his review of the DUI

8    case law, excuse me, the DUI statutes that there are 39

9    jurisdictions, which the parties are under near agreement on

10   39.  They say 38, we say at least about 40, but at least 39

11   jurisdictions not only prohibit this conduct of welfare fraud,

12   but also label it felonious.  What Judge Fisher says in the

13   dissent in Holloway is that 39 is "a significant majority" and

14   he believes the vast majority would tilt in favor in that

15   case, DUI, in favor of the challengers.

16           Here we respectfully submit that because 39

17   jurisdictions would not only criminalize, but also label them

18   felonies, that the factor of consensus is strong in the

19   Government's favor, but even if the Court were to find the

20   current --

21           THE COURT:  Well, let's assume -- I mean, really, a

22   swing of one or two states particularly given the fact that

23   there's a little bit of a comparing of apples and oranges

24   here, I mean it could be that the legislature in State A

25   really cannot be compared with how a legislature in State B

1    does things.  To focus on 39 to 40, I mean that's not a very

2    satisfying way to resolve this, do you think?

3          MR. KOOB:  Your Honor, my suggestion is if we look

4    at Judge Fisher's opinion and use the significant majority as

5    a standard, that 38/39 satisfies that standard regardless of

6    which way Your Honor decides to adopt whether it's 38 or 39.

7          Significant majority --

8          THE COURT:  So consensus then turns into meaning

9    bare majority.

10         MR. KOOB:  Not bare majority.  That would be 26,

11   Your Honor, and here we have 38, 39.

12         But I would like to address the argument made by my

13   friend on the other side about using specific versus general

14   statutes.  To cut out more general fraud statutes would not be

15   consistent with the Binderup opinion.  I mean Binderup was

16   evaluating the particular facts, in particular, Mr.

17   Binderup's case, a sexual relationship with a 17-year-old

18   employee.  It did not look at specific statutory rape-only

19   statutes.  It looked at the facts in that case and then

20   determined which statutes would apply based on the applicable

21   law of the state.  It did not say, well, the general statute

22   wouldn't apply because we have more specific facts here.  If

23   an individual in a particular state commits welfare fraud, but

24   there is no defining welfare fraud statute, that individual is

25   still subject to the general fraud statute and that in it

1    itself is a determination of the legislature.

2          THE COURT:  And then once you get on that

3    trajectory, does that not lead to looking at the dollar amount

4    involved and whether it's de minimis or whether it's a one

5    time action or whether it was if Mr. Range was the architect

6    of some scheme, and then once you start that, looking at the

7    specifics, where does that lead?

8          MR. KOOB:  Well, the dividing line, Your Honor, I

9    suggest is really the legislature's intent.  What did the

10   legislature intend?  We're not looking at what the judge would

11   have done with the case as my colleagues on the other side

12   suggest for Georgia.  That is too nuanced and I think that's

13   an unworkable solution for the courts, but what the courts can

14   do is look at what the legislature has decided based on the

15   elements of the offense and based on the particular -- if, in

16   fact, there is a dollar amount, if it's in the statute, that's

17   an easy enough application for the Court to apply, but we're

18   not going to look at prosecutorial judgment in terms of

19   whether to bring a case or not and how judges would perform

20   sentencing in Georgia or other states.  We just look at the

21   legislature, the state legislature's decision to enact a

22   particular statute and what the elements of that stature are.

23   It's not a difficult application to simply look at a dollar

24   amount if the state legislature has decided that a crime is

25   more serious based on the amount stolen.  And it's

1    particularly relevant here in Pennsylvania.

2            Now, there's an amendment, admittedly, in 2018 and

3    my friends on the other side addressed this.  When Mr. Range

4    was convicted in 1995, this statute was a misdemeanor in the

5    first degree punishable by up to five years.  We respectfully

6    submit that that is serious on its own as the Holloway Court

7    found with respect to DUI, but if we are trying to glean the

8    legislature's intent, in 2018, the Pennsylvania legislature

9    raised the very crime and the dollar amount that Mr. Range was

10   charged with to a felony, a third-degree felony.  And, in

11   fact, if we look at the legislative intent which is what the

12   Holloway decision did in evaluating the seriousness of an

13   offense, this is what Senator -- State Senator Regan had to

14   say at Senate Bill 6 which amended this particular statute 481

15   and raised it to a felony.  Senate Bill Number 6 was crafted

16   with two objectives in mind:  First, to demonstrate to the

17   taxpayers of Pennsylvania that we value their significant tax

18   contributions and are willing to hold the beneficiaries of

19   those dollars accountable for their actions.  Second, and more

20   importantly, to preserve the public assistance for those who

21   are truly in need and deserving of taxpayer-funded benefits of

22   which they depend.  Now, State Senator Regan went on to quote

23   some headlines to explain why they are increasing the

24   penalties.  He noted, "Pennsylvania has a problem when it

25   comes to welfare fraud.  We have all seen the headlines,

1  welfare fraud, 346 guilty in the first six months of 2016."

2  He continued.  "Latest charges totaled $287,000 stolen in PA

3  welfare fraud last month."  Finally he noted in an article in

4  June, again, this is June of 2018, "Since the beginning of

5  2017 alone, the Office of Inspector General has charged more

6  than 250 Pennsylvanians with welfare fraud amounting to over

7  $1.5 million in misused funds."

8          THE COURT:  How many articles, scholarly or

9  supposedly scholarly articles, have you read or tried to wade

10 through that talked about the risk of legislative intent?

11         MR. KOOB:  A number, Your Honor, and we're trying to

12 glean not only one legislature's intent, but 51 jurisdictions.

13         THE COURT:  Yes, that's quite a multiplication of

14 the problem.

15         MR. KOOB:  I'm very sensitive to that, Your Honor,

16 but, unfortunately, that's the characterization and the

17 structure we've been given in Binderup so I'm trying to work

18 within that framework and I think if we have to perform --

19         THE COURT:  And if you've read or had somebody else

20 read and give you a little snippet, you know I'm not a huge

21 fan of legislative intent.

22         MR. KOOB:  Your Honor, I appreciate that and share

23 your views.  I think when we look at the opinions in Binderup

24 and Holloway, the legislative intent, and we're trying to

25 glean what a legislature is doing, what 51 legislatures are

1    doing is one way for us to try to --

2         THE COURT:  No, I understand that.  I'm just giving

3    you a little bit of a speed bump on that.

4         MR. KOOB:  Okay, and I appreciate that, Your Honor,

5    however -- so, in addition, I want to address a point made

6    about the Irving opinion.  That was not the focus of that

7    case.  It was a very different opinion.  It didn't deal with a

8    review of the Second Amendment challenge to the context that

9    we're dealing with here.  In that case, there was two

10   indictments:  One for a particular underlying crime and then a

11   later indictment for a felon in possession that would have --

12   that the individual had not been convicted of at the time of

13   his actual possession and so I think under current Supreme

14   Court case law, that may not have been an appropriate vehicle

15   to bring that charge.  But --

16        THE COURT:  What I'd like to do, I mean I think that

17   you all, both sides here, have, dare I say, more or less a

18   consensus on the step one analysis and the way they kind of

19   shape out.  I'd like to turn and really focus on the

20   Government's burden on step two in Marzzarella's frame,

21   two-step thing, because there's a focus or there's a

22   discussion about the role of the so-called straw purchases and

23   I'd like to ask why the Government thinks that's relevant.

24        MR. KOOB:  Thank you, Your Honor.  Yes, I would like

25   to address that.

1          Mr. Range makes a lot of hay about the fact that the

2     Government hasn't presented --

3          THE COURT:  Are you trying to be clever with straw

4     purchases?

5          MR. KOOB:  No.  Thank you, Your Honor, I appreciate

6     it, but what Mr. Range is arguing is there aren't specific

7     factors to him at the second stage.  The Government hasn't

8     provided any studies that are specific to him -- and a point

9     we refute, Your Honor, and I'll get to, but I want to answer

10    your question first -- or that there aren't specific facts

11    about him that would justify the fit here in applying

12    922(g)(1) to him and, respectfully, what we look for when we

13    apply the fit is, is that fit reasonable?  And Range claims,

14    you know, he's 51 and so the studies that's up to 50 shouldn't

15    apply to him.  I would note in Holloway, Judge Fisher in his

16    dissent critiqued the district court for asking for too much

17    in terms of fit from studies and applications.  So I think the

18    ask of the plaintiff is not really the burden of the

19    Government's here, it's a bit lower.  But with respect to the

20    alleged straw purchasing, it shows the irresponsibility and

21    the Government's burden at the second stage is to show that

22    applying 922(g)(1) fits its interests, its interest in keeping

23    firearms out of the hands of people who are not responsible

24    with them.  It fits reasonably here and it fits the

25    substantial interests significantly.  So Range is

1    irresponsible by twice being denied a firearm.  I know there's

2    some argument that he didn't know that he was denied a

3    firearm, but the record is very clear.

4          THE COURT:  And why is that not a quintessential

5    fact issue suggesting that if it's important, what are we

6    doing here arguing about summary judgment?

7          MR. KOOB:  My response to that, Your Honor, is

8    simply the record is very clear that he admitted at his

9    deposition that he went to the firearms store and was twice

10   rejected.  That's clear knowledge that he was not entitled to

11   receive a firearm.

12         THE COURT:  But I understand the argument is that

13   the rejection was in the context of saying, Oh,

14   somebody's made a mistake here, the paperwork is wrong.

15         MR. KOOB:  That is what he alleges, that there was a

16   supposed mistake, but even assuming that's true --

17         THE COURT:  Going back to my issue, isn't it a fact

18   problem?

19         MR. KOOB:  No, Your Honor, even assuming that was

20   true, he was denied a firearm twice.  If he thinks it's a

21   mistake, there are steps that he can take to address that

22   mistake.  The step that he took was having his wife go

23   purchase a firearm and provide it to him.  Those facts are not

24   in dispute.  And whether that's a specific straw purchase or

25   not, Your Honor does not have to decide, however, the

1   Government believes that those facts specific to Range are

2   emblematic of why the fit here is perfectly reasonable.

3           THE COURT:  Okay, but the Government learned in 2020

4   about this activity.  That's like 25 years after he was first

5   convicted.  Is there never an end?  The answer is, according

6   to the Government, no.

7           MR. KOOB:  Well, no, Your Honor.  We don't know the

8   date of the alleged straw purchase.

9           THE COURT:  But you learned about it in 2020, right?

10          MR. KOOB:  That's correct.  As a member of the civil

11  division, we did learn that, and I'm not a member of the

12  criminal division and can't comment on whether those decisions

13  should or should not be made, but I think as a question of

14  intermediate scrutiny in whether applying 922(g)(1) to a

15  person like Range, and, again, I want to go back and talk

16  about the studies, as well, because I don't think it's

17  specific to Range, but to address his point that it has to be

18  very specific and tailored to him, well, I don't think that's

19  the standard, but if it has to be, the evidence of having his

20  wife purchase firearms when he's an excluded person suggests

21  that he is not a responsible firearm owner and the fit is

22  appropriate here.

23          If we could address the studies, as well, Your

24  Honor?

25          THE COURT:  Yes.  Yes.  By the way, a friendly

1   suggestion would be that when the Government's got "evidence"

2   that's been rejected, you might want to tell the next judge

3   that it's been rejected by the Court, the next higher level.

4   I'm not convinced that you all were completely thorough in

5   pointing out that the two studies were rejected in Binderup.

6        MR. KOOB:  And, Your Honor, we did not explicitly

7   acknowledge that, but I think when we talk about fitted, it

8   does have application and we have different underlying crimes.

9        THE COURT:  You get my point.

10        MR. KOOB:  Understood, Your Honor, and well taken.

11   I do want to address that issue, though.  We have two

12   underlying crimes in Binderup that were not at issue here.  So

13   I submit just because the studies were rejected in Binderup

14   does not mean they have no application to a welfare fraud

15   conviction like Range.  I can understand plaintiff's point

16   that he was not an incarcerated individual, but those are not

17   the only studies that we've relied upon.  The Wintemute study

18   is one that did not deal with incarcerated individuals and in

19   that study, Wintemute wrote, "Even handgun purchasers with

20   only one prior misdemeanor conviction and no convictions for

21   offenses involving firearms or violence were nearly five times

22   as likely as those with no prior criminal history to be

23   charged with new offenses involving firearms or violence."

24   That directly applies to Mr. Range.  That doesn't mention any

25   incarceration.  It's simply one prior misdemeanor conviction,

1    a nonviolent nonfirearm-related offense just like the one Mr.

2    Range had and people like him are five times as likely with no

3    prior history to commit an offense.  Congress' decision to

4    apply 922(g)(1) to people like Mr. Range is substantially

5    related to that important Government interest of preventing

6    someone who's not responsible with firearms from gaining

7    access to them.  And as I mentioned, we should be careful that

8    we don't impose too specific a standard in the evidence that

9    has to be shown.  That's what Judge Fisher has warned that the

10   district court was seeking too much from the Government and

11   "demanding an excessively particularized connection between

12   the evidence offered and Holloway's circumstances."  I think

13   that's a big guideline for district courts to follow that it

14   doesn't have to be a perfect fit, it just has to be

15   substantially related to that important interest, and I submit

16   here that it is.

17          Your Honor, I have no further argument on the second

18   point.  There's one point I wanted to make clear about the

19   first if I may return to that.

20          THE COURT:  Yes.

21          MR. KOOB:  There's been some discussion of the

22   Folajtar case.  I think it's important to note that although

23   that is a felony case, the Court is very clear that crimes

24   entailing deceit and false statements are outside the bounds

25   of the first step.  They do not meet the four factors of the

1   Binderup test.  So if we look at Range's underlying crime

2   here, any person who at the time of the application, for

3   instance, by means of a wilfully false statement or

4   misrepresentation or by wilfully failing to disclose a

5   material fact regarding eligibility secures assistance or

6   federal food stamps commits a crime which is defined -- which

7   is punishable as noted in the later subsection.  Quite

8   similarly, Folajtar's crimes "under penalty of perjury"

9   submitted tax returns she does not believe to be true and

10   correct as to every material matter.  That is -- those are

11   akin to each other.  They are fraud crimes involving deceit

12   and theft which as the Folajtar opinion laid out have been

13   considered a serious crime since before the country's founding

14   and at the country's founding.

15           THE COURT:  Are there any other constitutional

16   rights that would be implicated by a conviction for this crime

17   or this misdemeanor?

18           MR. KOOB:  The voting rights, Your Honor, could

19   certainly be impacted and --

20           THE COURT:  That's a state by state issue.

21           MR. KOOB:  That is a state by state issue, Your

22   Honor.  The states are in charge of --

23           THE COURT:  Right.  What about something like name

24   changes?  Is there a state law about when somebody's permitted

25   to change their name?

1          MR. KOOB:  I'm not following the --

2          THE COURT:  I'm trying to figure out if there are

3     implications in the exercise of other rights by an individual,

4     by a citizen, by a person that are cut back in some respect

5     because of this kind of a conviction.

6          MR. KOOB:  There may be others, Your Honor.  Voting

7     rights are the ones that stick out to me.

8          THE COURT:  It's not a fair question to talk about

9     the whole panoply of rights.

10          MR. KOOB:  But I can appreciate where Your Honor is

11     going and I think the response is like voting rights that are

12     managed at a state level.  That's what Congress is trying to

13     do here is they're trying to use what state legislatures, the

14     legislative body closest to people --

15          THE COURT:  Running for public office -- this is the

16     litany we go through, by the way, in guilty pleas.  Running

17     for public office.

18          MR. KOOB:  Yes.

19          THE COURT:  Voting rights is a state by state thing.

20     Possessing a firearm is -- at least here is listed.

21          MR. KOOB:  Yes.

22          THE COURT:  There are a number of rights that are

23     implicated, but none of them are subject to this kind of a

24     challenge that I've seen at least.  Maybe voting rights are.

25          MR. KOOB:  Yes, voting rights, Your Honor, that's a

1    separate issue and certainly a separate test to evaluate

2    those, but I think that's why we go back to the historical

3    context in the Second Amendment.  And if Your Honor has no

4    further questions --

5             THE COURT:  We can volley back and forth if you'd

6    like.

7             MR. KOOB:  Okay.  Thank you, Your Honor.

8             THE COURT:  Mr. Gura, anything more?

9             MR. GURA:  Yes, Your Honor, just a brief response to

10   a few of these points --

11            THE COURT:  Sure.

12            MR. GURA:  -- that Your Honor made.  This business

13   of the so-called alleged straw purchases, these were not straw

14   purchases.  Mr. Range's wife decides to gift him firearms

15   because she knows he likes firearms.  Neither of them had any

16   knowledge that he was prohibited from having firearms and the

17   Supreme Court recognized this exact circumstance as being

18   quite common when it decided Rehaif.  If these so-called straw

19   purchases were within the statute of limitations, and they are

20   not, but even if this happened sometime in the last five

21   years, the Government could never convict either of the Ranges

22   of anything under Rehaif because there's no way that you can

23   show, in fact, it is not true that they were aware that Mr.

24   Range was prohibited.  It is quite common especially -- this

25   is the very thing the Supreme Court was concerned about.  You

 1    have someone who is -- who pleads without a lawyer to a

 2    misdemeanor, receives probation.  They have no idea how to

 3    interpret Section 922 and all the various permutations and

 4    complexity of that.  We have lawyers arguing about these

 5    things all the time.  And so, you know, 922(g) requires

 6    knowing violation and the Supreme Court has told us that the

 7    Government has to prove that to a jury and there's no way that

 8    that's ever going to be here on these facts.  This is a

 9    gentleman, who I think if you're talking about what happened

10    here with these alleged straw purchases, the central fact of

11    the case is this, the very fact of the lawsuit.  What

12    happened?  As soon as Mr. Range discovered that he was subject

13    to 922(g), what did he do?  He got rid of the only gun he had

14    and he sued because he brought himself into compliance with

15    the law.  This is not the act of someone who thumbs his nose

16    at the law and uses his wife to sort of effect an end run

17    around the law.  This is the act of a law-abiding person who

18    doesn't want to go to jail, doesn't want to -- you know, there

19    are a lot of people walking around Philadelphia who maybe they

20    don't care so much about 922(g) and they're going to have the

21    guns and, you know, hope they don't get caught and they'll

22    deal with it later, but that's not Mr. Range.

23              THE COURT:  They do that in Virginia.

24              MR. GURA:  They do it everywhere, unfortunately, but

25    that's not Mr. Range.  He got rid of the gun and he sued.

1    That's not someone who's going to commit a firearms violation

2    and, again, what is he going to recidivate with?  Another

3    welfare fraud offense?  That's not going to happen either.

4         So there's really no step two here and we get

5    summary judgment, Your Honor, simply by prevailing in step one

6    and then turning to the Government and saying, Okay, where

7    is -- now let's carry your burden.  And when they don't make a

8    step two showing -- and they've had discovery.  They've had,

9    you know, the full panoply of rights that every defendant here

10   has and this is the record we've got and it is what it is and

11   there's no step two showing.  So as long as we prevail on step

12   one, this case needs to end, Your Honor, we submit, for

13   summary judgment for Mr. Range.

14        Thanks.

15        THE COURT:  Anything more?

16        MR. KOOB:  Your Honor, I would only point that the

17   ATF form is very clear on this issue that this is not a bona

18   fide transaction when someone's prohibited from owning a

19   firearm.

20        THE COURT:  As it happens, I've actually had a

21   couple of these cases and so I'm familiar with the form and,

22   as I said, it's an interesting aspect of this case that it

23   helps the Court be informed about the importance of the

24   colloquies that we go through every time we focus on a

25   defendant who may be making a certain decision, you know,

1   typically with counsel, of course, about the consequences of a

2   conviction.

3          MR. KOOB:  Understood, Your Honor.

4          THE COURT:  But I understand what you're talking

5   about with the ATF Form.

6          MR. KOOB:  Thank you, Your Honor.  We

7   respectfully --

8          THE COURT:  But I also point out that the issue

9   about knowledge and straw purchases, it is a fact issue and my

10  reaction to it in the context of today's time together is to

11  point out that it's not really deep in with cross summary

12  judgment motions.  If it's an issue about knowledge and

13  intent, then it's problematic.  You both have, I think, made a

14  very good argument for this being appropriate for summary

15  judgment purposes.

16         MR. KOOB:  And, Your Honor, the Government

17  respectfully submits that you don't need to reach step two,

18  that we're successful at step one and, therefore, the

19  challenge would fall and summary judgment should be granted on

20  behalf of --

21         THE COURT:  Yes, I got that.

22         MR. KOOB:  Thank you.

23         THE COURT:  Anything else from anybody?

24         MR. GURA:  No, Your Honor, thanks.

25         MR. KOOB:  No, Your Honor.

```
 1           THE COURT:  I appreciate being with you all.  It was

 2    very interesting.  It's a very interesting case and my request

 3    of you is that you stick around a bit and if the interns that

 4    have been listening to this have any questions for you

 5    while -- not on the case so much, but just the process of

 6    being lawyers and why it's a worthy virtuous pursuit, then I'd

 7    appreciate it because I think every time law students get to

 8    see lawyers in action, it's a good thing.

 9           So have a great holiday, everybody.  Thank you very

10    much and stay well.

11           MR. GURA:  Thanks.

12           MR. KOOB:  Thank you, Your Honor.

13           THE COURT:  We're adjourned.

14               (Court adjourned)

15

                       C E R T I F I C A T E
16

17        I certify that the foregoing is a correct transcript

18    from the record of the proceedings in the above-entitled

19    matter.

20

21                       Kathleen Feldman

22                    _____

23                    Kathleen Feldman, CSR, CRR, RPR, CM
                      Official Court Reporter
24

25    Date: _____
              September 30, 2021
```

## $

**$0.50** [1] - 18:18
**$2,500** [1] - 10:23
**$287,000** [1] - 34:2
**$500** [1] - 18:18

## '

**'87** [1] - 11:17
**'89** [1] - 27:14

## 1

**1** [3] - 1:9, 11:3, 11:8
**1.5** [1] - 34:7
**100** [1] - 17:8
**107** [1] - 1:13
**1234** [1] - 1:22
**1250** [1] - 1:19
**13th** [1] - 17:12
**15** [1] - 26:13
**15-year** [1] - 26:12
**17-year-old** [1] -
31:17
**18** [1] - 28:12
**19106** [1] - 1:23
**19106-4476** [1] - 1:20
**19401** [1] - 1:15
**1995** [3] - 10:12,
23:11, 33:4

## 2

**2,000** [1] - 17:8
**20** [2] - 21:4, 22:3
**20-3488** [2] - 1:6, 2:5
**2008** [1] - 5:24
**2016** [2] - 5:11, 34:1
**2017** [1] - 34:5
**2018** [3] - 33:2, 33:6,
34:4
**2020** [2] - 38:3, 38:9
**2021** [1] - 1:9
**215)779-5578** [1] -
1:24
**22314** [1] - 1:13
**25** [1] - 38:4
**250** [1] - 34:6
**26** [1] - 31:10
**29** [1] - 20:15

## 3

**30** [4] - 10:11, 23:16,
24:20, 26:19

**319** [1] - 1:15
**346** [1] - 34:1
**38** [4] - 20:4, 30:10,
31:6, 31:11
**38/39** [1] - 31:5
**39** [9] - 20:5, 30:8,
30:10, 30:13, 30:16,
31:1, 31:6, 31:11
**39** [1] - 27:14

## 4

**40** [2] - 30:10, 31:1
**481** [1] - 33:14
**49** [1] - 22:21

## 5

**5** [1] - 28:11
**50** [4] - 21:20, 26:10,
36:14
**500** [1] - 17:8
**51** [3] - 34:12, 34:25,
36:14
**51/49** [1] - 20:22

## 6

**6** [3] - 17:1, 33:14,
33:15
**601** [1] - 1:23
**615** [1] - 1:19

## 9

**916** [1] - 1:13
**922** [1] - 44:3
**922(g** [6] - 4:14,
12:12, 23:15, 44:5,
44:13, 44:20
**922(g)(1** [7] - 5:12,
7:22, 28:12, 36:12,
36:22, 38:14, 40:4
**922(g)(1)** [1] - 11:5

## A

**abiding** [1] - 44:17
**above-entitled** [1] -
47:18
**accept** [3] - 15:3,
15:4, 15:8
**accepted** [2] - 5:11,
6:7
**access** [2] - 5:20,
40:7
**according** [1] -
18:19, 38:5

**accountable** [1] -
33:19
**acknowledge** [1] -
39:7
**act** [3] - 22:24, 44:15,
44:17
**Acting** [1] - 1:6
**action** [2] - 32:5,
47:8
**ACTION** [1] - 1:3
**actions** [1] - 33:19
**activity** [2] - 27:15,
38:4
**acts** [1] - 5:22
**actual** [2] - 9:20,
35:13
**added** [1] - 8:19
**addition** [1] - 35:5
**additional** [1] - 10:21
**address** [8] - 30:4,
31:12, 35:5, 35:25,
37:21, 38:17, 38:23,
39:11
**addressed** [1] - 33:3
**adjourned** [2] -
47:13, 47:14
**admitted** [2] - 17:2,
37:8
**admittedly** [1] - 33:2
**adopt** [1] - 31:6
**advances** [1] - 9:25
**age** [2] - 26:9, 26:10
**ago** [6] - 5:11, 10:11,
12:4, 23:17, 24:20,
26:19
**agree** [2] - 20:4,
22:12
**agreement** [2] - 20:2,
30:9
**ahead** [2] - 28:5,
29:9
**akin** [1] - 41:11
**al** [1] - 1:6
**Alan** [2] - 2:8, 4:12
**aLAN** [1] - 1:12
**Alexandria** [1] - 1:13
**alleged** [4] - 36:20,
38:8, 43:13, 44:10
**alleges** [1] - 37:15
**allow** [1] - 5:16
**alone** [1] - 34:5
**ambit** [1] - 8:22
**Ambro** [4] - 6:23,
7:19, 7:23, 8:3
**Ambro's** [4] - 6:7,
6:17, 6:18, 7:25
**amended** [1] - 33:14
**Amendment** [6] -
5:3, 6:22, 8:23, 28:22,
35:8, 43:3

**amendment** [1] -
33:2
**amount** [9] - 18:7,
18:15, 23:4, 23:18,
32:3, 32:16, 32:24,
32:25, 33:9
**amounting** [1] - 34:6
**amplify** [1] - 26:6
**analysis** [3] - 28:25,
29:15, 35:18
**answer** [2] - 36:9,
38:5
**apart** [1] - 27:22
**APPEARANCES** [1] -
1:11
**apple** [1] - 3:20
**apples** [3] - 20:7,
30:23
**apples-to-apples** [1]
- 20:7
**applicable** [1] -
31:20
**application** [9] -
4:24, 10:19, 11:5,
12:12, 32:17, 32:23,
39:8, 39:14, 41:2
**applications** [1] -
36:17
**applied** [9] - 5:6,
5:12, 5:17, 6:3, 6:6,
8:3, 10:18, 28:13
**applies** [2] - 23:19,
39:24
**apply** [6] - 31:20,
31:22, 32:17, 36:13,
36:15, 40:4
**applying** [6] - 9:25,
10:14, 20:13, 36:11,
36:22, 38:14
**appreciate** [7] -
27:25, 34:22, 35:4,
36:5, 42:10, 47:1,
47:7
**approach** [1] - 6:22
**appropriate** [3] -
35:14, 38:22, 46:14
**approve** [1] - 15:5
**architect** [1] - 32:5
**area** [2] - 22:23, 23:6
**argue** [3] - 20:6,
24:11, 25:2
**argued** [2] - 7:11,
7:12
**arguing** [4] - 6:18,
36:6, 37:6, 44:4
**argument** [12] - 2:4,
3:10, 3:14, 3:19,
19:13, 19:19, 26:22,
31:12, 37:2, 37:12,
40:17, 46:14

**arguments** [2] - 5:2,
5:4
**armed** [1] - 18:25
**art** [1] - 12:2
**article** [1] - 34:3
**articles** [2] - 34:8,
34:9
**as-applied** [4] - 5:6,
5:12, 5:17, 6:6
**aside** [1] - 2:4
**aspect** [1] - 45:22
**assets** [1] - 16:5
**assigned** [1] - 12:5
**assignment** [1] -
13:19
**assistance** [4] -
10:14, 10:19, 33:20,
41:5
**assistants** [1] - 1:19
**assume** [1] - 30:21
**assuming** [2] -
37:16, 37:19
**ATF** [2] - 45:17, 46:5
**attempted** [1] - 9:8
**attendance** [1] - 2:7
**attention** [1] - 27:2
**ATTORNEY** [1] -
1:17
**Attorney** [2] - 1:6,
1:19
**Attorney's** [2] - 3:7,
3:13
**audience** [1] - 8:18
**authority** [1] - 5:19
**authors** [1] - 27:12
**aware** [2] - 28:24,
43:23

## B

**BAC** [1] - 15:19
**background** [2] -
3:17, 26:7
**balance** [1] - 11:15
**balancing** [1] - 12:1
**banc** [2] - 5:10, 7:13
**bans** [1] - 5:13
**bare** [2] - 31:9, 31:10
**Barr** [1] - 2:5
**based** [9] - 5:7, 5:8,
5:16, 17:19, 23:15,
31:20, 32:14, 32:15,
32:25
**BEFORE** [1] - 1:10
**beginning** [1] - 34:4
**behalf** [2] - 28:7,
46:20
**believes** [2] - 30:14,
38:1

below [1] - 19:3
bench [1] - 13:19
beneficiaries [1] -
33:18
benefit [1] - 8:17
benefits [3] - 10:21,
10:23, 33:21
Bernie [2] - 18:10,
20:11
better [4] - 6:17,
6:22, 20:7, 29:8
between [4] - 16:12,
17:10, 18:16, 40:11
big [1] - 40:13
Bill [2] - 33:14, 33:15
Binderup [32] - 5:10,
6:1, 6:5, 6:10, 8:11,
8:14, 8:18, 9:1, 11:7,
11:9, 11:13, 12:11,
15:7, 15:21, 25:21,
25:22, 26:3, 26:4,
26:14, 27:1, 28:23,
28:25, 29:7, 29:15,
31:15, 34:17, 34:23,
39:5, 39:12, 39:13,
41:1
Binderup's [3] -
11:8, 11:20, 31:17
bit [8] - 3:16, 14:24,
17:11, 22:1, 30:23,
35:3, 36:19, 47:3
body [1] - 42:14
bona [1] - 45:17
bounds [1] - 40:24
branch [1] - 23:23
brief [3] - 20:3,
28:14, 43:9
bring [3] - 3:6, 32:19,
35:15
brings [1] - 16:24
broad [2] - 4:23, 20:8
broadly [1] - 22:18
brought [3] - 9:16,
27:2, 44:14
BRYAN [1] - 1:3
Bryan [3] - 4:13, 5:7,
28:8
bucks [1] - 17:8
build [1] - 24:6
bump [1] - 35:3
burden [17] - 8:8,
8:21, 8:23, 8:24, 9:24,
15:9, 15:11, 15:14,
19:21, 25:2, 25:6,
27:17, 35:20, 36:18,
36:21, 45:7
burdening [1] - 10:2
business [1] - 43:12
BY [2] - 1:12, 1:18

# C

C.A.T [1] - 1:25
candor [1] - 26:25
cannot [1] - 30:25
capable [1] - 5:15
capacity [1] - 5:4
care [3] - 4:7, 10:16,
44:20
careful [1] - 40:7
carries [1] - 8:21
carry [4] - 9:23,
12:19, 27:17, 45:7
carts [1] - 3:20
case [40] - 2:5, 3:7,
3:17, 4:18, 4:24, 5:5,
5:10, 7:11, 7:24,
11:18, 13:4, 15:1,
15:9, 15:17, 16:1,
17:24, 18:11, 23:13,
23:25, 24:1, 24:8,
24:15, 27:21, 30:8,
30:15, 31:17, 31:19,
32:11, 32:19, 35:7,
35:9, 35:14, 40:22,
40:23, 44:11, 45:12,
45:22, 47:2, 47:5
cases [9] - 3:12, 5:1,
6:6, 7:10, 7:11, 11:23,
14:14, 27:19, 45:21
category [1] - 23:1
caught [1] - 44:21
central [1] - 44:10
century [1] - 17:12
certain [2] - 21:23,
45:25
certainly [5] - 11:19,
14:4, 19:12, 41:19,
43:1
certify [1] - 47:17
challenge [9] - 4:24,
5:7, 6:6, 7:23, 14:12,
24:15, 35:8, 42:24,
46:19
challenger [3] - 8:7,
8:21, 9:25
challenger's [1] -
10:3
challengers [1] -
30:15
challenges [3] -
5:12, 5:17, 8:1
challenging [1] -
12:12
chance [2] - 27:16,
27:23
change [2] - 6:20,
41:25
changes [1] - 41:24

character [2] - 18:7,
18:22
characterization [1]
- 34:16
charge [3] - 18:21,
35:15, 41:22
charged [6] - 5:1,
10:25, 11:1, 33:10,
34:5, 39:23
charges [1] - 34:2
checked [1] - 29:10
Chestnut [1] - 1:19
children [1] - 10:15
church [1] - 20:23
Circuit [13] - 5:10,
5:14, 6:8, 8:19, 11:25,
12:3, 12:5, 14:7,
25:21, 25:23, 26:3,
26:13, 28:23
circuit [1] - 6:7
Circuit's [1] - 13:24
circumstance [3] -
13:23, 19:15, 43:17
circumstances [4] -
4:23, 5:8, 5:16, 40:12
citizen [1] - 42:4
citizens [1] - 28:10
civil [2] - 1:3, 38:10
claim [2] - 6:19, 18:1
claims [2] - 28:12,
36:13
class [3] - 23:4, 23:8,
28:16
Class [1] - 11:3
classification [16] -
9:4, 11:6, 11:7, 11:22,
11:23, 12:4, 12:5,
12:6, 12:23, 12:24,
12:25, 13:5, 13:25,
18:4, 22:1, 29:16
classified [5] -
14:15, 14:16, 15:20,
18:19, 24:18
classify [1] - 24:7
clear [7] - 12:17,
37:3, 37:8, 37:10,
40:18, 40:23, 45:17
clearly [1] - 12:21
Clerk [1] - 2:1
clever [1] - 36:3
client [1] - 2:13
close [1] - 11:21
closer [2] - 11:19,
22:2
closest [1] - 42:14
clues [1] - 22:14
CM [2] - 1:21, 47:23
code [2] - 18:10,
18:13
coherent [1] - 26:21

cohort [2] - 26:5,
26:6
coin [1] - 4:4
collapses [1] - 16:21
colleague [1] - 29:16
colleagues [4] -
6:24, 7:2, 7:6, 32:11
collection [1] - 11:14
colloquies [1] -
45:24
combinations [1] -
27:20
comfortable [1] - 2:3
coming [1] - 26:2
comment [1] - 38:12
commerce [1] -
18:10
commit [2] - 40:3,
45:1
commits [2] - 31:23,
41:6
committed [1] -
24:20
common [2] - 43:18,
43:24
commonwealth [1] -
16:18
commonwheel [1] -
16:19
compared [1] - 30:25
comparing [1] -
30:23
comparison [1] -
20:7
compatible [1] - 18:4
complete [1] - 5:19
completely [2] -
25:4, 39:4
completeness [1] -
10:7
complexity [1] - 44:4
compliance [1] -
44:14
complicated [1] -
6:16
comports [1] - 17:9
conceding [1] -
21:14
concept [3] - 9:12,
17:10, 20:21
concerned [1] -
43:25
concurring [3] -
6:21, 7:2, 7:5
conduct [4] - 20:5,
20:17, 22:9, 30:11
Congress [5] - 5:19,
5:21, 5:23, 8:5, 42:12
Congress' [1] - 5:22,
40:3

connection [1] -
40:11
consensus [26] -
9:11, 9:12, 12:22,
20:19, 20:21, 20:22,
20:24, 21:1, 21:2,
21:9, 21:13, 21:16,
22:4, 22:6, 22:9,
22:12, 22:14, 22:19,
23:7, 23:10, 30:3,
30:18, 31:8, 35:18
consent [2] - 19:21,
20:24
consequence [3] -
13:10, 24:12, 24:13
consequences [1] -
46:1
considered [2] -
15:13, 20:6, 41:13
consistent [2] - 22:6,
31:15
consolidated [1] -
7:11
Constitution [1] -
5:22
constitutional [4] -
5:21, 28:18, 28:20,
41:15
contend [1] - 20:11
contest [1] - 11:15
context [8] - 17:18,
25:13, 28:22, 29:5,
35:8, 37:13, 43:3,
46:10
contingents [2] -
7:25
continued [1] - 34:2
contributed [1] - 7:4
contributions [1] -
33:18
controlling [3] - 6:8,
6:17, 6:18
convict [1] - 43:21
convicted [10] - 4:20,
10:12, 18:11, 18:14,
23:16, 24:17, 29:21,
33:4, 35:12, 38:5
conviction [10] - 8:6,
24:17, 28:10, 28:15,
39:15, 39:20, 39:25,
41:16, 42:5, 46:2
convictions [1] -
39:20
convinced [1] - 39:4
correct [20] - 5:25,
6:2, 7:3, 7:7, 7:10,
8:12, 9:2, 9:6, 12:14,
12:16, 16:20, 16:23,
19:22, 21:8, 23:14,
25:15, 38:10, 41:10,

47:17
   **counsel** [3] - 11:20, 29:6, 46:1
   **count** [8] - 10:12, 20:1, 20:4, 20:5, 20:16, 22:7, 22:14, 22:25
   **counting** [1] - 22:13
   **country** [2] - 16:6, 22:3
   **country's** [2] - 41:13, 41:14
   **couple** [3] - 10:18, 25:5, 45:21
   **course** [7] - 10:24, 15:16, 15:24, 17:2, 26:11, 27:9, 46:1
   **Court** [21] - 1:22, 5:13, 6:5, 7:8, 7:13, 11:22, 11:25, 15:3, 21:7, 30:19, 32:17, 33:6, 35:14, 39:3, 40:23, 43:17, 43:25, 44:6, 45:23, 47:14, 47:23
   **COURT** [102] - 1:1, 2:2, 2:15, 2:17, 2:21, 2:24, 3:3, 3:6, 3:9, 3:11, 3:22, 4:11, 4:17, 5:24, 6:1, 6:9, 6:12, 6:23, 7:1, 7:4, 7:8, 7:14, 8:10, 8:13, 8:25, 9:3, 9:5, 9:7, 9:10, 9:15, 9:19, 9:21, 10:5, 10:7, 10:9, 11:9, 11:14, 12:10, 12:15, 13:9, 14:3, 15:8, 16:4, 16:13, 16:15, 16:17, 16:21, 17:13, 19:12, 20:20, 21:12, 22:5, 23:9, 23:22, 24:11, 24:23, 25:1, 25:13, 26:23, 27:23, 28:1, 28:5, 28:17, 29:4, 29:10, 30:21, 31:8, 32:2, 34:8, 34:13, 34:19, 35:2, 35:16, 36:3, 37:4, 37:12, 37:17, 38:3, 38:9, 38:25, 39:9, 40:20, 41:15, 41:20, 41:23, 42:2, 42:8, 42:15, 42:19, 42:22, 43:5, 43:8, 43:11, 44:23, 45:15, 45:20, 46:4, 46:8, 46:21, 46:23, 47:1, 47:13
   **court** [9] - 2:1, 3:15, 6:3, 6:20, 14:22, 23:12, 25:22, 36:16,

40:10
   **Court's** [3] - 2:6, 4:17, 15:2
   **Courthouse** [1] - 1:22
   **courts** [6] - 4:15, 12:7, 21:21, 32:13, 40:13
   **Courts** [2] - 12:16, 25:18
   **cover** [1] - 20:9
   **crafted** [1] - 33:15
   **create** [1] - 17:19
   **crime** [26] - 4:20, 8:5, 13:3, 14:19, 15:13, 18:8, 19:10, 20:10, 22:24, 23:8, 23:16, 23:19, 24:4, 24:21, 28:15, 29:1, 29:2, 29:24, 32:24, 33:9, 35:10, 41:1, 41:6, 41:13, 41:16
   **crimes** [6] - 26:8, 39:8, 39:12, 40:23, 41:8, 41:11
   **criminal** [3] - 27:15, 38:12, 39:22
   **criminalize** [2] - 17:3, 30:17
   **criminals** [1] - 26:1
   **critiqued** [1] - 36:16
   **cross** [6] - 3:25, 9:11, 12:22, 21:8, 29:25, 46:11
   **cross-jurisdictional** [4] - 9:11, 12:22, 21:8, 29:25
   **CRR** [2] - 1:21, 47:23
   **CSR** [2] - 1:21, 47:23
   **current** [3] - 22:17, 30:20, 35:13
   **cut** [3] - 26:11, 31:14, 42:4
   **cuts** [1] - 26:9

**D**

   **damage** [1] - 16:25
   **dangerous** [4] - 15:18, 16:1, 25:12, 26:8
   **dangerousness** [4] - 9:20, 15:16, 16:10, 25:9
   **dare** [1] - 35:17
   **Date** [1] - 47:25
   **date** [2] - 3:6, 38:8
   **David** [1] - 28:8
   **DAVID** [1] - 1:3

   **de** - 32:4
   **deal** [8] - 13:17, 14:25, 20:12, 21:22, 32:5, 35:7, 39:18, 44:22
   **dealing** [1] - 35:9
   **deceit** [2] - 40:24, 41:11
   **decide** [2] - 17:9, 37:25
   **decided** [5] - 7:13, 18:21, 32:14, 32:24, 43:18
   **decides** [3] - 16:25, 31:6, 43:14
   **deciding** [1] - 23:23
   **decision** [4] - 32:21, 33:12, 40:3, 45:25
   **decisions** [1] - 38:12
   **declares** [1] - 20:25
   **deemed** [1] - 19:4
   **deep** [1] - 46:11
   **defeat** [1] - 21:10
   **defendant** [2] - 45:9, 45:25
   **Defendants** [4] - 1:7, 1:20, 3:1, 28:7
   **defense** [1] - 25:11
   **defer** [3] - 4:8, 12:7, 19:7
   **deferring** [1] - 18:4
   **define** [1] - 5:19
   **defined** [2] - 5:21, 41:6
   **defines** [1] - 16:5
   **defining** [1] - 31:24
   **definition** [2] - 7:22, 29:3
   **defrauding** [1] - 18:9
   **degree** [5] - 10:13, 28:11, 29:21, 33:5, 33:10
   **demanding** [1] - 40:11
   **demonstrate** [1] - 33:16
   **denial** [1] - 11:11
   **denied** [3] - 37:1, 37:2, 37:20
   **departed** [1] - 7:20
   **dependent** [1] - 16:6
   **deposition** [1] - 37:9
   **deputy** [1] - 2:1
   **description** [1] - 3:17
   **deserving** [1] - 33:21
   **designed** [1] - 17:19
   **determination** [1] - 32:1
   **determine** [3] - 21:7,

27:16, 29:1
   **determined** [1] - 31:20
   **developing** [1] - 20:24
   **difference** [2] - 17:10, 24:16
   **differences** [2] - 27:14, 27:16
   **different** [9] - 15:4, 18:17, 18:25, 22:10, 23:2, 23:3, 23:8, 35:7, 39:8
   **difficult** [1] - 32:23
   **directly** [1] - 39:24
   **disarm** [1] - 23:15
   **disclose** [1] - 41:4
   **disclosed** [1] - 10:20
   **disclosing** [2] - 11:1, 26:25
   **discovered** [2] - 10:22, 44:12
   **discovery** [4] - 25:7, 25:8, 25:10, 45:8
   **discussed** [1] - 29:16
   **discussing** [1] - 3:19
   **discussion** [2] - 35:22, 40:21
   **dismissed** [1] - 24:9
   **dispositive** [4] - 12:2, 12:17, 14:1, 14:10
   **dispute** [5] - 12:21, 12:22, 14:18, 20:16, 37:24
   **dissent** [3] - 7:21, 30:13, 36:16
   **dissenting** [2] - 7:5, 30:6
   **distinction** [5] - 17:4, 18:7, 18:14, 18:16
   **distinctions** [1] - 19:5
   **district** [4] - 25:22, 36:16, 40:10, 40:13
   **DISTRICT** [2] - 1:1, 1:2
   **diversion** [1] - 24:3
   **diversionary** [1] - 24:5
   **divided** [1] - 8:18
   **dividing** [1] - 32:8
   **division** [2] - 38:11, 38:12
   **docket** [1] - 2:6
   **docketed** [1] - 2:5
   **dollar** [7] - 17:4, 18:15, 23:4, 32:3, 32:16, 32:23, 33:9

   **dollar-level** [1] - 17:4
   **dollars** [2] - 18:19, 33:19
   **done** [1] - 32:11
   **down** [2] - 18:13, 28:23
   **drive** [2] - 2:17, 2:19
   **dug** [1] - 27:10
   **DUI** [7] - 15:19, 22:24, 29:23, 30:7, 30:8, 30:15, 33:7

**E**

   **E.K** [1] - 1:10
   **easier** [4] - 14:3, 14:4, 14:5, 14:6, 22:25, 23:7
   **EASTERN** [1] - 1:2
   **easy** [2] - 25:25, 32:17
   **effect** [1] - 44:16
   **eight** [3] - 6:1, 7:24, 8:2
   **either** [3] - 18:14, 43:21, 45:3
   **elaborate** [1] - 4:2
   **elements** [2] - 32:15, 32:22
   **eligibility** [1] - 41:5
   **elusive** [1] - 20:21
   **emblematic** [1] - 38:2
   **emphasis** [1] - 17:22
   **employee** [1] - 31:18
   **en** [2] - 5:10, 7:13
   **enact** [1] - 32:21
   **end** [6] - 7:23, 13:12, 38:5, 44:16, 45:12
   **Enron** [1] - 18:9
   **entailing** [1] - 40:24
   **entire** [2] - 12:19, 16:6
   **entitled** [3] - 28:17, 37:10, 47:18
   **Eric** [1] - 3:2
   **eRIC** [1] - 1:18
   **especially** [2] - 23:6, 43:24
   **ESQUIRE** [4] - 1:12, 1:14, 1:18, 1:18
   **essentially** [2] - 11:1, 27:5
   **established** [1] - 21:8
   **et** [1] - 1:6
   **evaded** [1] - 18:20
   **evaluate** [1] - 43:1
   **evaluating** [2] -

31:16, 33:12
evasion [1] - 18:16
event [4] - 7:18,
14:8, 14:16, 24:17
everywhere [2] -
22:25, 44:24
evidence [6] - 25:19,
25:20, 38:19, 39:1,
40:8, 40:12
exact [1] - 43:17
exactly [2] - 6:5, 11:7
example [1] - 18:24
excellence [1] -
17:16
excess [1] - 10:23
excessively [1] -
40:11
excluded [1] - 38:20
excuse [1] - 30:8
executive [2] - 23:23
exercise [2] - 28:18,
42:3
exiting [1] - 27:7
experience [1] - 12:8
expertise [1] - 12:8
explain [1] - 33:23
explained [2] -
24:12, 24:14
explicitly [1] - 39:6
express [1] - 19:2
extraordinarily [1] -
15:19

**F**

face [2] - 5:4, 21:17
facially [1] - 4:25
Fact [1] - 17:1
fact [14] - 14:9,
20:20, 29:17, 30:22,
32:16, 33:11, 36:1,
37:5, 37:17, 41:5,
43:23, 44:10, 44:11,
46:9
factor [15] - 8:20,
11:21, 11:24, 11:25,
12:17, 12:18, 13:25,
14:17, 14:18, 15:7,
15:16, 19:23, 21:15,
30:1, 30:18
factors [17] - 8:4,
8:19, 8:20, 9:1, 11:10,
11:14, 12:13, 15:9,
15:12, 15:14, 15:15,
17:18, 21:10, 27:20,
29:15, 36:7, 40:25
facts [6] - 5:8, 31:16,
31:19, 31:22, 36:10,
37:23, 38:1, 44:8

failed [1] - 25:5
failing [1] - 41:4
fails [1] - 18:3
fair [1] - 42:8
fairly [1] - 12:21
fall [1] - 46:19
falls [1] - 27:22
false [4] - 18:12,
18:21, 40:24, 41:3
familiar [1] - 45:21
family [1] - 10:15
fan [1] - 34:21
far [2] - 10:2, 13:22
favor [4] - 11:10,
30:14, 30:15, 30:19
Federal [2] - 3:1,
28:7
federal [1] - 41:6
Feldman [1] - 47:23
FELDMAN [1] - 1:21
felon [10] - 4:14,
5:13, 13:4, 13:6, 13:7,
14:11, 14:13, 14:15,
14:16, 35:11
felonies [1] - 30:18
felonious [2] - 19:4,
30:12
felony [14] - 4:16,
9:5, 17:6, 18:13,
18:16, 20:6, 20:17,
22:21, 24:8, 24:21,
33:10, 33:15, 40:23
felt [1] - 7:23
few [3] - 13:17,
15:23, 43:10
fide [1] - 45:18
fifth [3] - 8:19, 9:15,
9:16
figure [1] - 42:2
figured [1] - 7:17
figuring [1] - 8:20
finally [2] - 27:12,
34:3
fine [3] - 2:22, 14:23,
28:1
firearm [9] - 11:12,
37:1, 37:3, 37:11,
37:20, 37:23, 38:21,
42:20, 45:19
firearms [14] - 4:22,
8:9, 25:16, 26:8,
36:23, 37:9, 38:20,
39:21, 39:23, 40:6,
43:14, 43:15, 43:16,
45:1
firmly [1] - 30:1
first [22] - 2:7, 4:1,
4:6, 8:4, 8:18, 9:3,
9:13, 11:21, 14:17,
16:9, 28:11, 28:25,

29:21, 33:5, 33:16,
34:1, 36:10, 38:4,
40:19, 40:25
Fisher [5] - 30:6,
30:7, 30:12, 36:15,
40:9
Fisher's [1] - 31:4
fit [8] - 27:22, 36:11,
36:13, 36:17, 38:2,
38:21, 40:14
fits [5] - 7:21, 16:11,
36:22, 36:24
fitted [1] - 39:7
five [16] - 8:2, 8:20,
9:1, 11:4, 13:13,
13:16, 13:17, 13:18,
15:12, 15:14, 27:20,
29:22, 33:5, 39:21,
40:2, 43:20
flat [1] - 25:21
flaw [1] - 27:8
flexibility [1] - 13:20
fluid [1] - 23:5
focus [7] - 23:23,
29:19, 31:1, 35:6,
35:19, 35:21, 45:24
focused [3] - 16:9,
22:5, 29:17
Folajtar [6] - 12:4,
14:12, 18:11, 40:22,
41:12
Folajtar's [1] - 41:8
folks [1] - 8:17
follow [2] - 26:12,
40:13
follow-through [1] -
26:12
following [1] - 42:1
food [5] - 10:14,
10:18, 11:1, 20:14,
41:6
footnotes [1] - 6:15
FOR [2] - 1:2, 1:11
forbidden [1] - 4:22
foregoing [1] - 47:17
forever [1] - 4:22
forge [1] - 29:9
form [2] - 45:17,
45:21
Form [1] - 46:5
formal [2] - 22:10,
22:13
forth [3] - 6:22,
19:25, 43:5
founding [2] - 41:13,
41:14
four [8] - 7:2, 8:11,
8:18, 8:20, 12:20,
15:15, 21:10, 40:25
fourth [2] - 9:11,

15:16
fractured [1] - 6:13
frame [1] - 35:20
framework [1] -
34:18
fraud [23] - 11:1,
16:10, 17:3, 19:5,
20:18, 21:21, 21:22,
23:2, 28:8, 28:10,
28:15, 30:11, 31:14,
31:23, 31:24, 31:25,
33:25, 34:1, 34:3,
34:6, 39:14, 41:11,
45:3
fraudulent [2] - 18:2,
19:9
friend [1] - 31:13
friendly [1] - 38:25
friends [2] - 26:24,
33:3
frustrating [1] - 7:14
Fuentes [3] - 7:4,
7:7, 7:18
Fuentes' [1] - 7:21
full [2] - 13:18, 45:9
fully [2] - 10:14, 11:2
fundamental [2] -
5:18, 5:20
funded [1] - 33:21
funds [1] - 34:7
funny [1] - 5:17
future [1] - 6:6

**G**

gaining [1] - 40:6
gamut [1] - 12:19
Gardner [2] - 27:10,
27:12
GENE [1] - 1:10
general [4] - 31:13,
31:14, 31:21, 31:25
General [1] - 1:6,
34:5
generalized [1] -
20:9
generally [7] - 3:14,
12:2, 14:1, 14:9, 20:2,
21:11, 28:21
generated [1] - 11:19
gentleman [1] - 44:9
gentlemen [3] - 3:20,
26:4, 28:2
Georgia [3] - 24:6,
32:12, 32:20
gift [1] - 43:14
GILL [5] - 1:18, 3:2,
3:5, 3:8, 3:10
Gill [2] - 3:2, 3:3

given [5] - 10:21,
15:13, 21:23, 30:22,
34:17
glad [1] - 3:22
glean [3] - 33:7,
34:12, 34:25
Gottlieb [1] - 2:11
GOTTLIEB [3] - 1:14,
2:10, 2:19
governing [1] - 7:20
Government [30] -
8:7, 8:24, 9:23, 11:11,
13:7, 16:18, 17:1,
17:2, 17:24, 19:24,
20:3, 21:7, 25:7,
25:19, 25:24, 26:22,
26:25, 27:24, 35:23,
36:2, 36:7, 38:1, 38:3,
38:6, 40:5, 40:10,
43:21, 44:7, 45:6,
46:16
Government's [13] -
17:23, 25:2, 25:4,
25:8, 27:21, 28:3,
28:13, 30:2, 30:19,
35:20, 36:19, 36:21,
39:1
granted [2] - 28:14,
46:19
granular [1] - 21:25
great [3] - 7:15,
13:17, 47:9
grumbling [2] -
20:24, 21:5
guess [3] - 3:25,
10:4, 10:11
guidance [2] - 30:4,
30:5
guideline [1] - 40:13
guilty [4] - 14:23,
28:8, 34:1, 42:16
gun [2] - 44:13,
44:25
guns [3] - 8:6, 24:22,
44:21
gURA [1] - 24:13
Gura [3] - 2:8, 4:12,
43:8
GURA [61] - 1:12,
1:12, 2:8, 2:12, 2:22,
3:21, 4:6, 4:9, 4:12,
4:19, 5:25, 6:2, 6:11,
6:13, 6:25, 7:3, 7:7,
7:10, 7:15, 8:12, 8:14,
9:2, 9:4, 9:6, 9:9,
9:14, 9:18, 9:20, 9:23,
10:6, 10:8, 10:10,
10:13, 11:17, 12:14,
12:16, 13:15, 14:5,
15:10, 16:8, 16:14,

16:16, 16:20, 16:23, 17:21, 19:22, 21:3, 21:14, 22:12, 23:11, 23:25, 24:25, 25:4, 25:15, 27:4, 27:25, 43:9, 43:12, 44:24, 46:24, 47:11
**guys** [1] - 2:18

## H

**handed** [1] - 28:23
**handgun** [1] - 39:19
**hands** [1] - 36:23
**hard** [1] - 23:6
**hardened** [1] - 26:1
**hardest** [2] - 19:19, 21:14
**Hardiman** [1] - 7:1
**Hardiman's** [2] - 6:21, 7:25
**harm** [3] - 9:17, 16:2, 16:5
**harmful** [1] - 16:10
**haul** [1] - 19:17
**hay** [1] - 36:1
**headlines** [2] - 33:23, 33:25
**hear** [3] - 3:22, 27:24, 29:13
**heard** [1] - 28:11
**HEARING** [1] - 1:11
**heavily** [1] - 29:17
**heightened** [2] - 25:14, 27:17
**Heller** [2] - 5:13, 5:24
**hello** [1] - 2:2
**helpfully** [1] - 17:2
**helps** [1] - 45:23
**hi** [2] - 2:14, 2:15
**high** [1] - 15:19
**higher** [1] - 39:3
**highly** [1] - 6:13
**himself** [1] - 44:14
**historical** [2] - 29:2, 43:2
**history** [2] - 39:22, 40:3
**hold** [1] - 33:18
**holiday** [1] - 47:9
**Holloway** [13] - 8:19, 9:15, 15:17, 15:25, 16:9, 29:19, 29:23, 30:5, 30:13, 33:6, 33:12, 34:24, 36:15
**Holloway's** [1] - 40:12
**Honor** [60] - 2:8, 2:10, 2:23, 2:25, 3:2,

3:21, 4:10, 4:12, 8:14, 16:8, 16:23, 17:21, 22:12, 27:18, 28:4, 28:6, 28:21, 28:24, 29:6, 29:13, 29:20, 29:25, 30:3, 31:3, 31:6, 31:11, 32:8, 34:11, 34:15, 34:22, 35:4, 35:24, 36:5, 36:9, 37:7, 37:19, 37:25, 38:7, 38:24, 39:6, 39:10, 40:17, 41:18, 41:22, 42:6, 42:10, 42:25, 43:3, 43:7, 43:9, 43:12, 45:5, 45:12, 45:16, 46:3, 46:6, 46:16, 46:24, 46:25, 47:12
**Honor's** [2] - 8:17, 19:22
**HONORABLE** [1] - 1:10
**hope** [1] - 44:21
**horrible** [1] - 2:19
**hues** [1] - 23:3
**huge** [1] - 34:20
**Hugo** [1] - 17:15

## I

**idea** [4] - 7:19, 22:7, 23:10, 44:2
**ideas** [1] - 13:1
**identified** [1] - 25:18
**identifies** [1] - 30:7
**ignored** [1] - 29:18
**impact** [1] - 46:19
**impacted** [1] - 41:19
**impacts** [1] - 8:22
**implicated** [2] - 41:16, 42:23
**implicates** [1] - 22:9
**implications** [1] - 42:3
**importance** [1] - 45:23
**important** [19] - 10:1, 11:24, 12:6, 13:6, 13:8, 13:10, 13:14, 13:16, 13:25, 14:11, 14:13, 14:14, 14:15, 27:14, 37:5, 40:5, 40:15, 40:22
**importantly** [1] - 33:20
**impose** [1] - 40:8
**imposed** [2] - 9:10, 15:4
**IN** [1] - 1:1

**incarcerated** [2] - 39:16, 39:18
**incarceration** [1] - 39:25
**incidents** [1] - 26:8
**income** [4] - 10:14, 10:20, 11:2, 20:13
**increasing** [1] - 33:23
**incredible** [1] - 27:9
**indicated** [1] - 12:1
**Indicating** [1] - 29:12
**indictment** [1] - 35:11
**indictments** [1] - 35:10
**individual** [6] - 8:8, 31:23, 31:24, 35:12, 39:16, 42:3
**individuals** [2] - 28:16, 39:18
**informed** [1] - 45:23
**infraction** [1] - 14:20
**inherently** [2] - 22:23, 23:2
**inmates** [1] - 27:8
**Inspector** [1] - 34:5
**instance** [2] - 29:17, 41:3
**instructions** [3] - 4:17, 8:16, 8:17
**intend** [1] - 32:10
**intent** [8] - 32:9, 33:8, 33:11, 34:10, 34:12, 34:21, 34:24, 46:13
**interest** [7] - 10:1, 25:15, 25:17, 25:18, 36:22, 40:5, 40:15
**interested** [2] - 3:10, 3:14
**interesting** [5] - 3:23, 27:18, 45:22, 47:2
**interests** [2] - 36:22, 36:25
**intermediate** [2] - 9:24, 38:14
**interns** [3] - 3:6, 3:13, 47:3
**interpret** [1] - 44:3
**interviewed** [1] - 22:16
**invalidation** [1] - 19:11
**investors** [1] - 18:9
**involve** [2] - 9:7, 16:2
**involved** [3] - 14:20, 29:15, 32:4

**involving** [3] - 39:21, 39:23, 41:11
**irrelevant** [1] - 25:9
**irresponsibility** [1] - 36:20
**irresponsible** [1] - 37:1
**Irving** [2] - 23:12, 35:6
**issue** [24] - 3:23, 5:5, 11:6, 11:7, 20:22, 21:13, 22:5, 24:23, 25:14, 26:9, 26:25, 28:17, 37:5, 37:17, 39:11, 39:12, 41:20, 41:21, 43:1, 45:17, 46:8, 46:9, 46:12
**issues** [1] - 3:18
**itself** [3] - 4:15, 13:25, 32:1

## J

**jail** [7] - 4:21, 4:22, 11:4, 15:6, 15:21, 15:24, 44:18
**Jean** [2] - 17:15, 19:8
**JEFFREY** [1] - 1:6
**joined** [4] - 2:12, 6:23, 7:1, 7:18
**judge** [3] - 17:7, 32:10, 39:2
**Judge** [24] - 6:7, 6:17, 6:18, 6:21, 6:23, 7:1, 7:4, 7:7, 7:18, 7:19, 7:21, 7:23, 7:24, 7:25, 8:3, 23:12, 27:10, 27:11, 30:6, 30:7, 30:12, 31:4, 36:15, 40:9
**judges** [7] - 6:14, 6:15, 7:24, 11:18, 19:6, 21:24, 32:19
**JUDGMENT** [1] - 1:11
**judgment** [17] - 3:25, 7:2, 13:3, 14:8, 17:6, 19:2, 20:14, 20:15, 23:5, 28:14, 32:18, 37:6, 45:5, 45:13, 46:12, 46:15, 46:19
**judicial** [1] - 23:13
**JULY** [1] - 1:9
**June** [2] - 34:4
**juries** [1] - 4:18
**jurisdictional** [4] - 9:11, 12:22, 21:8, 29:25
**jurisdictions** [5] -

21:4, 30:9, 30:11, 30:17, 34:12
**jury** [1] - 44:7
**justify** [1] - 36:11

## K

**Kathleen** [1] - 47:23
**kATHLEEN** [1] - 1:21
**keep** [1] - 8:10
**keeping** [1] - 36:22
**kids** [1] - 10:16
**kind** [3] - 35:18, 42:5, 42:23
**kinds** [1] - 5:2
**knowing** [1] - 44:6
**knowledge** [4] - 37:10, 43:16, 46:9, 46:12
**knows** [2] - 11:18, 43:15
**Koob** [2] - 2:25, 28:6
**KOOB** [41] - 1:18, 2:25, 4:8, 28:4, 28:6, 28:21, 29:6, 29:13, 31:3, 31:10, 32:8, 34:11, 34:15, 34:22, 35:4, 35:24, 36:5, 37:7, 37:15, 37:19, 38:7, 38:10, 39:6, 39:10, 40:21, 41:18, 41:21, 42:1, 42:6, 42:10, 42:18, 42:21, 42:25, 43:7, 45:16, 46:3, 46:6, 46:16, 46:22, 46:25, 47:12

## L

**label** [8] - 13:9, 13:14, 13:15, 21:4, 29:18, 29:19, 30:12, 30:17
**lack** [2] - 28:15, 29:8
**laid** [1] - 41:12
**last** [3] - 20:3, 34:3, 43:20
**latest** [1] - 34:2
**law** [20] - 4:14, 5:15, 6:7, 6:8, 6:18, 9:25, 19:5, 20:1, 20:2, 22:23, 23:6, 30:8, 31:21, 35:14, 41:24, 44:15, 44:16, 44:17, 47:7
**law-abiding** [1] - 44:17
**lawful** [2] - 5:14, 7:22
**lawless** [1] - 26:7

**lawn** [1] - 10:20
**lawns** [1] - 10:17
**laws** [2] - 20:7, 21:6
**lawsuit** [1] - 44:11
**lawyer** [3] - 24:3, 24:16, 44:1
**lawyers** [5] - 19:7, 19:20, 44:4, 47:6, 47:8
**lay** [1] - 4:15
**lead** [2] - 32:3, 32:7
**learn** [1] - 38:11
**learned** [2] - 38:3, 38:9
**least** [6] - 12:20, 29:14, 30:10, 42:20, 42:24
**leave** [1] - 20:25
**leeway** [1] - 13:17
**left** [1] - 28:18
**legal** [4] - 3:18, 17:16, 17:19, 19:13
**legislative** [6] - 13:2, 33:11, 34:10, 34:21, 34:24, 42:14
**legislature** [20] - 13:19, 15:22, 16:24, 17:5, 17:6, 18:5, 19:2, 19:4, 19:6, 20:12, 21:21, 30:24, 30:25, 32:1, 32:10, 32:14, 32:21, 32:24, 33:8, 34:25
**legislature's** [6] - 12:7, 13:1, 32:9, 32:21, 33:8, 34:12
**legislatures** [5] - 21:20, 21:25, 22:16, 34:25, 42:13
**legitimate** [1] - 12:21
**less** [4] - 13:10, 26:15, 35:17
**level** [6] - 15:19, 17:4, 20:11, 21:23, 39:3, 42:12
**lie** [1] - 18:18
**lies** [1] - 16:17
**life** [2] - 4:23, 5:9
**likely** [2] - 39:22, 40:2
**limit** [1] - 19:3
**limitation** [1] - 5:22
**limitations** [1] - 43:19
**limits** [1] - 5:21
**line** [1] - 32:8
**listed** [1] - 42:20
**listening** [1] - 47:4
**litany** [1] - 42:16
**litmus** [1] - 11:24

**logical** [1] - 26:21
**lollipop** [2] - 18:25, 19:1
**look** [17] - 12:25, 18:13, 20:7, 20:14, 22:18, 28:25, 29:2, 31:3, 31:18, 32:14, 32:18, 32:20, 32:23, 33:11, 34:23, 36:12, 41:1
**Look** [2] - 14:23, 15:23
**looked** [1] - 31:19
**looking** [6] - 12:24, 20:15, 26:9, 32:3, 32:6, 32:10
**lose** [1] - 12:18
**lower** [1] - 36:19

## M

**M1** [2] - 11:6, 11:8
**machine** [1] - 1:25
**Madoff** [1] - 18:10
**Madoffs** [1] - 21:24
**majority** [9] - 20:18, 22:7, 30:5, 30:13, 30:14, 31:4, 31:7, 31:9, 31:10
**managed** [1] - 42:12
**mandated** [1] - 15:24
**mandatory** [1] - 15:21
**Market** [1] - 1:23
**Marzzarella** [7] - 7:20, 8:3, 8:13, 8:14, 8:23, 8:25, 9:21
**Marzzarella's** [1] - 35:20
**Massachusetts** [1] - 20:16
**material** [2] - 41:5, 41:10
**matter** [4] - 4:1, 4:5, 41:10, 47:19
**maximum** [1] - 29:20
**McHugh** [1] - 23:12
**MCSWAIN** [1] - 1:17
**mean** [22] - 6:19, 11:15, 13:10, 16:5, 17:15, 20:21, 20:22, 21:2, 22:23, 24:22, 26:20, 26:23, 27:9, 27:11, 30:6, 30:21, 30:24, 31:1, 31:15, 35:16, 39:14
**meaning** [2] - 8:5, 31:8
**means** [4] - 12:18,

21:1, 30:3, 41:3
**Medoff** [1] - 20:11
**meet** [3] - 19:14, 25:5, 40:25
**meets** [1] - 8:7
**member** [2] - 38:10, 38:11
**mention** [1] - 24:1, 39:24
**mentioned** [2] - 29:25, 40:7
**mess** [1] - 6:12
**met** [1] - 15:15
**method** [1] - 18:24, 19:1
**methodology** [1] - 8:3
**methods** [1] - 23:3
**Michael** [1] - 2:10
**mICHAEL** [1] - 1:14
**microphone** [1] - 29:11
**might** [9] - 14:6, 15:12, 16:1, 22:20, 23:7, 23:10, 24:3, 28:19, 39:2
**million** [2] - 18:18, 34:7
**mind** [1] - 33:16
**minds** [1] - 21:19
**minimis** [1] - 32:4
**minimize** [1] - 16:15
**minute** [2] - 9:13, 26:3
**misdemeanor** [25] - 4:21, 9:5, 10:12, 10:13, 11:3, 12:23, 15:17, 15:18, 15:20, 17:5, 18:17, 21:5, 21:17, 22:3, 24:9, 24:18, 28:11, 29:18, 29:22, 33:4, 39:20, 39:25, 41:17, 44:2
**Misdemeanor** [1] - 11:8
**misdemeanors** [1] - 13:18
**misrepresentation** [1] - 41:4
**mistake** [4] - 37:14, 37:16, 37:21, 37:22
**misused** [1] - 34:7
**mixes** [1] - 26:22
**money** [4] - 10:17, 16:12, 17:11, 18:7
**month** [1] - 34:3
**months** [1] - 34:1
**morning** [6] - 2:8, 2:10, 2:25, 3:2, 4:12, 28:6

**most** [4] - 11:23, 12:3, 13:25, 27:12
**mostly** [1] - 17:23
**motion** [1] - 3:24
**MOTIONS** [1] - 1:11
**motions** [2] - 3:25, 46:12
**mowing** [2] - 10:17, 10:20
**MR** [106] - 2:8, 2:10, 2:12, 2:19, 2:22, 2:25, 3:2, 3:5, 3:8, 3:10, 3:21, 4:6, 4:8, 4:9, 4:12, 4:19, 5:25, 6:2, 6:11, 6:13, 6:25, 7:3, 7:7, 7:10, 7:15, 8:12, 8:14, 9:2, 9:4, 9:6, 9:9, 9:14, 9:18, 9:20, 9:23, 10:6, 10:8, 10:10, 11:13, 11:17, 12:14, 12:16, 13:15, 14:5, 15:10, 16:8, 16:14, 16:16, 16:20, 16:23, 17:21, 19:22, 21:3, 21:14, 22:12, 23:11, 23:25, 24:13, 24:25, 25:4, 25:15, 27:4, 27:25, 28:4, 28:6, 28:21, 29:6, 29:13, 31:3, 31:10, 32:8, 34:11, 34:15, 34:22, 35:4, 35:24, 36:5, 37:7, 37:15, 37:19, 38:7, 38:10, 39:6, 39:10, 40:21, 41:18, 41:21, 42:1, 42:6, 42:10, 42:18, 42:21, 42:25, 43:7, 43:9, 43:12, 44:24, 45:16, 46:3, 46:6, 46:16, 46:22, 46:24, 46:25, 47:11, 47:12
**multiplication** [1] - 34:13
**must** [3] - 6:2, 7:14, 12:20

## N

**name** [2] - 41:23, 41:25
**nature** [2] - 19:9, 19:10
**near** [1] - 30:9
**nearly** [1] - 39:21
**need** [4] - 3:17, 12:19, 33:21, 46:17
**needed** [1] - 7:13
**neediest** [1] - 28:9

**needs** [1] - 45:12
**never** [2] - 38:5, 43:21
**new** [2] - 26:11, 39:23
**next** [4] - 16:24, 20:20, 39:2, 39:3
**nexus** [1] - 30:1
**nice** [2] - 3:4, 3:5
**none** [1] - 42:23
**nonfirearm** [1] - 40:1
**nonfirearm-related** [1] - 40:1
**nonviolent** [2] - 13:7, 40:1
**normally** [2] - 3:11, 3:17
**Norristown** [2] - 1:15, 2:20
**nose** [2] - 22:13, 44:15
**noses** [1] - 22:7
**note** [1] - 11:5, 36:15, 40:22
**noted** [5] - 6:15, 24:2, 33:24, 34:3, 41:7
**notes** [1] - 17:2
**notion** [3] - 5:11, 15:8, 16:17
**novel** [1] - 17:19
**novelization** [1] - 17:22
**nuanced** [1] - 32:12
**number** [5] - 3:12, 4:25, 5:11, 34:11, 42:22
**Number** [2] - 17:1, 33:15
**numbers** [1] - 20:2

## O

**objections** [1] - 25:10
**objectives** [1] - 33:16
**obligation** [1] - 4:2
**obvious** [1] - 12:23
**obviously** [2] - 21:6, 25:6
**occurred** [1] - 27:16
**odds** [1] - 26:15
**OF** [1] - 1:2
**offense** [17] - 5:8, 9:20, 14:20, 15:18, 15:20, 16:2, 18:3, 18:8, 18:22, 19:3, 26:18, 26:19, 32:15,

33:13, 40:1, 40:3, 45:3
**offenses** [4] - 20:8, 26:8, 39:21, 39:23
**offer** [2] - 15:2, 15:5
**offered** [5] - 7:21, 8:4, 17:1, 26:3, 40:12
**Office** [4] - 3:7, 3:13, 10:19, 34:5
**office** [2] - 42:15, 42:17
**Official** [2] - 1:22, 47:23
**oftentimes** [1] - 13:4
**ON** [1] - 1:11
**once** [3] - 26:10, 32:2, 32:6
**one** [37] - 6:16, 7:23, 8:7, 8:25, 10:12, 11:24, 15:11, 16:4, 17:18, 18:3, 19:23, 21:22, 22:20, 26:9, 27:4, 27:5, 27:6, 27:7, 27:9, 27:19, 27:21, 29:15, 29:17, 30:22, 32:4, 34:12, 35:1, 35:10, 35:18, 39:18, 39:20, 39:25, 40:1, 40:18, 45:5, 45:12, 46:18
**ones** [2] - 25:25, 42:7
**opened** [1] - 2:1
**opinion** [17] - 6:8, 6:17, 6:19, 6:21, 7:5, 13:23, 13:24, 28:24, 29:7, 29:19, 30:5, 30:6, 31:4, 31:15, 35:6, 35:7, 41:12
**opinions** [4] - 6:12, 6:14, 22:17, 34:23
**opposed** [2] - 13:14, 18:9
**option** [1] - 24:6
**oral** [1] - 2:4
**oranges** [1] - 30:23
**order** [1] - 22:8
**otherwise** [2] - 16:21, 23:11
**outcome** [1] - 11:11
**outlier** [1] - 22:20
**outside** [1] - 40:24
**overall** [1] - 22:2
**overbroad** [1] - 5:3
**overcome** [1] - 5:15
**overreaction** [1] - 19:16
**overwhelming** [2] - 11:10, 22:19
**own** [2] - 17:1, 33:6

**owner** [1] - 38:21
**owning** [1] - 45:18

## P

**PA** [5] - 1:8, 1:15, 1:20, 1:23, 34:2
**Padilla** [1] - 24:15
**panels** [1] - 7:12
**panoply** [2] - 42:9, 45:9
**papers** [5] - 6:20, 17:25, 19:23, 24:2, 27:11
**paperwork** [1] - 37:14
**par** [1] - 17:16
**part** [3] - 3:15, 8:16, 19:19
**particular** [13] - 13:3, 13:22, 17:20, 19:15, 23:6, 24:1, 31:16, 31:23, 32:15, 32:22, 33:14, 35:10
**particularized** [1] - 40:11
**particularly** [2] - 30:22, 33:1
**parties** [1] - 30:9
**party** [2] - 13:11, 13:12
**past** [1] - 26:12
**PAUL** [1] - 1:18
**Paul** [2] - 2:25, 28:6
**pay** [1] - 18:20
**paying** [1] - 18:17
**penalties** [1] - 33:24
**penalty** [2] - 29:20, 41:8
**Pennsylvania** [9] - 10:13, 11:3, 11:6, 13:18, 16:19, 33:1, 33:8, 33:17, 33:24
**PENNSYLVANIA** [1] - 1:2
**Pennsylvania's** [1] - 28:9
**Pennsylvanians** [1] - 34:6
**people** [18] - 4:15, 5:1, 13:20, 14:6, 17:7, 20:13, 23:15, 24:5, 24:19, 26:1, 26:9, 26:20, 28:19, 36:23, 40:2, 40:4, 42:14, 44:19
**per** [3] - 8:16, 18:3, 19:10
**percent** [2] - 21:4,

22:3
**perfect** [1] - 40:14
**perfectly** [1] - 38:2
**perform** [2] - 32:19, 34:18
**perhaps** [4] - 23:7, 25:24, 27:12, 29:13
**period** [2] - 10:21, 24:9
**perjury** [1] - 41:8
**permissible** [1] - 5:12
**permitted** [1] - 41:24
**permutations** [1] - 44:3
**person** [1] - 6:3, 8:6, 12:11, 13:4, 14:14, 26:14, 38:15, 38:20, 41:2, 42:4, 44:17
**person's** [1] - 14:16
**personal** [1] - 5:7
**persuasiveness** [1] - 19:13
**PHILADELPHIA** [1] - 1:8
**Philadelphia** [3] - 1:20, 1:23, 44:19
**picture** [1] - 22:2
**PLAINTIFF** [2] - 2:14, 2:16
**Plaintiff** [2] - 1:4, 1:16
**plaintiff** [4] - 2:9, 2:11, 4:13, 36:18
**plaintiff's** [1] - 39:15
**plead** [1] - 14:23
**pleaded** [1] - 28:8
**pleads** [1] - 44:1
**pleas** [1] - 42:16
**PLLC** [1] - 1:12
**plurality** [1] - 6:8
**plus** [1] - 7:25
**point** [19] - 16:24, 18:7, 19:24, 24:14, 24:15, 25:6, 25:23, 26:1, 26:6, 35:5, 36:8, 38:17, 39:9, 39:15, 40:18, 45:16, 46:8, 46:11
**pointed** [1] - 29:6, 29:7
**pointing** [1] - 39:5
**points** [3] - 16:8, 25:5, 43:10
**pop** [1] - 27:23
**position** [4] - 12:10, 13:5, 14:11, 25:8
**possess** [1] - 11:12
**possessing** [1] -

42:20
**possession** [3] - 4:14, 35:11, 35:13
**posture** [1] - 3:18
**potential** [2] - 9:16, 29:20
**potentially** [1] - 27:14
**power** [1] - 5:22
**practically** [1] - 20:23
**PRATTER** [1] - 1:10
**presentation** [1] - 17:23
**presentations** [1] - 3:16
**presented** [1] - 36:2
**preserve** [1] - 33:20
**preserved** [2] - 6:19, 28:20
**presumptions** [1] - 5:15
**presumptively** [1] - 5:14
**prevail** [2] - 8:1, 45:11
**prevailed** [1] - 11:13
**prevailing** [1] - 45:5
**preventing** [1] - 40:5
**primary** [5] - 12:5, 14:1, 14:7, 14:10, 21:10
**Prince** [1] - 1:13
**principal** [1] - 3:18
**prison** [6] - 13:13, 15:25, 26:2, 26:5, 27:8, 28:12
**probation** [2] - 14:24, 44:2
**problem** [4] - 22:21, 33:24, 34:14, 37:18
**problematic** [1] - 46:13
**proceedings** [1] - 47:18
**process** [3] - 7:19, 8:15, 47:5
**produced** [1] - 1:25
**prohibit** [2] - 8:6, 30:11
**prohibited** [3] - 43:16, 43:24, 45:18
**prohibiting** [1] - 8:8
**prohibition** [1] - 5:2
**proof** [1] - 15:9
**property** [2] - 18:23, 23:4
**proposed** [1] - 17:1
**prosecute** [1] - 23:23
**prosecution's** [1] -

15:1, 15:5
**prosecutorial** [1] - 32:18
**prove** [4] - 13:6, 15:11, 44:7
**provide** [1] - 37:23
**provided** [1] - 36:8
**proving** [1] - 19:21
**provisions** [1] - 18:15
**public** [14] - 10:1, 10:2, 16:11, 18:8, 19:3, 20:8, 25:15, 25:16, 25:17, 25:18, 25:19, 33:20, 42:15, 42:17
**public's** [1] - 12:8
**punish** [1] - 21:21
**punishable** [7] - 4:20, 4:21, 11:4, 28:11, 29:22, 33:5, 41:7
**punished** [1] - 22:25
**punishment** [1] - 29:23
**purchase** [4] - 37:23, 37:24, 38:8, 38:20
**purchasers** [1] - 39:19
**purchases** [7] - 35:22, 36:4, 43:13, 43:14, 43:19, 44:10, 46:9
**purchasing** [1] - 36:20
**pure** [1] - 17:16
**purposes** [1] - 46:15
**pursuit** [1] - 47:6
**put** [3] - 17:17, 17:21, 25:9

## Q

**Quakers** [1] - 20:23
**questions** [4] - 3:19, 25:7, 43:4, 47:4
**quintessential** [1] - 37:4
**quite** [7] - 4:23, 6:15, 7:14, 34:13, 41:7, 43:18, 43:24
**quote** [1] - 33:22
**quoting** [2] - 27:11, 27:13

## R

**raised** [3] - 29:20, 33:9, 33:15

**Range** [40] - 2:5, 2:13, 2:15, 4:13, 5:7, 10:9, 10:10, 10:11, 10:16, 10:25, 11:2, 14:22, 19:19, 24:2, 24:12, 26:10, 26:17, 28:8, 28:12, 29:14, 29:21, 32:5, 33:3, 33:9, 36:1, 36:6, 36:13, 36:25, 38:1, 38:15, 38:17, 39:15, 39:24, 40:2, 40:4, 43:24, 44:12, 44:22, 44:25, 45:13
**RANGE** [1] - 1:3
**range** [1] - 15:23
**Range's** [7] - 10:16, 15:9, 15:11, 17:18, 20:17, 41:1, 43:14
**Ranges** [3] - 10:15, 21:24, 43:21
**rape** [1] - 31:18
**rape-only** [1] - 31:18
**rather** [1] - 5:5
**rationale** [1] - 25:20
**reach** [2] - 26:10, 46:17
**reaction** [1] - 46:10
**read** [4] - 24:8, 34:9, 34:19, 34:20
**real** [1] - 21:18
**really** [16] - 11:9, 11:14, 11:23, 13:2, 14:18, 17:17, 19:14, 19:20, 22:6, 30:21, 30:25, 32:9, 35:19, 36:18, 45:4, 46:11
**reason** [3] - 12:6, 12:25, 17:21
**reasonable** [2] - 36:13, 38:2
**reasonably** [1] - 36:24
**reasoned** [1] - 5:14
**receive** [1] - 37:11
**received** [4] - 13:21, 14:21, 15:6, 15:25
**receives** [1] - 44:2
**recently** [1] - 12:3
**recidivate** [1] - 45:2
**recidivated** [1] - 26:15
**recidivism** [2] - 26:12, 26:16
**recognized** [2] - 26:13, 43:17
**record** [4] - 37:3, 37:8, 45:10, 47:18
**referring** [1] - 12:3
**reflected** [3] - 15:1,

15:2, 15:22
**reflecting** [2] - 12:8, 28:15
**reflects** [1] - 14:8
**refute** [1] - 36:9
**Regan** [2] - 33:13, 33:22
**regarding** [1] - 41:5
**regardless** [1] - 31:5
**regulation** [1] - 8:22
**Rehaif** [2] - 43:18, 43:22
**rehear** [1] - 7:13
**rejected** [10] - 25:21, 25:22, 27:1, 27:3, 27:6, 37:10, 39:2, 39:3, 39:5, 39:13
**rejection** [1] - 37:13
**relate** [1] - 25:11
**related** [3] - 40:1, 40:5, 40:15
**relates** [1] - 18:22
**relationship** [1] - 31:17
**relevant** [2] - 33:1, 35:23
**relied** [1] - 39:17
**removes** [1] - 28:16
**reoffend** [1] - 26:17
**repeat** [1] - 15:18
**reply** [1] - 4:10
**report** [1] - 20:13
**Reporter** [2] - 1:22, 47:23
**represented** [1] - 24:2
**request** [1] - 47:2
**require** [1] - 12:11
**requires** [2] - 17:17, 44:5
**reserves** [1] - 28:9
**resolve** [1] - 31:2
**respect** [6] - 10:4, 19:8, 27:8, 33:7, 36:19, 42:4
**respected** [1] - 19:14
**respectfully** [5] - 30:16, 33:5, 36:12, 46:7, 46:17
**respects** [1] - 3:24
**respond** [1] - 28:2
**response** [4] - 17:23, 37:7, 42:11, 43:9
**responsible** [3] - 36:23, 38:21, 40:6
**restitution** [1] - 14:24
**resulted** [1] - 10:20
**retired** [1] - 25:24
**return** [2] - 18:12,

40:19
**returns** [1] - 41:9
**revealing** [1] - 10:13
**review** [2] - 30:7, 35:8
**revisit** [1] - 26:24
**rid** [2] - 44:13, 44:25
**rights** [14] - 6:4, 10:3, 28:20, 41:16, 41:18, 42:3, 42:7, 42:9, 42:11, 42:19, 42:22, 42:24, 42:25, 45:9
**risk** [4] - 13:12, 16:2, 27:15, 34:10
**robber** [1] - 18:25
**role** [1] - 35:22
**room** [2] - 1:22, 20:25
**ROSEN** - 1:6
**roughly** [1] - 20:2
**RPR** [2] - 1:21, 47:23
**rule** [1] - 10:7
**run** [3] - 3:12, 12:19, 44:16
**running** [2] - 42:15, 42:16

# S

**safety** [4] - 10:1, 10:2, 25:17, 25:20
**satisfied** [1] - 29:14
**satisfies** [3] - 8:9, 10:1, 31:5
**satisfy** [1] - 12:12
**satisfying** [1] - 31:2
**scheme** [1] - 32:6
**scholarly** [2] - 34:8, 34:9
**scrutiny** [4] - 9:24, 25:14, 27:17, 38:14
**se** [2] - 18:3, 19:10
**seats** [1] - 2:3
**Second** [5] - 5:3, 6:22, 8:23, 28:22, 35:8, 43:3
**second** [7] - 9:7, 14:18, 16:14, 33:19, 36:7, 36:21, 40:17
**section** [1] - 18:18
**Section** [4] - 4:14, 5:12, 7:22, 44:3
**secures** [1] - 41:5
**see** [8] - 3:4, 3:5, 3:14, 18:13, 22:18, 25:25, 29:10, 47:8
**seeking** [1] - 40:10
**Senate** [2] - 33:14,

33:15
**Senator** [3] - 33:13, 33:22
**sense** [1] - 26:21
**sensitive** [1] - 34:15
**sent** [1] - 13:13
**sentence** [8] - 9:10, 13:21, 14:21, 14:22, 15:4, 15:5, 15:22, 15:24
**sentencing** [1] - 32:20
**separate** [3] - 16:12, 43:1
**separately** [1] - 6:14
**serious** [19] - 8:5, 12:9, 13:2, 15:13, 16:7, 16:25, 18:1, 18:3, 18:5, 18:6, 19:1, 28:15, 29:1, 29:2, 29:23, 29:24, 32:25, 33:6, 41:13
**seriousness** [1] - 33:12
**set** [2] - 2:4, 4:2
**sets** [2] - 6:22, 17:5
**setting** [1] - 22:11
**several** [1] - 13:24
**severity** [1] - 15:22
**sexual** [1] - 31:17
**shake** [1] - 15:12
**shape** [1] - 35:19
**share** [1] - 34:22
**shift** [1] - 23:10
**shifted** [1] - 29:19
**shifts** [1] - 8:23
**shooting** [1] - 26:20
**shoplifters** [1] - 18:24
**shorthand** [1] - 1:25
**show** [4] - 8:8, 8:21, 36:21, 43:23
**showing** [5] - 9:24, 9:25, 15:13, 45:8, 45:11
**shown** [1] - 40:9
**shows** [1] - 36:20
**side** [5] - 29:7, 29:16, 31:13, 32:11, 33:3
**sides** [1] - 35:17
**significant** [4] - 30:13, 31:4, 31:7, 33:17
**significantly** [2] - 27:12, 36:25
**similar** [1] - 27:7
**similarly** [1] - 41:8
**simply** [8] - 18:4, 18:20, 19:9, 27:22, 32:23, 37:8, 39:25,

45:5
**single** [2] - 12:17, 15:6
**sits** [1] - 20:12
**situation** [1] - 5:17
**six** [2] - 7:5, 34:1
**sketch** [1] - 6:9
**slightly** [1] - 21:4
**small** [2] - 10:15, 27:15
**snapshot** [1] - 23:19
**snippet** [1] - 34:20
**so-called** [3] - 35:22, 43:13, 43:18
**society** [4] - 13:3, 22:9, 23:20, 24:18
**solution** [1] - 32:13
**solves** [1] - 11:25
**someone** [5] - 16:17, 40:6, 44:1, 44:15, 45:1
**sometime** [1] - 43:20
**somewhat** [1] - 13:16
**soon** [1] - 44:12
**sort** [3] - 7:16, 21:24, 44:16
**speaking** [1] - 28:4
**specific** [12] - 22:24, 31:13, 31:18, 31:22, 36:6, 36:8, 36:10, 37:24, 38:1, 38:17, 38:18, 40:8
**specifically** [3] - 20:8, 20:14, 27:3
**specifics** [1] - 32:7
**specify** [1] - 20:17
**speech** [1] - 20:1
**speed** [1] - 35:3
**split** [2] - 6:5, 8:2
**stage** [5] - 4:2, 28:25, 29:15, 36:7, 36:21
**stamp** [3] - 10:14, 10:18, 11:1
**stamps** [2] - 20:14, 41:6
**standard** [4] - 31:5, 38:19, 40:8
**start** [4] - 4:9, 10:4, 26:20, 32:6
**State** [4] - 30:24, 30:25, 33:13, 33:22
**state** [17] - 4:21, 10:22, 22:20, 26:2, 31:21, 31:23, 32:21, 32:24, 41:20, 41:21, 41:24, 42:12, 42:13, 42:19
**state's** [2] - 20:1

**statement** [3] - 18:12, 18:22, 41:3
**statements** [1] - 40:24
**STATES** [2] - 1:1, 1:17
**states** [10] - 17:3, 20:5, 20:16, 21:16, 21:20, 22:21, 24:6, 30:22, 32:20, 41:22
**States** [2] - 1:6, 1:19
**stature** [1] - 32:22
**statute** [15] - 4:15, 4:19, 4:23, 5:3, 5:6, 21:22, 24:7, 31:21, 31:24, 31:25, 32:16, 32:22, 33:4, 33:14, 43:19
**statutes** [7] - 20:9, 22:15, 30:8, 31:14, 31:19, 31:20
**statutory** [1] - 31:18
**stay** [1] - 47:10
**stealing** [6] - 17:10, 17:11, 18:2, 18:24, 18:25, 28:9
**step** [32] - 7:19, 7:23, 8:3, 8:4, 8:7, 8:8, 8:15, 8:18, 8:23, 8:25, 9:21, 15:11, 18:3, 25:1, 25:5, 26:22, 27:19, 27:21, 29:17, 35:18, 35:20, 35:21, 37:22, 40:25, 45:4, 45:5, 45:8, 45:11, 46:17, 46:18
**steps** [4] - 8:11, 8:13, 37:21
**stick** [2] - 42:7, 47:3
**still** [6] - 12:18, 13:6, 18:19, 20:15, 21:9, 31:25
**stolen** [2] - 32:25, 34:2
**store** [1] - 37:9
**story** [3] - 17:15, 17:18, 17:20
**straight** [2] - 17:14, 29:11
**strange** [1] - 22:20
**straw** [10] - 35:22, 36:3, 36:20, 37:24, 38:8, 43:13, 43:18, 44:10, 46:9
**Street** [4] - 1:13, 1:15, 1:19, 1:23
**stressed** [1] - 11:22
**strong** [2] - 17:25, 30:18
**strongest** [1] - 19:24

**structure** [1] - 34:17
**struggling** [1] - 10:18
**stuck** [2] - 23:11, 29:8
**students** [1] - 47:7
**studies** [18] - 25:23, 25:24, 26:1, 26:2, 26:6, 26:9, 27:2, 27:4, 27:6, 27:9, 36:8, 36:14, 36:17, 38:16, 38:23, 39:5, 39:13, 39:17
**study** [9] - 26:11, 26:23, 27:7, 27:11, 27:13, 27:15, 39:17, 39:19
**suarez** [1] - 26:4
**subject** [5] - 23:2, 23:22, 31:25, 42:23, 44:12
**submit** [9] - 21:3, 21:9, 27:18, 29:14, 30:16, 33:6, 39:13, 40:15, 45:12
**submits** [1] - 46:17
**submitted** [1] - 41:9
**subsection** [1] - 41:7
**subsequently** [1] - 11:22
**substantial** [1] - 36:25
**substantially** [2] - 40:4, 40:15
**successful** [1] - 46:18
**sued** [2] - 44:14, 44:25
**suggest** [2] - 32:9, 32:12
**suggested** [1] - 25:19
**suggesting** [1] - 37:5
**suggestion** [2] - 31:3, 39:1
**suggests** [1] - 38:20
**Suite** [2] - 1:13, 1:19
**summary** [8] - 3:24, 28:14, 37:6, 45:5, 45:13, 46:11, 46:14, 46:19
**SUMMARY** [1] - 1:11
**super** [1] - 14:13
**supports** [1] - 30:1
**suppose** [2] - 14:5, 25:2
**supposed** [1] - 37:16
**supposedly** [1] - 34:9
**Supreme** [5] - 5:13,

35:13, 43:17, 43:25, 44:6
**surmise** [1] - 21:20
**surmising** [1] - 12:11
**surprisingly** [1] - 25:20
**suspect** [1] - 24:3
**sustain** [1] - 19:21
**Swede** [1] - 1:15
**swing** [1] - 30:22
**system** [3] - 17:19, 19:13, 19:16

## T

**table** [1] - 24:4
**tailored** [2] - 19:14, 38:18
**target** [1] - 20:8
**tax** [9] - 18:10, 18:11, 18:12, 18:13, 18:15, 18:16, 18:17, 33:17, 41:9
**taxpayer** [1] - 33:21
**taxpayer-funded** [1] - 33:21
**taxpayers** [1] - 33:17
**tea** [1] - 13:11
**teed** [1] - 17:14
**ten** [1] - 17:7
**tenet** [1] - 20:23
**term** [1] - 4:16
**terms** [6] - 8:15, 10:2, 22:8, 27:14, 32:18, 36:17
**test** [5] - 11:24, 12:1, 28:22, 41:1, 43:1
**tests** [1] - 27:1
**texts** [1] - 11:19
**THE** [106] - 1:1, 1:2, 1:10, 2:2, 2:14, 2:15, 2:16, 2:17, 2:21, 2:24, 3:3, 3:6, 3:9, 3:11, 3:22, 4:11, 4:17, 5:24, 6:1, 6:9, 6:12, 6:23, 7:1, 7:4, 7:8, 7:14, 8:10, 8:13, 8:25, 9:3, 9:5, 9:7, 9:10, 9:15, 9:19, 9:21, 10:5, 10:7, 10:9, 11:9, 11:14, 12:10, 12:15, 13:9, 14:3, 15:8, 16:4, 16:13, 16:15, 16:17, 16:21, 17:13, 19:12, 20:20, 21:12, 22:5, 23:9, 23:22, 24:11, 24:23, 25:1, 25:13, 26:23, 27:23, 28:1, 28:5, 28:17, 29:4,

29:10, 30:21, 31:8, 32:2, 34:8, 34:13, 34:19, 35:2, 35:16, 36:3, 37:4, 37:12, 37:17, 38:3, 38:9, 38:25, 39:9, 40:20, 41:15, 41:20, 41:23, 42:2, 42:8, 42:15, 42:19, 42:22, 43:5, 43:8, 43:11, 44:23, 45:15, 45:20, 46:4, 46:8, 46:21, 46:23, 47:1, 47:13
**theft** [13] - 16:5, 16:10, 17:25, 18:5, 18:6, 19:5, 19:10, 20:9, 21:21, 21:22, 23:1, 41:12
**theme** [1] - 17:25
**theory** [1] - 8:2
**thereafter** [1] - 5:9
**therefore** [4] - 11:4, 18:3, 29:24, 46:18
**they've** [4] - 13:24, 14:9, 45:8
**thinks** [3] - 20:12, 35:23, 37:20
**Third** [14] - 5:10, 5:14, 6:8, 8:19, 11:25, 12:3, 12:4, 13:23, 14:7, 25:21, 25:23, 26:3, 26:13, 28:23
**third** [4] - 7:16, 9:10, 14:21, 33:10
**third-degree** [1] - 33:10
**thorough** [1] - 39:4
**three** [4] - 7:12, 7:16, 8:2, 10:15
**throughout** [1] - 25:8
**thumbs** [1] - 44:15
**tilt** [1] - 30:14
**timely** [1] - 3:24
**today** [4] - 6:18, 20:5, 23:17, 24:21
**today's** [1] - 46:10
**together** [1] - 46:10
**tomorrow** [1] - 26:19
**took** [1] - 37:22
**toss** [1] - 4:4
**total** [1] - 10:23
**totaled** [1] - 34:2
**totally** [1] - 19:17
**toting** [1] - 11:10
**tough** [1] - 11:15
**track** [1] - 8:10
**traffic** [3] - 2:19, 2:20
**train** [2] - 2:17, 2:22
**trajectory** [1] - 32:3
**transaction** [1] -

45:18
**Transcript** [1] - 1:25
**transcript** [1] - 47:17
**travel** [1] - 23:13
**treat** [2] - 13:20, 21:17
**treated** [4] - 22:18, 23:16, 23:17, 24:18
**treats** [1] - 13:3
**tried** [2] - 6:9, 34:9
**triggers** [1] - 11:5
**true** [7] - 19:9, 19:24, 24:13, 37:16, 37:20, 41:9, 43:23
**truly** [1] - 33:21
**trust** [1] - 21:23
**truthfulness** [1] - 16:19
**try** [2] - 21:25, 35:1
**trying** [9] - 21:12, 33:7, 34:11, 34:17, 34:24, 36:3, 42:2, 42:12, 42:13
**turn** [2] - 24:21, 35:19
**turning** [1] - 45:6
**turns** [1] - 31:8
**twice** [3] - 37:1, 37:9, 37:20
**two** [29] - 4:21, 6:23, 7:12, 7:19, 8:3, 8:8, 8:13, 8:15, 8:24, 9:21, 16:8, 25:2, 25:5, 26:22, 26:25, 27:5, 27:21, 29:14, 30:22, 33:16, 35:9, 35:20, 35:21, 39:5, 39:11, 45:4, 45:8, 45:11, 46:17
**two-step** [4] - 7:19, 8:3, 8:15, 35:21
**type** [8] - 14:20, 15:19, 18:23, 20:5, 20:10, 22:24, 24:4
**types** [1] - 5:4
**typical** [1] - 4:3
**typically** [3] - 5:15, 17:4, 46:1

## U

**U.S** [3] - 1:22, 3:7, 3:13
**U.S.C** [1] - 28:12
**unbelievable** [1] - 23:18
**unbelievably** [1] - 26:7
**uncertainty** [1] -

23:18
**unconstitutional** [1] - 28:13
**under** [8] - 4:22, 6:18, 10:23, 23:15, 30:9, 35:13, 41:8, 43:22
**underlying** [4] - 35:10, 39:8, 39:12, 41:1
**understood** [4] - 17:9, 28:21, 39:10, 46:3
**unfortunately** [3] - 22:13, 34:16, 44:24
**UNITED** [2] - 1:1, 1:17
**United** [2] - 1:6, 1:19
**unlike** [2] - 15:21
**unusual** [1] - 29:4
**unworkable** [1] - 32:13
**up** [13] - 3:6, 6:19, 11:4, 11:10, 17:14, 20:10, 26:22, 27:23, 28:11, 29:11, 29:22, 33:5, 36:14
**uphold** [1] - 11:11
**upset** [1] - 3:20
**upstairs** [1] - 29:11
**uses** [1] - 44:16

## V

**VA** [1] - 1:13
**valid** [1] - 4:25
**Valjean** [2] - 17:15, 19:8
**value** [1] - 33:17
**values** [1] - 12:8
**variety** [1] - 8:4
**various** [3] - 15:12, 22:16, 44:3
**vast** [1] - 30:14
**vehicle** [1] - 35:14
**versus** [2] - 2:5, 31:13
**via** [1] - 1:25
**Victor** [1] - 17:15
**view** [9] - 6:20, 13:1, 15:1, 15:2, 15:22, 20:19, 22:19, 28:3, 30:2
**views** [1] - 34:23
**violates** [2] - 5:3, 6:4
**violation** [4] - 5:1, 11:8, 44:6, 45:1
**violence** [5] - 9:7, 9:8, 14:19, 39:21,

39:23
**violent** [2] - 14:19, 26:7
**Virginia** [1] - 44:23
**virtue** [1] - 28:16
**virtuous** [3] - 28:18, 29:3, 47:6
**virtuousness** [1] - 28:22
**volley** [1] - 43:5
**vote** [2] - 22:10, 22:13
**voting** [6] - 41:18, 42:6, 42:11, 42:19, 42:24, 42:25
**vs** [1] - 1:5

## W

**wade** [1] - 34:9
**Wait** [1] - 26:3
**walked** [1] - 14:22
**walking** [2] - 28:19, 44:19
**warned** [1] - 40:9
**ways** [1] - 24:24
**weighs** [1] - 15:7
**weight** [5] - 12:6, 14:1, 14:7, 14:10, 21:11
**welcome** [1] - 2:21
**Welfare** [1] - 10:19
**welfare** [19] - 17:3, 18:8, 19:3, 20:8, 20:17, 26:18, 26:19, 28:8, 28:10, 28:14, 30:11, 31:23, 31:24, 33:25, 34:1, 34:3, 34:6, 39:14, 45:3
**well-understood** [1] - 17:9
**whole** [3] - 10:17, 16:21, 42:9
**wife** [6] - 10:16, 10:25, 37:22, 38:20, 43:14, 44:16
**wiggle** [1] - 21:12
**wilfully** [4] - 18:17, 18:20, 41:3, 41:4
**wILLIAM** [1] - 1:17
**willing** [1] - 33:18
**wins** [1] - 22:8
**Wintemute** [2] - 39:17, 39:19
**wish** [1] - 6:20
**word** [4] - 12:3, 22:6, 29:4, 29:8
**words** [2] - 14:2, 15:6

**world** [2] - 2:21, 18:9
**worse** [1] - 6:17
**worthy** [2] - 23:23, 47:6
**Wright** [2] - 27:10, 27:13
**write** [1] - 6:14
**wrote** [2] - 7:1, 39:19

## Y

**year** [2] - 4:21, 10:24
**years** [20] - 4:22, 5:11, 6:1, 10:11, 11:4, 13:13, 13:16, 13:17, 13:19, 15:23, 17:7, 23:16, 24:20, 26:13, 26:19, 28:12, 29:22, 33:5, 38:4, 43:21
**yield** [1] - 15:12
**yourselves** [1] - 2:3